**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

-------------------------------------------------------x

| | |
|---|---|
| TERRY HAMBY, individually, and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| MORGAN ASSET MANAGEMENT, INC.; REGIONS BANK; REGIONS FINANCIAL CORPORATION; SAMUEL W. BARTHOLOMEW, JR.; GEORGE W. BRYAN; DAVID J. COOPER; EARNEST W. DEAVENPORT, JR.; DON DEFOSSET; MARTHA R. INGRAM; RONALD L. KUEHN, JR.; JAMES R. MALONE; SUSAN W. MATLOCK; JOHN E. MAUPIN, JR.; CHARLES D. MCCRARY; ALLEN B. MORGAN, JR.; JACKSON W. MOORE; CLAUDE B. NIELSEN; JORGE PEREZ; C. DOWD RITTER; JOHN R. ROBERTS; LEE J. STYSLINGER III; SPENCE L. WILSON; HARRY W. WITT; BARBARA H. WATSON; PLAN ADMINISTRATOR OF THE REGIONS FINANCIAL CORPORATION—AMSOUTH BANCORPORATION THRIFT PLAN; DOES 1-100, | |
| Defendants. | |

-------------------------------------------------------x

## COMPLAINT

## INTRODUCTION

Plaintiff Terry Hamby brings this action, individually and on behalf of all others similarly situated, to recover losses to the Regions Financial Corporation-AmSouth Bancorporation Thrift Plan ("Plan") and the participants and beneficiaries of the Plan for whose benefit the fiduciaries

of the Plan imprudently converted, purchased, held, or otherwise invested in Regions Financial

Corporation common stock ("Regions Stock") between November 4, 2006 and the date that

Regions discloses the full impact of its financial problems, which will be determined through

discovery (the "Class Period").  Class Members work or worked for Regions Financial

Corporation (and its predecessor AmSouth Bancorporation) (collectively, the "Company") and

are Plan participants (and their beneficiaries) for whose account Plan fiduciaries acquired or held

shares of Regions Stock during the Class Period.

With respect to all factual matters pled herein except those regarding her own

circumstances, Plaintiff alleges the following upon information and belief:

## NATURE OF ACTION

1.      This class action asserts claims under the Employee Retirement Income Security

Act of 1974, as amended ("ERISA"), including ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109

and 1132(a)(2), to recover losses to the Plan arising from the imprudent investment of Plan assets

in Regions Stock, and under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to the extent that

additional equitable relief is needed to protect the interests of Plan participants and beneficiaries.

Once these losses are restored to the Plan, Plaintiff requests that the amounts restored be

distributed among the class members' current and prior accounts in a manner that the Court

deems proper and equitable.

2.      The defendants were or are ERISA fiduciaries of the Plan during the Class Period,

whose responsibilities included, *inter alia*, selecting and monitoring the investments offered to

participants, and providing participants with complete and accurate information as to the risks of

each investment.  As more fully described below, the defendants were obligated to comply with

ERISA-imposed fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries.

3.       The defendants breached their ERISA fiduciary duties by, *inter alia*, (i) causing participants' retirement savings to be invested in Regions Stock when investing in it was imprudent because of: (a) the serious downturn in the housing market, which greatly increased the Company's exposure to losses in connection with its residential construction loans, subprime mortgage debt and other problem lending, and (b) the Company's incomplete and inaccurate public disclosures of its exposure to such losses and to losses resulting from certain of its RMK Select Funds' heavy investment in speculative and illiquid collateralized debt obligations or "CDOs" including unauthorized investments for those funds; and (ii) failing to provide complete and accurate information to participants regarding the soundness of investing their retirement savings in Regions Stock, particularly in light of the risks identified above.

4.       This action is brought to recover millions of dollars in losses to the Plan which Plaintiff alleges were caused by the defendants' fiduciary breaches.

## JURISDICTION AND VENUE

5.       This action is brought pursuant to the civil enforcement provisions of ERISA § 502, 29 U.S.C § 1132.  The Court has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1) as well as 28 U.S.C § 1331.

6.       ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1), provides for nationwide service of process.  As all of the defendants are residents of the United States, this Court has personal jurisdiction over them.

7.       Venue is proper in this District pursuant to ERISA § 502(e)(1), 29 U.S.C § 1132(e)(1), since Defendant Morgan Asset Management, Inc. has its principal place of

business in Memphis, Tennessee; and since many of the fiduciary breaches for which relief is sought are believed to have occurred in this District.  Venue is also proper in this District under 28 U.S.C. §1391(b) & (c) because some of the defendants reside in, have principal executive offices in, and/or regularly do business in, this District.

## PARTIES

8.      **Plaintiff Terry Hamby** is a resident of Pinson, Alabama.  She was employed by the Company from 1996 through December 3, 2007.  She is a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and her account was invested in the Regions Stock Fund during the Class Period until she withdrew her account balance from the Plan on January 30, 2008.

9.      **Defendant Morgan Asset Management, Inc.**  ("Morgan Management"), through several intermediary subsidiaries, is a wholly-owned subsidiary of Regions Financial Corporation.  Morgan Management is a registered investment adviser that served and serves as the investment advisor to the Regions Morgan Keegan Trust ("RMK Trust") division of Regions Bank.  Upon information and belief, Morgan Management is a party-in-interest to the Plan, managed the trust services to the Plan on behalf of Regions Bank and its RMK Trust division and, therefore, was a fiduciary of the Plan.  Morgan Management has a principal place of business in Memphis, Tennessee and is headquartered in Birmingham, Alabama.  Morgan Management maintains a number of offices throughout the South and manages more than $36 billion for institutions and high net worth individuals, including the Plan's assets.

10.      **Defendant Regions Bank**.  Regions Bank is an Alabama-chartered commercial bank which has its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama.  Regions Bank is a wholly-owned banking subsidiary of Regions Financial

4

Corporation and therefore a party-in-interest to the Plan.  Regions Bank operates some 2,000 banking offices and a 2,400-ATM network throughout sixteen Southern states, including Tennessee.  Regions Bank also does business as RMK Trust, and in that capacity is one of the nation's largest trust companies with more than $87 billion in assets.  Regions Bank serves as trustee for the Plan's assets and therefore is a fiduciary under ERISA § 403 with respect to the investment of Plan assets.

11.      **Defendant Regions Financial Corporation** ("Regions" or the "Company") is a Delaware corporation with its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama.  Regions is the successor by merger with several financial institutions, including Memphis-based Union Planters Corporation ("Union Planters"), which merged with Regions on July 1, 2004, and AmSouth Bancorporation, which merged with Regions on November 4, 2006.  Regions is a full-service provider of consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services, and is one of the nation's largest banks with $141 billion in assets as of November 2007.  Regions is a fiduciary of the Plan because it exercised authority over Plan assets and discretionary authority over Plan administration and management.

12.      **Defendants Members of the Regions Board of Directors.**  The members of Regions' Board of Directors ("Director Defendants") are Plan fiduciaries because they appointed the trustee, investment fiduciaries, and plan administrators for the Plan, and appointment of fiduciaries is a fiduciary function.  The Director Defendants (named below) are persons who serve or served on the Company's Board of Directors during the Class Period, and who knew or should have known about the facts and circumstances that rendered Regions Stock an imprudent retirement investment for Plan assets.  Specifically, the Director Defendants are:

a.      **Defendant Samuel W. Bartholomew, Jr.**  Since 2001, Defendant Bartholomew has served as a member of the Board of Regions ("Board") and the board of its predecessor company, Union Planters, and he has been a member of the Board's Risk Management Committee throughout the Class Period.

b.      **Defendant George W. Bryan**.  Since 1986, Defendant Bryan has served as a member of the Board and of the board of Union Planters, and he has been a member of the Board's Compensation Committee throughout the Class Period.

c.      **Defendant David J. Cooper**.  Defendant Cooper has served as a member of the Board since November 2006, and as a member of the Board's Nominating & Corporate Governance Committee during the Class Period.  Before November 2006, Cooper served as an AmSouth director.

d.      **Defendant Earnest W. Deavenport, Jr.**  Since 2006, Defendant Deavenport has served as a member of the Board and as Chair of the Board's Risk Management Committee, and he has been a member of the Board's Compensation Committee throughout the Class Period.  Before November 2006, Deavenport served as an AmSouth director.

e.      **Defendant Don DeFosset**.  Since November 2006, Defendant DeFosset has served as a member of the Board and he has been a member of the Board's Audit Committee throughout the Class Period.  Before November 2006, DeFosset served as an AmSouth director.

f.      **Defendant Martha R. Ingram**.  Since November 2006, Defendant Ingram has served as a member of the Board, and she has been a member of the Board's

6

Compensation Committee throughout the Class Period.  Prior to November 2006, Ingram served as an AmSouth director.

g.      **Defendant Ronald L. Kuehn, Jr.**  Defendant Kuehn was a Regions director from November 2006 to April 2007. Kuehn was also a member of Regions' Audit Committee from November 2006 to April 2007.

h.      **Defendant James R. Malone**.  Defendant Malone has served as a member of the Board since November 2006, and he has been a member of the Board's Audit and Risk Management Committees throughout the Class Period.  Before November 2006, Malone served as an AmSouth director.

i.      **Defendant Susan W. Matlock**.  Defendant Matlock has served as a member of the Board since 2002, and she has been a member of the Board's Compensation Committee throughout the Class Period.

j.      **Defendant John E. Maupin, Jr.**  Defendant Maupin has served as a member of the Board since July 2007, and he has been a member of the Board's Risk Management Committee since that time.

k.      **Defendant Charles D. McCrary**.  Defendant McCrary has served as a member of the Board since November 2006, he has been the Chair of the Board's Audit Committee, and a member of the Board's Nominating & Corporate Governance Committee throughout the Class Period.  Before November 2006, McCrary served as an AmSouth director.

l.      **Defendant Allen B. Morgan, Jr.**  Defendant Morgan began serving as a member of the Board in 2001, and as the Vice Chairman of Regions and Chairman of

Morgan Keegan & Company Inc.  –  the parent of Morgan Management – in 2003. Morgan retired from all three positions effective December 31, 2007.

     m.    **Defendant Jackson W. Moore**.  Defendant Moore has served as a member of the Board and a member of the board of Union Planters since 1986.  From May 2006 through January 2007, he served as Chairman of Regions and Regions Bank. On January 31, 2007, he became the Executive Chairman of Regions and Regions Bank. Moore retired from these positions effective December 31, 2007.

     n.    **Defendant Claude B. Nielsen**.  Defendant Nielsen has served as a member of the Board since November 2006, and has been Chair of the Board's Compensation Committee throughout the Class Period.  Before November 2006, Nielsen served as an AmSouth director.

     o.    **Defendant Jorge Perez**.  Since 2001, Defendant Perez has served as a member of the Board, and a member of the Board of Union Planters, and he has been a member of the Board's Nominating & Governance Committee throughout the Class Period.

     p.    **Defendant C. Dowd Ritter**.  Defendant Ritter has served as a member of the Board since November 2006.  Ritter has served as the President and Chief Executive Officer of Regions and Regions Bank since November 2006.  Before that, Ritter was Chairman, President, and Chief Executive Officer of AmSouth Bancorporation and AmSouth Bank.

     q.    **Defendant John R. Roberts**.  Since 2001, Defendant Roberts has served as a member of the Board and as a member of the board of Union Planters and he has

been Chair of the Board's Nominating & Corporate Governance Committee and a member of the Board's Audit Committee throughout the Class Period.

r.      **Defendant Lee J. Styslinger III**.  Defendant Styslinger has served as a member of the Board since 2003, and he has been a member of the Board's Audit and Compensation Committees throughout the Class Period.

s.      **Defendant Spence L. Wilson**.  Since 1996, Defendant Wilson has served as a member of the Board, and as a member of the board of Union Planters, and he has been a member of the Board's Risk Management Committee throughout the Class Period.

t.      **Defendant Harry W. Witt**.  Defendant Witt has served as a member of the Board since 2002.

13.      **Defendant Barbara H. Watson** is a Vice President of Regions Bank. She signed the Plan's 11-K form on behalf of the Plan and Regions Bank as Trustee on June 28, 2007. Upon information and belief, Watson serves as a Plan fiduciary who exercises authority and control over Plan assets and/or manages and administers the Plan.

14.      **Defendant Plan Administrator**.  The Form 5500 for the plan year ending December 31, 2005, dated July 27, 2006 (before the merger of AmSouth and Regions), names the AmSouth Benefits Committee as the Plan Administrator.  Plaintiff believes one or more persons and/or entities serve as Plan Administrator.  The pertinent facts regarding who or what entities actually served as Plan administrator are unknown to Plaintiff but can be determined from Plan records or from the Plan Administrator.  Such persons and/or entities constitute the Plan "administrator" as this term is defined in ERISA § 3(16), 29 U.S.C. § 1002(16).

15.      **Defendants DOES 1-100** are additional Plan fiduciaries whose exact identities and fiduciary functions will be ascertained through discovery.  The information and documents

on which Plaintiff's claims are based are, for the most part, solely within the defendants' possession and control.  Therefore, to the extent necessary and appropriate in light of discovery, Plaintiff will amend her Complaint or seek leave to amend to add such other fiduciaries as defendants.

## FACTUAL BACKGROUND

**A.**     **The Regions Financial Corporation –
            AmSouth Bancorporation Thrift Plan**

16.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  The Plan covers certain current and former employees of Regions who are former employees of AmSouth and affiliated companies.  According to the Plan's Form 5500, which all pension plans must file annually with the Department of Labor and Internal Revenue Service, the Plan had more than 15,000 participants as of December 31, 2005.

17.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that it provides for individual accounts for each participant and for benefits based solely upon the amounts contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts by other participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on amounts allocated to each participant's individual account.

18.     Plan participants are permitted to make employee contributions upon their date of hire.  Each year, participants are also permitted to contribute up to 80% of their pretax annual compensation, subject to Internal Revenue Code limitations.  Participants are also permitted to contribute or "rollover" distributions from other qualified benefit or defined contributions plans.

10

Participants are immediately vested in their contributions and in the actual earnings on those contributions.

19.     Prior to AmSouth's merger with Regions on November 4, 2006, the Plan offered as an investment the AmSouth Bancorporation Stock Fund, which consisted primarily of shares of AmSouth common stock.  The value of the AmSouth Bancorporation Stock Fund was reported as more than $187,000,000 as of December 31, 2005.

20.     All shares of AmSouth common stock – including those in the AmSouth Bancorporation Stock Fund – were converted to Regions Stock on the effective date of the merger, at which time the AmSouth Bancorporation Stock Fund in the Plan became the Regions Stock Fund.

21.     Regions makes matching contributions to the Plan, matching dollar for dollar each participant's pre-tax deferrals, and 50% of each participant's after-tax deferrals, up to a total of 4% of base compensation.  The Company's matching contributions are automatically invested in the Regions Stock Fund, which consists primarily of Regions Stock.  Participants are immediately vested in matching contributions made on their behalf.

22.     According to the Plan's Form 11-K for 2006, signed by Defendant Watson on June 28, 2007, the Plan included an employee stock ownership plan component.

23.     As reported on this Form 11-K, the value of Plan assets as of December 31, 2006 was $479,318,029; 43% of this amount, or $206,798,913, constituted investments in the Regions Stock Fund.

24.     During the Class Period, a number of funds were offered to Plan participants for investment of contributions.  Although from time to time the other funds that were offered for

11

investment were substituted or renamed, Defendants always offered the Regions Stock Fund to Plan participants.

25.     On February 29, 2008, Regions sent a notice to Plan participants that the Plan would be merged with the Regions Financial Corporation 401(k) Plan effective as of April 1, 2008.

**B.     Defendants Are Fiduciaries of the Plan**

26.     As specified in greater detail below, the defendants were Plan fiduciaries at all relevant times because:

       a.     they were so named;

       b.     they exercised authority or control respecting management or disposition of plan assets;

       c.     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

       d.     they had discretionary authority or discretionary control respecting management of the Plan.

27.     A person or entity is a fiduciary, even if a plan does not name him or it as such, or by its terms assign fiduciary duties to him or it, where by his or its conduct he or it engages in fiduciary activities.  To fulfill ERISA's express remedial purpose, the term "fiduciary" is to be construed broadly.  The test for whether a person (or entity) is a fiduciary is a functional one, based on conduct.  Those who have control over management of a plan or plan assets are fiduciaries regardless of labels or duties assigned by plan language.

28.     Defendant Regions Bank is a Plan fiduciary because it served as Plan "trustee" within the meaning of ERISA § 403, 29 U.S.C. § 1103.  According to the Plan's Form 11-K for

the fiscal year ended December 31, 2006, Defendant Regions Bank d/b/a/ RMK Trust "serves as corporate trustee and custodian of the Plan holding the Plan's investment assets and executing transactions therein."  Upon information and belief, Regions Bank was not a "directed trustee" within the meaning of ERISA § 403(a)(1), 29 U.S.C. §1103(a)(1).  Alternatively, to the extent that Regions Bank purported to be a directed trustee, it was improperly conflicted because it was deeply involved in the conduct complained of below, including but not limited to, facilitating or causing Regions' exposure to losses from residential construction loans and mortgages; failing to maintain adequate risk management; and failing to report on Regions' books and records the full extent of financial problems and risks related to the Company's involvement with the RMK mutual funds, which were heavily invested in overly risky Collateralized Debt Obligations or "CDOs" and other unacceptably low quality investments.

29.     Upon information and belief, Defendant Morgan Management served as an investment advisor to Regions Bank d/b/a RMK Trust.  Plaintiff does not know the precise distribution of duties between Morgan Management and the Trustee with respect to the Regions Stock Fund; however, both touted Regions Stock as a reasonably prudent investment.  Though RMK Trust operated pursuant to the trust powers of Regions Bank, upon information and belief, Morgan Management actually managed the delivery of trust services to the Plan on behalf of Regions Bank and its RMK Trust division.

30.     Defendant Plan Administrator serves as a fiduciary in its capacity as Plan Administrator.  As such, Defendant Plan Administrator is charged with general Plan administration which, among other things, includes communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.

31.    Regions is a fiduciary because, upon information and belief, at all relevant times, it had effective control over the activities of its officers and employees, including their plan-related activities.  Regions exercised ultimate discretionary decisional authority in all aspects of Plan administration, management and disposition of Plan assets, and appointment and removal of fiduciaries through its Board of Directors, its management employees, and/or Plan Administrator.

32.    Upon information and belief, the business and affairs of the Company, including its role as Plan fiduciary, are managed under the direction of its Board of Directors.

33.    The purposes and responsibilities of each Board committee are set forth in the respective charter of each committee.

34.    Defendants Bryan, Deavenport, Ingram, Matlock, Nielsen and Styslinger served on the Board's Compensation Committee.  According to the charter of the Board's Compensation Committee it has the authority and responsibility to:

- "Review periodically the administration of all of the Company's pension, profit sharing, and welfare employee benefit plans, other than executive compensation plans (collectively, "Benefit Plans")";

- "Select and appoint Plan administrators, trustees, Named Fiduciaries, actuaries and investment managers, and allocate assets of the Benefit Plans among investment managers, if any";

- "Consistent with the terms of the Benefit Plans, delegate, to the fullest extent permitted by applicable law, to the Company's Chief Executive Officer or body or committee the authority to make such selections appointments and allocations"; and

- "Establish and, as appropriate, review, the Benefit Plans' investment and funding policies and objectives."

35.    The fiduciary status of the Director Defendants arises from, *inter alia*, the Board's authority to appoint and remove Plan Administrators, trustees, Named Fiduciaries, actuaries and

14

investment managers.  Under ERISA, the duty to appoint and remove ERISA fiduciaries gives rise to a concomitant fiduciary duty to monitor at reasonable intervals the performance of the fiduciaries appointed to ensure that they are complying with plan terms and statutory standards, and are meeting plan needs.

36.     Upon information and belief, Regions, together with the Director Defendants and the Plan Administrator, exercised responsibility for communicating with participants regarding the Plan by drafting and disseminating various documents and materials related to the Plan, including but not limited to the Summary Plan Description ("SPD") and documents incorporated into the SPD.

**C.     During the Class Period, Regions Stock Was an Imprudent Investment for the Plan Due to the Ever Increasing Exposure to Losses from Its Residential Loan Portfolio and Its RMK Mutual Funds**

37.     On May 24, 2006, Regions signed a definitive merger agreement with AmSouth, pursuant to which Regions would purchase AmSouth for $10.5 billion.  On October 3, 2006, Regions and AmSouth shareholders approved the merger and on October 20, 2006, regulatory approval was received.  The transaction closed on November 4, 2006, at which time each share of AmSouth common stock was converted into 0.7974 of a share of Regions common stock. Shares of Regions Stock opened at $37.25 on Monday, November 6, 2006.

38.     Before and after the merger with AmSouth, Regions consistently touted itself as a sound financial institution, conservative in focus, with a stable portfolio that gave it the ability to manage risk in the real estate market.  Regions' self-portrait, and along with it the value of Regions Stock, has been badly battered by facts which were or should have been well known to Defendants for some time but which have been publically disclosed slowly and piecemeal over the last year and which disclosure may not be completed.

15

39.     Regions operated a subprime mortgage origination business through its wholly-owned subsidiary, EquiFirst Corporation ("EquiFirst").  Subprime mortgage lending involves issuing high or variable interest loans to individuals with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default, individuals who otherwise would not qualify under underwriting standards utilized by mainstream lenders. Beginning in 2004, many mortgage originators across the United States began to focus on so-called "innovative" subprime products that relied on, among other things, inappropriately lax underwriting standards and temporary payment reductions.  This new regime greatly increased risk for borrowers and lenders alike.  Between 2003 and 2005, loans to subprime borrowers industry-wide increased from 8% to 20% of total originations.

40.     When home prices are appreciating and interest rates are low, subprime borrowers are generally able to stay current on their loans because their equity interest in their property is rising.  However, when housing prices depreciate, default rates increase, and can do so dramatically.

41.     As of December 31, 2006, EquiFirst held subprime loans for sale totaling $1.17 billion.

42.     In October 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration jointly issued the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("OCC Guidance").  The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms and underwriting

16

standards were consistent with prudent lending practices, which entail a credible analysis of a borrower's repayment capacity.

43.     The OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate.  For products like payment option ARMs that permit negative amortization, the OCC Guidance provided that a lender's underwriting analysis should be based on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan.

44.     The OCC Guidance also addressed the practice of relying on reduced documentation, particularly unverified income, to qualify borrowers for subprime mortgages. This practice substituted assumptions and alternative information for verified data in analyzing a borrower's creditworthiness and ability to pay.  Because such practices presented significant risk, including the risk of fraud, they were to be used sparingly.  Accordingly, the OCC Guidance cautioned, that reduced documentation should be accepted only where there were mitigating factors that minimized the need for verification of repayment capacity.

45.     Before the Class Period, defendants Ritter and Morgan, in particular, either knew or should have known that, in light of the Company's underwriting practices and problems in the real estate market, the credit quality of its residential loan portfolio was likely to deteriorate and it would sustain greater losses in the future from its residential loans.

46.     For example, in October 2006, the <u>American Banker</u> reported:

> The Southeast has been one of the nation's stronger markets for loan growth, but analysts said they plan to watch how banking companies there reserved for such growth in the third quarter.

In recent quarters the hot topic was margin pressure and its effects on earnings. But analysts and executives now call margin compression an obvious and inevitable headwind and are shifting their commentary to asset quality….

Paul Davis, "Reserves Under Microscope in Southeast," <u>American Banker</u>, October 16, 2006

(emphasis added).

47.     Notwithstanding this "obvious and inevitable headwind," the same article stated:

Regions Financial Corp., the first large Southeastern banking company to report earnings, gave little indication that it is preparing for a slide in credit quality.  The $87 billion-asset Birmingham, Ala., company said Friday that it increased its allowance for loan losses marginally from a quarter earlier, adding $25 million of provisions in the third quarter, compared with $24.3 million of net charge-offs.

48.     In a press release dated January 19, 2007, Regions announced earnings of

56 cents per diluted share for the fiscal quarter ended December 31, 2006.

49.     The January 19, 2007 press release also announced that Regions would be exiting

the subprime mortgage business by selling EquiFirst.  The same press release noted that

mortgage originations had increased notwithstanding "a challenging environment":

[T]he mortgage business continues to experience a challenging environment.  Mortgage originations increased to $4.9 billion in the fourth quarter, helped by the addition of AmSouth's mortgage business.  However, lower levels of loan sales and early payment default losses negatively impacted gain on sale fees and profitability at our non-conforming mortgage company, EquiFirst.

Today, January 19, 2007, Regions announced the signing of a definitive agreement to sell EquiFirst Corporation to Barclays Bank PLC.  The transaction is expected to close in the first half of 2007.

50.     In the press release, the Company's emphasized its "Strong credit quality":

**Credit quality remains strong**
Credit quality trends remain positive with net loan charge-offs of $56.1 million, or an annualized 0.27 percent of average net loans in the quarter.  Net loan charge-offs in the quarter include $11.0 million related to conforming certain credit policies.

Fourth quarter's provision for loan losses totaled $60.0 million.  The total reserve for credit losses was 1.17 percent of net loans at Dec. 31, 2006.  Total non-

performing assets at Dec. 31, 2006, were $379.1 million, or 0.40 percent of loans and other real estate, compared to a $312.0 million, or 0.52 percent at Sept. 30; the dollar increase was driven largely by assets acquired in the AmSouth merger.

See Regions Press Release, "Regions Reports Fourth Quarter 2006 Earnings," Jan. 19, 2007.

51.     The January 19, 2007 press release reinforced the picture Regions wished to portray to the market, i.e., that it was a conservative financial institution engaging in prudent risk management by ridding itself of exposure to the subprime lending market.

52.     The price that Regions was to receive in exchange for EquiFirst was first announced as $225 million. That amount was far less than the $1.17 billion of loans for sale that Regions showed on its books for EquiFirst as of December 31, 2006, just three weeks before.

53.     Shares of Regions Stock closed at $36.47 on January 19, 2007.

54.     On April 17, 2007, Regions reported earnings for the quarter ending March 31, 2007 of 65 cents per diluted share. In its April 17, 2007 press release, Regions emphasized that it had "Low credit losses of an annualized 0.20 of average loans":

**Credit losses remain low**

Net loan charge-offs declined to $46.0 million, or an annualized 0.20 percent of average net loans in first quarter 2007 compared to $56.1 million or an annualized 0.27 percent of average loans in fourth quarter 2006. Net loan charge-offs in the previous quarter included $11.0 million related to conforming certain credit policies between Regions and AmSouth.

The first quarter's provision for loan losses totaled $47.0 million. The total reserve for credit losses was 1.18 percent of net loans at March 31, 2007, up one basis point from the previous quarter. Total non-performing assets at March 31, 2007, were $422.5 million, or 0.45 percent of loans and other real estate, compared to $379.1 million, or 0.40 percent at Dec. 31, 2006. The increase in non-performing assets is primarily attributable to real estate loans for which Regions believes it is adequately reserved.

55.     Regions' press release quoted Defendant Dowd Ritter, its President and CEO, as stating:

"Our first quarter earnings demonstrate strong core results," said Dowd Ritter, president and chief executive officer. "This quarter was also marked by progress in our merger integration, including successful systems conversions and completion of required branch divestitures. In addition, we completed the sale of EquiFirst, our non-conforming mortgage origination business. This strong start to 2007 is tangible evidence that the many anticipated benefits of the merger are beginning to be realized."

56.     Regarding the sale of EquiFirst, the April 17, 2007 press release read:

On March 30, 2007, Regions completed the sale of its non-conforming wholesale mortgage originator, EquiFirst Holdings Corp., to Barclays Bank PLC. Thus, EquiFirst's first quarter results were reported as discontinued operations, and prior periods were reclassified accordingly. EquiFirst sustained a first quarter after tax net loss of $141.1 million (19 cents per diluted share). **The closing of the EquiFirst transaction essentially ends Regions' direct exposure to a business that had become increasingly difficult and was outside the company's strategic focus.**

Id. (emphasis added).

57.     Prior to completion of the EquiFirst sale, Regions recorded $142 million of after-tax losses which it later attributed to "significant and rapid deterioration of the sub-prime market during the first three months of 2007." Contrary to this assertion, the subprime market had begun to deteriorate long before the first quarter of 2007. In fact, by December 2005, banking regulators had identified the subprime mortgage industry as in distress.

58.     When the EquiFirst sale closed on March 30, 2007, the sales price received by Regions was further reduced to $76 million – significantly lower than the $225 million announced price – and Regions reported only a $1 million gain on the transaction. Moreover, the sale was "subject to final resolution of closing date values of net assets sold." More than eleven months later, the results of that resolution have yet to be completed or reported. While Regions recently stated in its 2007 10-K that it "believes any adjustments to the sales price will not have a material impact to the consolidated financial statements," the investment in EquiFirst and its subprime mortgages had a material impact on Regions during the class period.

59.     While Regions was touting its lack of exposure to subprime credit problems due to its sale of EquiFirst, its stock held steady, trading in the mid-30 range and closing at $34.21 on July 16, 2007.

60.     On July 17, 2007, Regions reported earnings for the quarter ending June 30, 2007 of 63 cents per diluted share.  The press release stated that mortgage revenue "improved by $3.8 million compared with the prior quarter despite the continuing operations challenges the entire mortgage industry faces."

61.     As it had in the two prior quarters, Regions emphasized that "Credit costs remain low with net charge-offs of an annualized 0.23 percent of average loans":

**Credit quality remains strong, non-performing loans begin to normalize**

Net loan charge-offs increased to $53.9 million, or an annualized 0.23 percent of average net loans in the second quarter of 2007 compared to $46.0 million or an annualized 0.20 percent of average loans in the prior quarter.

The second quarter's loan loss provision totaled $60.0 million.  The total reserve for credit losses was 1.19 percent of net loans at June 30, 2007, up one basis point from the previous quarter.  Total non-performing assets at June 30, 2007, were $585.0 million, or 0.62 percent of loans and other real estate, compared to $422.5 million, or 0.45 percent at March 31, 2007.  The increase in non-performing assets was driven partly by weaker demand for certain types of commercial real estate projects and also **by the implementation of one set of more prescriptive credit policies, including extensive credit file reviews, for the combined company.**

July 17, 2007 Press Release (emphasis added).

62.     The July 17 press release also stated, "[I]n an effort to manage interest rate sensitivity, approximately $1 billion of investment securities were sold at a loss of $32.8 million. A majority of the proceeds have been re-invested in higher yielding securities without extending duration . . . ."

63.     These announcements in the July 17, 2007 press release reinforced the impression that Regions was a conservative financial institution with a portfolio of high quality loans, and that it was actively managing risk by tightening underwriting standards and refinancing its investment securities in order to gain better interest rates.

64.     Over the next three months, Regions Stock dropped approximately 13%, closing at $29.13 on October 15, 2007.

65.     On October 5, 2007, *The Wall Street Journal* published an article titled "Mutual Fund Opens a Subprime Window – Regions Morgan Keegan Says One Is Down 35%; Pinch of Net Redemptions" which discussed the Regions Morgan Keegan Select High Income Fund.  The article reported that the fund was "at the bottom of the junk-bond fund category for the one-, three- and five-year annual performance periods…." According to the article, Regions intended to bail out the fund by purchasing $55.2 million in the fund's shares. The fund was down about 35% for that year.

66.     On October 16, 2007, Regions reported earnings for the quarter ending September 30, 2007 of 56 cents per diluted share.  Again, the Company emphasized that "Credit quality remains steady":

> **Net charge-offs of 27 basis points of average loans, non-performing assets at 62 basis points of loans and other real estate.**
>
> Net loan charge-offs increased to $63.1 million, or an annualized 0.27 percent of average net loans in the third quarter of 2007 compared to $53.9 million, or an annualized 0.23 percent of average net loans in the prior quarter.  The linked-quarter increase was primarily due to higher levels of consumer-related losses. **Regions continues to expect full-year 2007 net charge-offs in the mid-20s basis point range.**
>
> Third quarter's loan loss provision totaled $90.0 million. The total reserve for credit losses was 1.19 percent of net loans at September 30, 2007, consistent with the prior quarter.

22

Total non-performing assets at September 30, 2007, were $588.3 million, or 0.62 percent of loans and other real estate, compared to $585.0 million, or 0.62 percent at June 30, 2007. Regions sold or transferred to held for sale $76.6 million of non-performing loans during the quarter. The balance of loans migrating to non-performing status was primarily residential real estate related.

Id. (emphasis added).

67.     In the October 16, 2007 press release, Defendant Ritter was quoted as follows:

Business conditions continued to be less than optimal during the quarter, but **our conservative operating culture continues to serve us well in this challenging environment. Regions' underwriting standards and avoidance of higher-risk credit concentrations coupled with a strong capital position have been a buffer against recent turmoil in the credit and liquidity markets.**

Id. (emphasis added).

68.     The October 16, 2007 press release also stated:

Average total loans increased slightly linked-quarter; however loan demand in general continues to be sluggish. Home equity production was solid, but was offset by high levels of paydowns, neutralizing balance sheet growth. Account and balance retention tactics implemented during the second quarter have, however, begun to slow the pace of these paydowns.

69.     In an October 16, 2007 earnings conference call, Defendant Ritter made the following points:

There are other reasons why we feel that Regions is well-positioned. First and foremost, particularly in this environment, is Regions' conservative risk culture. This is perhaps best exemplified by what we do not have on our balance sheets. We have no negative amortizing mortgages, no option norms, very little in the way of subprime backed or high risk investment securities, only about $100m of subprime loans or less than 0.1% of the total loan portfolio and our Alt-A portfolio represents just 3.6% of the overall loan portfolio. As to credit quality, our loan portfolio products geographic, and sized diversification provides considerable protection from credit cycle downturns and we follow strict conservative underwriting standards. There is no doubt that our low tolerance for risk has caused us to give some potential loan growth in the past but it serves us very well in the current market. As an example, where home equity loans have been a troubled area for many banks lately, Regions is faring well.

70.     The third quarter earnings announcement followed the pattern of prior quarters – with Regions emphasizing its conservative risk culture, lack of subprime mortgage exposure, high credit quality and diversification of its loan portfolio.

71.     Over the next six weeks, Regions Stock dropped by nearly 19%, closing at $23.65 on December 31, 2007.

72.     Plaintiff's "Personal Progress Statement" for the period October 1, 2007 through December 31, 2007 reflects that Plaintiff's Regions account began the period with a value of $10,596.38 and lost $928.35 over the period, ending with a value of $9,981.49.

73.     Notwithstanding Regions' repeated pronouncements of its conservative risk culture, and the high credit quality and diversification of its loan portfolio, Regions announced on January 3, 2008 that it planned to increase its loan loss provision to approximately $360 million in the fourth quarter of 2007, an increase of approximately $270 million from the third quarter of 2007.  January 3, 2008 Press Release.  Regions also announced that charge-offs increased to 46 basis points for the quarter, and disclosed for the first time that residential construction loans constituted a full 8 % or $7.5 billion of its total loan portfolio of $95 billion.

74.     In its January 3, 2008 press release, the Company stated:

Regions' decision was prompted by weakening credit quality, primarily in its residential builder loan portfolio.  Fourth quarter 2007 net loan charge-offs and non-performing assets are expected to rise to approximately an annualized 46 basis points of average loans and 91 basis points of period-end loans and foreclosed properties, respectively.  The total allowance for credit losses is expected to be strengthened to about 1.45 percent of net loans at December 31, 2007, from the prior period's 1.19 percent.

"We are experiencing a sharp slowdown in real estate demand, especially in parts of Florida and Georgia, and are responding aggressively to counter its effects," said Dowd Ritter, chairman and chief executive officer.  "We are closely monitoring the impact of the declines in housing demand and values on our borrowers and are acting quickly to address current areas of weakness."

Residential builder loans represent approximately 8 percent, or $7.5 billion, of Regions' total portfolio of $95 billion.  In addition to increasing the loan loss provision, the company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers.  While Regions expects that these actions will help mitigate the overall effects of the credit down cycle, it also expects that weakness in the homebuilder segment will continue well into 2008.  Accordingly, it is anticipated that Regions' non-performing asset and charge-off levels will continue to increase as the year progresses.

75.     In a January 3, 2008 conference call, Defendant Ritter stated: "The velocity and the volume that has gone from 'performing' to 'in trouble' has done so at a very quick pace.  Projects that were viable, with good sales four and five months ago, are at zero activity today....  This is without a doubt the most challenging environment faced by the financial services industry in many years."  Russell Hubbard, "Bank Raises Bad-Loan Provision Ups Set-Aside for Bad Loans.  Trouble Real Estate Market the Cause," Birmingham News, January 4, 2008.

76.     Defendant Ritter also stated that prospective home buyers were having trouble finding loans, which led to an oversupply of housing and reduction in the value of residential property.  Regions lent money to some of the developers of that property, Ritter said, and now had to face the prospect that it would not be repaid for all of it.  Id.

77.     Regions Stock dropped another 10% after this announcement, closing at $20.80 on January 4, 2008, and dropped to a low of $17.90 on January 22, 2008, when Regions reported earnings for the quarter ending December 31, 2007 of 10 cents per diluted share.

78.     In the January 22, 2008 Press Release, Regions stated:

Net loan charge-offs increased to $107.5 million, or an annualized 0.45 percent of average net loans, in the fourth quarter of 2007 compared to $63.1 million, or an annualized 0.27 percent of average net loans in the prior quarter.  The linked-quarter increase was partially related to deterioration in the residential homebuilder loan portfolio, a result of the housing down cycle in some of the Company's markets, including Florida and Atlanta. Loans within Regions'

residential first mortgage and home equity portfolios continue to perform relatively well.

As previously reported, residential homebuilder loans represent approximately 8 percent, or $7.2 billion, of Regions' total portfolio of $95.4 billion.  In addition to increasing the loan loss provision, the Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers.  Approximately $850 million of loans have been identified to be managed by Regions' special assets department.

Indicative of the more challenging credit environment, the fourth quarter's loan loss provision totaled $358.0 million, or $250.5 million above actual fourth quarter net loan charge-offs.  The total reserve for credit losses was 1.45 percent of net loans at December 31, 2007, a significant increase over the prior quarter's 1.19 percent.

Total non-performing assets at December 31, 2007, were $864.1 million, or 0.90 percent of loans and other real estate, compared to $588.3 million, or 0.62 percent at September 30, 2007. Stress on the residential builder portfolio largely drove the quarterly increase.  Non-performing assets and net charge-off levels are expected to continue upward in 2008 as the depressed housing market further evolves.

79.     During a conference call on January 22, 2008, Defendant Ritter said that bankers identified $850 million of the $7.2 billion builder loan portfolio, as needing special attention and characterized  "those relationships" as ones that "we wish to exit."  Ritter also stated, "While I'm confident that we now have the right people and the right strategy in place to minimize our losses, we still expect both non-performing assets and loan charge-offs to rise this year."  David Flaum, "Profits take big tumble in Regions 4th quarter – Loans , merger costs, mutual fund losses figure in 'tumultuous' period," <u>Memphis Commercial Appeal</u>, Jan. 23, 2008.

80.     On March 28, 2008, Fitch Rating downgraded Regions' rating to "B."  Fitch stated in pertinent part as follows:

The Rating Outlook has been revised to Negative from Stable. A complete list follows below.

The downgrades and Outlook revision reflect Fitch's increased concerns regarding the company's asset quality, specifically its U.S. residential homebuilder portfolio. Contributing to the rating action, RF's [Regions'] profitability will likely remain pressured given asset quality deterioration and a challenging operating environment.

RF reported deterioration in its residential homebuilder loan portfolio, which represents approximately 8% of total loans. RF noted particular stress in several of the company's markets, including Florida and Atlanta. Much of the fourth quarter 2007 increase in NPAs was due to this portfolio. Based on expected pressure in the housing market, RF is projecting further deterioration in NCOs and NPAs, with full year NCOs between 0.55% and 0.65% and NPAs between 1.5% and 2% at year-end. In light of weaknesses in the homebuilder portfolio and the expected deterioration in NCOs and NPAs, Fitch intends to closely monitor RF's asset quality.

Although capital continues to be solid, capital ratios have fallen over the past several years. Capital management was considered aggressive in 2007 with a dividend payout ratio at nearly 83%. Combined with $1.4bn in share repurchases, RF paid out almost 192% of net income in the form of dividends and share repurchases. In an attempt to preserve capital during this challenging environment, RF indicated that it intends not to repurchase shares over the next several quarters. This action increases the prospect of internal capital generation in future periods. Given the uncertain environment expected in 2008, Fitch would view material share repurchase activity negatively.

Prolonged material asset quality worsening would likely result in a downgrade in RF's ratings, particularly if accompanied by a reduction in the company's capital position or loan loss reserves.

The affirmed ratings reflect the company's solid performance to date in its home equity and residential mortgage portfolios. RF reported 31bps in home equity NCOs in the 4Q07, which was below industry averages. The entire portfolio has been originated through the bank's branch network, as opposed to brokers, and a good percentage of home equity products are in first lien position. These two factors in part explain the strong performance to date in RF's home equity portfolio. Further, RF reported successful conversions of AmSouth Bancorporation's final branches during the 4Q07, and that cost savings continue to exceed expectations. Lastly, ratings were affirmed based on RF's solid funding base and strength of its franchise.

81.     In later 2007 and early 2008, Regions, its subsidiary Morgan Keegan & Co. Inc.,

and Morgan Management were named as defendants in securities class action lawsuits filed in

the United States District Court for the Western District of Tennessee on behalf of investors who

27

purchased shares of Regions Morgan Keegan Select Intermediate Bond Fund and the Regions Morgan Keegan Select High Income Fund (collectively the "RMK Select Funds" or "Funds"). See, e.g., Massey v. Morgan Keegan & Company, Inc., et al, 2:08-cv-02127-dkv (Complaint filed 2/26/2008); Willis et al v. Morgan Keegan & Company, Inc. et al, 2:07-cv-02830-SHM-sta (Complaint filed 2/21/2008); Gregory et al v. Morgan Keegan & Co., Inc. et al, 2:08-cv-02078-SHM-sta (Complaint filed 2/6/2008); Hartman et al v. Morgan Keegan & Company, Inc. et al, 2:08-cv-02071-dkv (Complaint filed 2/05/2008); Atkinson, M.D. et al v. Morgan Asset Management, Inc. et al, 2:07-cv-02784-SHM-dkv (Complaint filed 12/6/2007). The complaints alleged that the defendants misrepresented or failed to disclose material facts relating to the activities of certain of the RMK Select Funds.  Defendant Morgan Management served as investment manager for the Funds.  In March of 2008, a shareholders derivative action against various current and former directors and officers of Regions was removed to this Court, alleging that its $11.1 billion capitalization loss resulted from a series of improper, undisclosed actions. Olsen et al v. Regions Financial Corporation et al, 2:08-cv-02157-dkv (Complaint filed 3/11/2008).

82.     These cases have many facts in common with each other and with the instant case.  They all challenge Regions' practices along the lines alleged herein and give rise to substantial potential liability.

83.     During the Class Period, the RMK Select Funds invested heavily in CDOs and home equity loans and lost significant value due to the subprime mortgage crisis.  The Funds were also invested in other illiquid asset-backed securities.  As the subprime events unfolded in the fixed income markets in 2007, buyers for these financial instruments disappeared.  Both Funds sustained "stunning" losses, with the High Income Fund plummeting 56% and the

Intermediate Bond Fund falling 45%.  Andrew Tanzer, "Two Morgan Keegan Funds Crash and Burn," December 2007, available at Kiplinger.com.

84.     Due to excessive investment in CDOs, the Funds performed substantially worse than their peers.  Out of more than 400 other intermediate bond funds, and more than 250 other high income funds, none suffered losses this severe during the same time frame.  The Company's January 3, 2008 earnings press release revealed $38 million in projected losses to Regions from investments in Morgan Keegan funds, including the RMK Select Funds.

85.     Regions filed its 10-K for fiscal year 2007 on February 27, 2008.  The filing addressed the securities fraud suits by stating, "In late 2007 and early 2008, Regions and certain of its affiliates were named in class-action lawsuits filed in the United States District Court for the Western District of Tennessee on behalf of investors who purchased shares of certain Regions Morgan Keegan Section Funds."

86.     Regions had previously reported that the Morgan Keegan relationship was a source of financial growth and strength to the company and had not disclosed the particular risks that caused substantial losses to certain of its funds.  In contrast, the 2007 10-K reports that Regions **"cannot determine the probability of a material adverse result or reasonably estimate a range of potential exposures, if any."**  (emphasis added)  If Regions, a mammoth and sophisticated financial institution, was unable to assess risks related to problems in its management of its funds, employee-participants were in no position to evaluate those risks for purposes of determining whether Regions Stock was an appropriate retirement investment.

87.     On February 27, 2008, Regions announced that it had received requests for information from the Securities and Exchange Commission related to the RMK Select Funds run

by its Morgan Keegan brokerage and asset management unit, and that Morgan Keegan's CEO, Douglas Edwards would be stepping down in April 2008.

88.     The 2007 10-K also revealed loan losses from continuing operations that more than tripled from 2006 levels, increasing from $142.4 million by the end of 2006 to $555 million by the end of 2007.  Similarly during this same time, Regions nearly doubled its inventory of foreclosed property and real estate, going from $65.2 million by the end of 2006 to $120.5 million by the end of 2007.

89.     Throughout most of the Class Period, Regions described itself as maintaining a diversified loan portfolio.  In its 2007 10-K, however, Regions admitted that its $7.2 billion in residential homebuilder loans – fully 8% of its total loan portfolio – was a "concentration," and that "the weakness in the homebuilder portfolio is expected to continue well into 2008" because it "represented extensions of credit to real estate developers where repayment is dependent on the sale of real estate."

90.     Regions also reported that "the effects of recent mortgage market challenges, combined with the ongoing decrease in residential real estate market prices and demand, could result in further price reductions in home values, adversely affecting the value of collateral securing the residential real estate and construction loans that we hold, as well as loan originations and gains on sale of real estate and construction loans."

91.     Regions reported that between December 31, 2006 and December 31, 2007 its non-performing assets increased substantially from $484.9 million $864.1 million, "primarily due to weakness in the Company's residential homebuilder portfolio."  Regions previously disclosed its loan portfolio as diversified.  In fact, it was concentrated to the extent of 8% in

residential homebuilding.  Its loan portfolio had a direct and adverse effect on the Company's financials.

92.     Plaintiff believes that Regions failed to adequately disclose what it generally calls "off-balance sheet exposure."  This included sales of "commercial loans to qualifying special purpose entities known as 'conduits' in securitization transactions.  The conduits are financed by the issuance of securities to asset-backed commercial paper issuers.  The transactions are accounted for as sales and allow Regions to utilize its asset capacity and capital for higher-yielding interest-earning assets, while continuing to manage customer relationships.  At December 31, 2006, Regions had $431.7 million in such products, which, while a source of funding involve off balance sheet arrangements which have the potential to require Regions to provide funding to the conduits in the event of a liquidity shortage."

93.     In 2007, Regions sharply reduced its involvement in these off-balance sheet transactions.  Nevertheless, corporate balance sheets should properly disclose and make transparent the financial condition of the company.  The fiduciaries knew or should have known that Regions' off-balance sheet exposure was not and could not be known or evaluated by Plan participants, and required monitoring, disclosure, and prudent consideration by Regions, which was well aware of these risks.

94.     Public reporting and disclosure by Regions has been and continues to be in many material aspects so opaque as to render it incomprehensible to Plan participants.  In the most recent 10-K, for example, Regions reported that "one of the factors affecting non-performing assets to a lesser extent" was the impact of combining the credit policies and procedures of legacy Regions and AmSouth to form a single credit culture.  Yet Regions failed to identify the differences between these respective "credit cultures" and the impact of the differences,

including why losses might have resulted from them and whether any additional losses should be anticipated.

95.     Regions 2007 10-K states, "For residential real estate mortgages, home equity lending, and other consumer-related loans, individual products are reviewed on a group basis or in loan pools (e.g., residential real estate mortgage pool).  The total of all residential loans, including residential real estate mortgages and home equity lending, represents approximately 34 percent of total loans."  Reviewing such products on a group basis or in loan pools makes it impossible for Plan participants to know whether underwriting and credit quality standards were maintained for these loans.  Recent huge increases in underperforming loans indicate that Regions had undisclosed credit quality issues.

96.     The day after filing the Company's 2007 10-K, February 28, 2008, bad news for investors and plan participants continued as a major borrower, a condominium developer in Fort Lauderdale, filed Chapter 11 proceedings, leaving Regions and a lending partner with $18.6 million in unpaid loans.

97.     Regions has recently been downgraded by a number of analysts and credit reporting agencies.  S&P Equity Research downgraded Regions from Hold to Sell on January 31, 2008.  Citi's Greg Ketron downgraded its recommendation with respect to Regions to Sell on February 8, 2008.  In addition, Moody's downgraded Regions on March 11, 2008, citing concerns about commercial lending.  Such downgrades are likely to affect Regions' capital costs, its ability to raise capital and, in turn, its liquidity.

**D.     Defendants Breached Their Fiduciary Duties**

98.     At all relevant times after November 4, 2006, Regions, Regions Bank, Morgan Management, and each of the individual defendants in their capacities as directors of the

Company, knew or should have known in the exercise of prudence that Regions Stock was not a prudent retirement investment for the Plan due to Regions' undisclosed greatly increased and ever-increasing exposure to losses from its residential loan portfolio and from the RMK Select Funds' undisclosed heavy investment in CDOs and other highly speculative and illiquid investments.  The conduct, acts, omissions and knowledge of the individual defendants, particularly those of Defendants Ritter and Morgan, are imputed to Regions, Regions Bank, and Morgan Management.

99.     Despite knowledge of undisclosed problems with Regions' loan portfolio and/or failure to diligently and prudently investigate these problems along with Regions' financial condition and reporting,  defendant fiduciaries continued to publicly proclaim the high quality of Regions' loan portfolio and its sound financial condition and risk management, and continued to allow the Plan's fiduciaries to invest Plan assets in Regions Stock and to offer it for investment by participants, all of which these fiduciaries knew would be to the detriment of Plan participants for whose accounts Regions common stock was purchased and held at inflated prices.

100.    As fiduciaries, the defendants also had a duty to provide participants with complete and accurate information regarding the Plan's investment options, including the Regions Stock Fund and Regions Stock.  Defendants failed to do so here so that the participants could understand the risks presented by such investments and make informed investment decisions.

101.    Among other deficiencies, the defendants failed to provide participants with information regarding Regions' ever-increasing exposure to losses due to the rapidly deteriorating credit quality of its concentrated portfolio of residential construction loans, and of the Company's exposure to massive losses from its RMK Select Funds' heavy investment in

CDOs and other highly speculative and illiquid investments.  Because the defendants –
particularly Defendants Ritter and Morgan – failed to provide this and other material information
to participants, as a reasonably prudent impartial and unconflicted fiduciary would have done,
participants never were given information material to their decisions regarding what investment
options they should select in the Plan.

102.    Regions and the Director Defendants, as Plan fiduciaries with responsibility for
monitoring the Plan's other fiduciaries, failed to adequately review the performance of these
other fiduciaries to ensure that they were fulfilling their duties under ERISA.  These Defendants
also failed to provide the Plan's other fiduciaries, as well as the participants themselves, with
information regarding Regions' exposure to losses from its rapidly deteriorating residential loans
and its RMK Select Funds, so that these other fiduciaries and participants could make informed
investment decisions about the Regions Stock Fund.

103.    Because the defendants knew or should have known by the beginning of the Class
Period that Regions Stock was no longer a prudent investment option for the Plan while the
extent of Regions' financial problems were not disclosed and not reflected in the market price of
the stock, they had an obligation to protect the Plan and its participants from unreasonable and
foreseeable losses incurred from the Plan's investments in Regions Stock.  The defendants had
several vehicles available to them for discharging this obligation, including: (i) appropriate
public disclosure; (ii) halting new investments in Regions Stock; (iii) divesting the Plan of
Regions Stock; (iv) discontinuing the use of matching contributions to purchase Regions Stock;
(v) ceasing to offer the Regions Stock Fund as an investment option; (vi) notifying appropriate
federal agencies, such as the Department of Labor, of problems affecting Plan investment in
Regions Stock; (vii) consulting or retaining independent fiduciaries to advise them about

appropriate measures to prudently and loyally serve participants; and (viii) resigning as fiduciaries to the extent that, as a result of their employment by the Company, Regions Bank, or Morgan Management, they could not loyally serve participants regarding Plan's investments in Regions Stock.

104.    Despite the availability of these and other options, the defendants failed to take any action to protect participants from losses from the Plan's investments in Regions Stock.

## THE LAW UNDER ERISA

105.    **The Statutory Requirements**. ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; . . .  and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

106.    **The Duty of Loyalty**. ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries. . . ."

107.    The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur. A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or plan sponsor.

108.   **The Duty of Prudence**. Section 404(a)(l)(B) imposes on a plan fiduciary the duty of prudence, that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . ."

109.   **The Duty to Inform**. The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and, 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. The duties to disclose and inform recognize that a disparity may exist, and in this case did exist, between the training and knowledge of fiduciaries, on the one hand, and of Participants, on the other.

110.   **The Duty to Investigate and Monitor Investment Alternatives**. For pension plans such as this one, the duties of loyalty and prudence entail a duty to independently investigate and continually monitor the merits of the investments offered by the plan, such as the merits of offering employer securities, to ensure that each investment is a suitable option for the Plan.

111.   **The Duty to Monitor Appointed Fiduciaries**. Fiduciaries who have the responsibility for appointing other fiduciaries have a concomitant duty to monitor the fiduciaries they appoint. The duty to monitor entails giving information to, and reviewing the performance of, the appointed fiduciaries.  For defined contribution plans such as the Plan, monitoring fiduciaries must ensure that appointed fiduciaries:

36

a       possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

b.       are knowledgeable about Plan operations and goals, and the behavior and characteristics of Plan participants;

c.        are provided with adequate financial resources to discharge their duties;

d.       have adequate information to perform their duty of overseeing plan investments in employer stock;

e.       have access to outside, impartial advisors when needed;

f.       maintain adequate records which documents the information on which they based decisions and analysis of plan investment options; and

g.       report regularly to monitoring fiduciaries.

Monitoring fiduciaries must then review, comprehend and approve the conduct of the hands-on fiduciaries they appointed.

112.    **The Duty to Follow Plan Documents with Prudence**. A fiduciary may not avoid liability by rote reliance on the language of plan documents without considering its impact on his fiduciary duties. While the plan sponsor may specify the basic structure of a plan, within limits, the fiduciary may not blindly follow plan documents if it would lead to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § l104(a)(1)(D).

113.    **Non-Fiduciary Liability**. Non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

114.    **404(c) Defense Inapplicable.** ERISA § 404(c), 29 U.S.C. § 1104(c), provides a limited exception to fiduciary liability for losses that result from participants' exercise of control

over investment decisions, but not for the selection of imprudent investments for the Plan. Before § 404(c) will apply, it must be shown that participants in fact exercised "independent control" over investment decisions within the meaning of 29 C.F.R. § 2550.404c-1.

115.    As alleged, the defendants failed to provide participants with complete and accurate information regarding Regions Stock in the Plan and the financial condition of the Company.  The Department of Labor's § 404(c) regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant."  Accordingly, § 404(c) does not apply here, and the defendants remain liable for losses suffered by participants during the Class Period.

116.    In addition, § 404(c) does not apply to any losses resulting from Regions' matching contributions which were automatically invested by the defendants in the Regions Stock Fund, since participants did not exercise independent or any control over those investments.

117.    Because the information and documents on which Plaintiff's claims are based are, for the most part, solely within the defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  After Plaintiff has had the opportunity to conduct discovery, Plaintiff will to the extent necessary and appropriate amend her Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that support each of the following counts below.

## CLAIMS FOR RELIEF

## COUNT I

### Failure to Prudently and Loyally Manage Plan Assets

### (Breaches of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by Regions, Regions Bank, Morgan Management, and Defendant Watson)

118.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully set forth herein.

119.    At all relevant times, the defendants named in this Count acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and of the assets of the Plan.

120.    During the Class Period, Regions, Regions Bank, Morgan Management, and Defendant Watson knew or should have known that Regions Stock was not a suitable and appropriate investment for the Plan due to Regions' undisclosed exposure to losses due to the deteriorating quality of the its residential construction loans and mortgages, inappropriate investments in RMK Select Funds, and other problems.  Despite this, during the Class Period, these fiduciaries continued to offer the Regions Stock Fund as an investment option, and to direct and approve investment of matching contributions in Regions Stock.  Despite their knowledge of the imprudence of the investment because of the non-disclosures and inflated prices, Regions, Regions Bank, Morgan Management and Defendant Watson failed to take adequate steps to prevent participants from suffering losses as a result of the Plan's investments in Regions Stock.

121.    Upon information and belief, the defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, among other things: failing to engage independent fiduciaries that could make independent judgments regarding the Plan's investments in Regions Stock; failing to notify appropriate federal agencies, including the United

States Department of Labor, of the facts and transactions which made Regions Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and in each of these failures, by otherwise placing the Company's interests above those of the participants.

122.     As a direct and proximate result of these breaches of fiduciary obligations as alleged, the Plan, and indirectly Plaintiff and other Plan participants and beneficiaries, have lost millions of dollars.

123.     Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the defendants named in this Count are liable to restore the losses to the Plan caused by the defendants' breaches of their fiduciary duties.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by All Defendants)

124.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

125.     At all relevant times, the defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and of Plan assets.

126.     Because investment in the Regions Stock Fund was, by definition, not diversified, it carried an inherently high degree of risk.  This risk made the defendants' duty to provide complete and accurate information particularly important for the Regions Stock Fund and investments of Plan assets in Regions Stock.

127.    Regions, Regions Bank, Morgan Management, the Director Defendants, Defendant Watson, and the Plan Administrator breached their duty to inform participants by failing to provide complete and accurate information regarding Regions Stock, the extent of the Company's exposure to losses in connection with the deteriorating quality of its residential construction loans and mortgages, the Company's artificial inflation of the value of the stock, and, generally, by conveying inaccurate information about the soundness of Regions Stock and the prudence of investing retirement contributions in it.

128.    These actions and failures caused Plan participants and beneficiaries to make and maintain substantial investments in Regions Stock in the Regions Stock Fund at a time when the defendants knew or should have known that Regions Stock was not a prudent investment option for the Plan or Plan participants.

129.    As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other participants and beneficiaries, have lost millions of dollars.

130.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the defendants named in this Count are liable to restore the losses to the Plan caused by the defendants' breaches of their fiduciary duties.

## COUNT III

### Failure to Monitor the Plan's Fiduciaries

**(Breach of Fiduciary Duties in Violation of ERISA, 29 U.S.C. § 1104(a)(1) by Regions and the Director Defendants, and Against Regions Under Agency Principles)**

131.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

132.     At all relevant times, Regions and the Director Defendants acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), for the Plan because they were charged with, responsible for, and otherwise assumed the duty of, appointing, monitoring, and, when necessary, removing Plan fiduciaries, including but not limited to trustees, Plan Administrators, investment advisors, investment managers, and any other as yet unidentified Regions employees or agents to whom such duties were delegated.

133.     Regions and the Director Defendants breached their fiduciary duties by failing to adequately monitor the trustees, Plan Administrators, and other persons, if any, to whom management of Plan assets was delegated.  These defendants knew or should have known that the other fiduciaries were imprudently allowing the Plan to offer Regions Stock as an investment option, and investing plan assets in it, when it was not prudent to do so. Despite this, they failed to take action to protect Plan participants from the failures of these other fiduciaries.

134.     As a result of the Company's inappropriate and possibly unlawful practices, these fiduciaries, in discharging their monitoring and oversight duties, were required to disclose to other fiduciaries directly involved in investment of Plan assets accurate information about the financial condition and practices of the Company that these defendants knew or should have known the investing fiduciaries needed in order to make informed decisions.  By remaining silent and concealing such information from the other fiduciaries, these defendants breached their monitoring duties under ERISA.

135.     In summary, the defendants named in this Count breached their monitoring duties by:

            a.      failing to adequately monitor the investing fiduciaries' investment of Plan
                    assets;

b.      failing to adequately monitor the Plan's other fiduciaries' implementation of Plan terms, including but not limited to investment of plan assets in Regions Stock;

c.      failing to disclose to the investing fiduciaries material facts about the financial condition and practices of the Company that the defendants named in this Count knew or should have known were material to loyal and prudent investment decisions about the Plan's acquisition and retention of Regions Stock in the Regions Stock Fund, and with respect to implementation of Plan terms;

d.      failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets;

e.      failing to appropriately monitor the merits of investing Plan assets in Regions Stock;

f.      enabling or causing other fiduciaries to breach their duties, particularly in the investment of Plan assets, and disclosure of complete and accurate information about Regions Stock – the single largest investment in the Plan – due to their own failure to appropriately monitor the conduct of these other fiduciaries;

g.      knowingly participating in the investing fiduciaries' breaches and allowing these breaches to occur for the benefit the Company; and

h.      being aware of the fiduciary breaches of these other fiduciaries, in particular those of the directors, officers, and employees through whom the Company acted, and yet not making no effort to remedy the breaches.

136.    Regions is also liable for breaches of duty by the Director Defendants, Defendant Watson and the Plan Administrator and for the losses caused by them, under the law of agency, including principles of vicarious liability and *respondeat superior*; and Regions is liable as indemnitor of these defendants under corporate law and Regions' articles of incorporation and other documents of corporate governance.

137.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, have lost millions of dollars.

138.     Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the defendants named in this Count are liable to restore the losses to the Plan caused by the defendants' breaches of their fiduciary duties.

## COUNT IV

### Breach of Co-Fiduciary Duties

### (Breach of Co-Fiduciary Duties in Violation of ERISA § 405, 29 U.S.C. § 1105, by all Defendants)

139.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

140.     A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

141.     By virtue of all facts and events alleged herein, and at all relevant times, all Defendants, by failing to comply with their specific fiduciary responsibilities under Section 404(a)(1) of ERISA, 29 U.S.C. §1104(a)(1), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the

breaches. Accordingly, defendants are each liable for the others' violations pursuant to Section 405(a)(2) and (3) of ERISA, 29 U.S.C. § 1105(a)(2) and (3).

142.    Regions, Regions Bank, Morgan Management and the Director Defendants – and in particular defendants Ritter and Morgan – are liable under Section 405 because, among other things, they knew that the other defendants had breached their duties under Section 404 by continuing to offer the Regions Stock Fund as an investment option, and to direct and approve investment of matching contributions in Regions Stock, when it was imprudent and contrary to ERISA to do so, yet they failed to make reasonable efforts to remedy the situation. Moreover, these defendants are liable because their own failures to comply with their responsibilities under ERISA, as alleged, enabled the other defendants to commit fiduciary breaches by, among other things, continuing to offer the Regions Stock Fund when it was an imprudent investment.

143.    Regions, the Director Defendants, and Regions Bank also breached their co-fiduciary obligations by, among other failures, failing to appropriately monitor and control the Plan's other fiduciaries, including investing fiduciaries, and, as a result, allowing or even causing these other fiduciaries to fail to satisfy their duties in the prudent investment of Plan assets, and by being aware of other fiduciaries' failures to satisfy their duty to prudently and loyally manage the Plan assets, yet making no effort to remedy this.

144.    As a result of their breaches of Section 405 of ERISA, the defendants have caused the Plan to suffer financial losses for which they are jointly and severally liable, pursuant to Section 409 of ERISA.

## CLASS ACTION ALLEGATIONS

145. Plaintiff brings this class action on behalf of a Class defined as: All participants (excluding the defendants) in the Regions Financial Corporation—AmSouth Bancorporation Thrift Plan (the "Plan"), and their beneficiaries, for whose account Plan fiduciaries acquired or held shares of Regions Financial Corporation common stock during the period November 4, 2006 and the date that Regions discloses the full impact of its financial problems, which will be determined through discovery.

146. Class certification is appropriate under Rule 23(b)(1)(A) & (B) and 23(b)(2) of the Federal Rules of Civil Procedure.

147. The Class consists of more than 15,000 individuals and is so numerous that joinder of all members is impracticable.

148. There are questions of law and fact common to the Class, which include

a. Whether the defendants are fiduciaries;

b. Whether the defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to offer the Regions Stock Fund as an investment option at a time when the defendants knew or should have known that Regions Stock was not a prudent retirement investment;

c. Whether the defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to make and maintain investments in Regions Stock at a time as it was not prudent to do so;

d. Whether the defendants breached their fiduciary obligations to the Plan and participants by providing incomplete and inaccurate information to participants, and

by preventing participants from exercising "independent control" over investments in the Regions Stock Fund as a result;

e.      Whether the Company and the Director Defendants breached their fiduciary obligations to the Plan and participants by failing to prudently monitor the Plan's other fiduciaries, the investing decisions of the Plan, and the administration of the Plan, such that the interests of the Plan and Plan participants were adequately protected and served;

f.      Whether the Company and the Director Defendants, by failing to comply with their specific fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled and/or caused their co-fiduciaries to violate of ERISA and, despite knowledge of such breaches, failed to make reasonable efforts to remedy them, and are each liable for the others' violations pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).

g.      Whether as a result of fiduciary breaches by the defendants, the Plan, participants and beneficiaries have suffered losses.

149.    Plaintiff's claims are typical of the Class.

150.    Plaintiff will fairly and adequately protect the interests of the Class.  She has no interest that is antagonistic to or in conflict with the interest of the Class as a whole, and she has engaged competent counsel experienced in class actions and ERISA actions of this nature.

151.    This action is properly maintainable as a class action for the following independent reasons and under these portions of Rule 23:

a.      Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which would establish incompatible standards

of conduct for the defendants with respect to their obligations under the Plan.  Fed. R. Civ. P. 23(b)(1)(A).

b.      The prosecution of separate actions by members of the Class would create a risk of adjudications for individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1)(B).

c.      The defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.  Fed. R. Civ. P. 23(b)(2).

d.      Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

152.    There may be one or more putative or certified securities class action cases pending against the Company and certain other defendants.  The claims asserted herein are brought under ERISA and related principles of federal common law and are not and cannot be asserted by the plaintiffs in a securities class action, as they would not be Plan participants and would have no claims against Plan fiduciaries.  Accordingly, the named plaintiffs in any securities class action would not adequately represent the Plaintiff, the Plan or the Class herein with respect to ERISA claims.  Moreover, the named plaintiffs in a securities class action may be subject to defenses, stays of discovery, heightened pleading requirements, and limitations of liability under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1(b), and

153.    Finally, the plaintiffs in a securities class action cannot pursue under the federal securities laws all of the relief which the Plan and their participants are entitled to obtain under ERISA §§ 502(a) and 409, 29 U.S.C. §§ 1132(a) and 1109.  Therefore, the interests of the Plan and their participants cannot be adequately represented by class plaintiffs in a securities class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

2.    Declare that the defendants, and each of them, have breached their fiduciary duties to the Plan's participants and beneficiaries;

3.    Issue an order compelling the defendants to restore to the Plan all losses suffered by the Plan as a result of these breaches, including restoring the return on investments that the Plan, Plaintiff, participants and beneficiaries would have realized had Defendants discharged their duty of prudent and loyal investment of Plan assets;

4.    Order equitable restitution and other appropriate equitable monetary relief against the defendants;

5.    Award such other equitable or remedial relief as may be appropriate, including permanent removal of the defendants from any positions of trust with respect to the Plan and appointment of independent fiduciaries to administer the Plan;

6.      Enjoin the defendants, and each of them, from any further violations of ERISA fiduciary responsibilities, obligations and duties;

7.      Order the defendants or successor fiduciaries to allocate Plan recoveries to the accounts of all participants who had any portion of their account balances invested in the Regions Stock Fund in proportion to the accounts' losses attributable to the decline in Regions' stock price;

8.      Award Plaintiff attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

9.      Award such other and further relief as the Court deems equitable and just.

Respectfully Submitted,

Dated:  March 31, 2008                    /s/ Ellen M. Doyle
                                                          Ellen M. Doyle
                                                          edoyle@stemberfeinstein.com
                                                          William T. Payne
                                                          wpayne@stemberfeinstein.com
                                                          John Stember
                                                          jstember@stemberfeinstein.com
                                                          Stephen M. Pincus
                                                          spincus@stemberfeinstein.com
                                                          Joel R. Hurt
                                                          jhurt@stemberfeinstein.com
                                                          **STEMBER FEINSTEIN DOYLE &
                                                              PAYNE, LLC**
                                                          1705 Allegheny Building
                                                          429 Forbes Avenue
                                                          Pittsburgh, PA  15219
                                                          Tel.: (412) 281-8400

                                                          Jon C. Goldfarb
                                                          jcq@wcap.com
                                                          **WIGGINS, CHILDS, QUINN &
                                                              PANTAZIS, LLC**
                                                          The Kress Building
                                                          301 – 19th Street North
                                                          Birmingham, AL 35203
                                                          Tel.: (205) 314-0500