# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **IN RE REGIONS MORGAN KEEGAN ERISA LITIGATION** | Civil Action No.:  08-02192 (SHM) |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF ERISA** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ......................................................................................... 1

II.  NATURE OF ACTION ................................................................................ 1

III.  JURISDICTION AND VENUE .................................................................. 8

IV.  PARTIES ................................................................................................... 9

    A.  Plaintiffs ............................................................................................ 9

    B.  Defendants ...................................................................................... 11

—LEGACY PLAN DEFENDANTS— .................................................................. 13

—AMSOUTH THRIFT PLAN DEFENDANTS— ................................................ 18

—REGIONS 401(K) PLAN DEFENDANTS— .................................................... 21

V.  THE PLANS ............................................................................................. 24

    A.  Background ...................................................................................... 24

    B.  Plan Structures ............................................................................... 26

        1.  Plan Assets are Held in Trust ................................................ 26

        2.  Plan Eligibility ....................................................................... 26

        3.  Participant Contributions ....................................................... 28

        4.  Company Matching Contributions to the Plans ..................... 29

    C.  Funds in the Plans .......................................................................... 31

        1.  Regions Common Stock ......................................................... 32

        2.  Bond Funds ............................................................................ 33

        3.  RMK Select Funds ................................................................. 34

VI.  DEFENDANTS' FIDUCIARY STATUS .................................................. 35

    A.  The Nature of Fiduciary Status ...................................................... 35

    B.  Regions Financial Corporations' Fiduciary Status ........................ 37

i

C.     Regions Bank's Fiduciary Status ............................................................. 38

D.     All Plans' Compensation Committee Defendants' Fiduciary Status .................. 40

E.     Legacy Plan Benefits Management Committee Defendants'
Fiduciary Status ...................................................................................... 41

F.     Legacy Plan Benefits Administration Committee Defendants'
Fiduciary Status ...................................................................................... 42

G.     Additional Legacy Plan Defendants' Fiduciary Status ....................................... 43

H.     AmSouth Thrift Plan Benefits Committee Defendants' Fiduciary
Status ...................................................................................................... 43

I.     Additional AmSouth Thrift Plan Defendants' Fiduciary Status ......................... 44

J.     Regions 401(k) Plan Benefits Management Committee
Defendants' Fiduciary Status ................................................................... 44

K.     Regions 401(k) Plan Investment Committee Defendants' Fiduciary
Status ...................................................................................................... 46

VII.     FACTS ............................................................................................................. 46

A.     Regions Common Stock ........................................................................... 46

1.     The Rise of Subprime Lending ................................................. 47

2.     During the Company Stock Subclass Period, Regions
Common Stock Was an Imprudent Investment for the Plans
Due to Regions' Real Estate Loan Portfolio ............................. 53

3.     Regions Failed to Reserve For Losses ..................................... 57

4.     Regions Failed to Manage Its Risk Properly .......................... 61

5.     Regions' Securities Portfolio Contains Massive Exposure
to Risky Mortgage-Backed Securities ..................................... 62

6.     Regions' Imprudent and Improperly Disclosed Off-Balance
Sheet Exposure ......................................................................... 65

7.     Throughout the Company Stock Subclass Period, Regions
Failed to Value Properly its Goodwill ..................................... 67

8.     During the Common Stock Subclass Period, Regions
Common Stock Was an Imprudent Investment for the Plans

Due to the Company's Involvement in the Sale of Auction Rate Securities ........................................................................ 68

9.  Regions Faces Substantial Downgrades Due to Its Failed Business Practices ................................................................. 69

10. Defendants Knew or Should Have Known that Regions Common Stock Was an Imprudent Investment. ..................................... 71

11. Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Regions Common Stock in the Plans .......................... 73

B.  The Bond Funds Were Grossly Mismanaged ..................................... 76

1.  The Bond Funds Were Invested in High Risk Assets, Mortgage Backed Securities and CDOs ................................. 76

2.  During the Bond Fund Subclass Period, the Bond Funds Were Imprudent Investments for the Plans Because they Contained Mortgage and Asset Backed Securities and CDOs in Far Higher Percentages than was Appropriate Under the Circumstances ........................................ 78

3.  The Bond Funds' Over-Concentration in High Risk Mortgage Backed Securities and CDO Assets Comes to Light ........................................................ 83

4.  Defendants Selected the Bond Funds to Benefit Regions and its Subsidiaries Instead of Plan Participants ..................................... 88

5.  Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in The Bond Funds ............................ 89

C.  Excessive Fees and the RMK Select Funds ...................................... 91

1.  The RMK Select Funds Were Imprudent Investments for the Legacy and Regions 401(k) Plans During the Excessive Fee Subclass Period and Defendants' Fiduciary Breaches Have Caused the Plans to Incur Substantial Losses ............................. 91

2.  The Excessive Fees Charged by the RMK Select Funds Cannot Be Justified by Their Performance ........................................ 102

3.  Defendants Knew or Should Have Known That the RMK Select Funds Were Imprudent Investments .......................................... 102

iii

4.      Defendants Failed to Provide Legacy and Regions 401(k) Plan Participants with Complete and Accurate Information Regarding the Excessive Fees Associated With the RMK Select Funds ................................................................. 107

5.      Defendants Paid Themselves Unlawful Transactions Based on Their Selection of the RMK Select Funds as a Plan Investment Option ................................................................. 109

VIII.   THE RELEVANT LAW ................................................................ 111

IX.     CAUSES OF ACTION ................................................................. 117

—COUNTS RELEVANT TO THE COMPANY STOCK SUBCLASS— ........................... 117

Count I:  Failure to Prudently and Loyally Manage the Plans and the Plans' Assets ................................................................. 117

Count II:  Failure to Monitor Fiduciaries ................................................................. 123

Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries ................................................................. 126

Count IV: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries ................. 127

Count V:  Co-Fiduciary Liability ................................................................. 130

—COUNTS RELEVANT TO THE BOND FUND SUBCLASS— ........................................ 132

Count VI:  Failure to Prudently and Loyally Manage the Legacy and 401(k) Plans and the Plans' Assets ................................................................. 132

Count VII:  Failure to Monitor Fiduciaries ................................................................. 137

Count VIII:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries ................................................................. 139

Count IX: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Legacy and 401(k) Plans' Participants and Beneficiaries ................................................................. 141

Count X:  Co-Fiduciary Liability ................................................................. 143

—COUNTS RELEVANT TO THE EXCESSIVE FEE SUBCLASS— ................................. 145

Count XI:  Failure to Prudently and Loyally Manage the Legacy and Regions 401(k) Plans and the Plans' Assets ................................................................. 145

iv

Count XII: Failure to Monitor Fiduciaries.................................................................. 149

Count XIII: Breach of Fiduciary Duty: Failure to Provide Complete and
      Accurate Information to the Legacy and Regions 401(k) Plans'
      Participants and Beneficiaries.......................................................... 152

Count XIV: Co-Fiduciary Liability ............................................................. 154

Count XV: Prohibited Transactions Regarding Revenue Sharing and Other
      Kickback Payments............................................................................. 157

X.     CAUSATION ......................................................................................... 161

XI.    REMEDY FOR BREACHES OF FIDUCIARY DUTY ............................. 162

XII.   CLASS ACTION ALLEGATIONS ......................................................... 164

XIII.  PRAYER FOR RELIEF .......................................................................... 167

## I.    INTRODUCTION

1.      Plaintiffs Terry Hamby, Nancy Jackson, Robert H. Harrison, Ceasar L. Smith, Barbara Williams, and Gary Shamblin ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel.

## II.    NATURE OF ACTION

2.      This is a class action brought on behalf of three plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of and nonfiduciary parties in interest to the plans for violations of ERISA.

3.      The three plans at issue are retirement plans that are or have been sponsored by Regions Financial Corporation ("Regions" or the "Company").  Prior to a merger with AmSouth Bancorporation ("AmSouth"), Regions administered the first plan, the Regions Financial 401(k) Plan ("Legacy Plan"), for its employees.  On November 4, 2006, after Regions merged with AmSouth, Regions closed the Legacy Plan to contributions from new employees and began active administration of a second plan, the AmSouth Bancorp Thrift Plan (the "AmSouth Thrift Plan"), as the retirement plan for persons hired after January 1, 2007.  Thus, Regions actively maintained both the Legacy and AmSouth Thrift Plans, permitting investment in the Legacy Plan only by pre-merger Regions employees, and opening the AmSouth Thrift Plan to new hires.  On April 1, 2008, the Legacy Plan merged into the AmSouth Thrift Plan and the surviving plan, the third plan in this litigation, was renamed the Regions Financial Corporation 401(k) Plan (the "Regions 401(k) Plan").  *See* Regions Financial Corp. 401(k) Plan, Annual Report (Form 11-K) at 9 (Dec. 31, 2007) (hereinafter the "2007 Form 11-K").  The three plans are collectively called "Plans" or "Plan" herein.

1

4.     Defendants are fiduciaries of the Plans.  Plaintiffs' claims arise from Defendants' failure to act solely in the interest of the Plans' participants and beneficiaries, and to exercise the required skill, care, prudence, and diligence in administering the Plans and Plan assets.

5.     Defendants' failures involve three subclasses of Plan participants[1]:

The "Company Stock Subclass":  those Plan participants whose Plan accounts were invested in Regions common stock.  The class period for the Company Stock Subclass is from January 1, 2007 to the present ("Company Stock Subclass Period").

The "Bond Fund Subclass":  those Plan participants whose Plan accounts were invested in the various RMK Select Bond Funds[2] (the "Bond Funds"), which were investment alternatives for the Legacy and Regions 401(k) Plans.  The class period for the Bond Fund Subclass is from January 1, 2007 to the present ("Bond Fund Subclass Period").

The "Excessive Fee Subclass": those Plan participants whose Legacy and Regions 401(k) Plan accounts were invested in one or more of the RMK Select Funds.  The class period for the Excessive Fee Subclass is from May 1, 2003 to the present ("Excessive Fee Subclass Period").

---

[1] The three subclasses are defined with greater precision in ¶¶ 500-502 below.

[2] Within the Legacy Plan, the "RMK Select Bond Funds" include, but are not limited to:  Regions Morgan Keegan Select Balanced A; Regions Morgan Keegan Select Ltd Mat A; Regions Morgan Keegan Select Growth A; Regions Morgan Keegan Select Value A; Regions Morgan Keegan Select Fixed Income A; Regions Morgan Keegan Select Core Equity Fund; Regions Morgan Keegan Select MidCap Growth A; Regions Morgan Keegan Select MidCap Value A; Regions Morgan Keegan Select Treasury Money Market Fund; Regions Morgan Keegan High Income Fund; Regions Morgan Keegan Intermediate Bond Fund; and Regions Morgan Keegan Short Term Bond Fund.  The Legacy Plan also offered the following as investment options: Regions Common Stock; Federated International Max Cap Inst Fund; AIM Small Cap Growth A; and Fidelity Advisor Diversified Intl A.  2007 Form 11-K, at 10.  However the Regions 401(k) Plan reduced the number of funds available within the plan.  Specifically, it removed: Pioneer Value Fund; the RMK Select Core Equity Fund; the Pioneer Oakridge Fund; the RMK Select Mid Cap Value Fund; the Fidelity Diversified International Fund; the RMK Select Limited Fixed fund; and the RMK Select Money Market Fund.  R V Kuhns & Assocs. Plan Report, Feb. 22, 2008 at 1-2 (RMK00002049-00002050).  The following funds remained within the Plan, but frozen to new contribution: the RMK Select Fixed Income Fund; the RMK High Income Fund, the RMK Select Intermediate Fund; the RMK Select Short Term Fund; the Regions Stable Principle Fund; and the RMK Select LCV.  *Id.*

6.      Plaintiffs allege that during the subclass periods (collectively, "Subclass Periods"), Defendants imprudently permitted the investment of the participants' assets in:

(1)     Regions common stock, despite the fact that Defendants knew, or should have known, that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices (**Company Stock Subclass claims**);

(2)     the Bond Funds, despite the fact that Defendants knew, or should have known, that such investment was unduly risky and imprudent because the Bond Funds were overly invested in high-risk structured finance products including, among other things, mortgage-backed securities and Collateralized Debt Obligations ("CDOs") (**Bond Fund Subclass claims**); and

(3)     the RMK Select Funds, despite the fact that Defendants knew, or should have known, that such options caused the Legacy and Regions 401(k) Plans to incur excessive fees and expenses that substantially diminished the retirement savings of Legacy and Regions 401(k) Plan participants (**Excessive Fee Subclass claims**).

7.      In Count I,[3] Plaintiffs allege that the Defendants responsible for the investment of the Legacy, AmSouth Thrift, and Regions 401(k) Plans' assets breached their fiduciary duties to those Plans' participants in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Regions common stock.

8.      In Count II, Plaintiffs allege that for the Company Stock Subclass Period, the Defendants responsible for the selection, monitoring and removal of the other fiduciaries of the Legacy, AmSouth Thrift, and Regions 401(k) Plans failed to properly monitor the performance of their fiduciary appointees, and to remove and replace those whose performance was inadequate.

---

[3] A chart of the claims is included as Attachment A to this Consolidated Complaint.

9.      In Count III, Plaintiffs allege that, as to each Plan, Defendants with fiduciary duties to disclose necessary information to co-fiduciaries[4] breached their duties to provide their co-fiduciaries with complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in Regions common stock and the impact of such investments on participants' retirement savings.

10.     In Count IV, Plaintiffs allege that the Defendants responsible for communicating with each Plan's participants breached their duties to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in Regions common stock.

11.      In Count V, Plaintiffs allege that all Defendants with respect to each Plan breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

12.     In Count VI, Plaintiffs allege that the Defendants responsible for investment of the Legacy Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in the Bond Funds.

13.     In Count VII, Plaintiffs allege that for the Bond Fund Subclass Period, the Defendants responsible for the selection, monitoring and removal of the Legacy and Regions 401(k) Plans' other fiduciaries failed to properly monitor the performance of their fiduciary appointees, and to remove and replace those whose performance was inadequate.

---

[4] These defendants are defined *infra*.

14.     In Count VIII, Plaintiffs allege that as to the Legacy and Regions 401(k) Plans, Defendants with fiduciary duties to disclose necessary information to co-fiduciaries breached their duties to provide co-fiduciaries with complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in the Bond Funds and the impact of such investments on participants' retirement savings.

15.     In Count IX, Plaintiffs allege that the Defendants responsible for communicating with the Legacy and Regions 401(k) Plans' participants breached their duties to inform the Plan participants by failing to provide complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in the Bond Funds.

16.     In Count X, Plaintiffs allege that the Legacy and Regions 401(k) Plan Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other Legacy and Regions 401(k) Plan fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

17.     In Count XI, Plaintiffs allege that the Defendants responsible for the investment of the Legacy and Regions 401(k) Plans' assets breached their fiduciary duties to Plan participants in violation of ERISA by failing to prudently and loyally manage the Plans' investment in the RMK Select Funds.

18.     In Count XII, Plaintiffs allege that for the Excessive Fee Subclass Period, the Defendants responsible for the selection, monitoring and removal of the Legacy and Regions 401(k) Plans' other fiduciaries failed to properly monitor the performance of their fiduciary appointees, and to remove and replace those whose performance was inadequate.

19.     In Count XIII, Plaintiffs allege that the Communications Defendants of the Legacy and Regions 401(k) Plans, defined *infra*, breached their duties to provide the Plans' other

fiduciaries with complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in the RMK Select Funds and the impact of such investments on participants' retirement savings.

20.     In Count XIV, Plaintiffs allege that the Defendants responsible for communicating with the Legacy and Regions 401(k) Plans' participants breached their duties to inform the Plan participants by failing to provide complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in the RMK Select Funds.

21.     In Count XV, Plaintiffs allege that the Defendants responsible for the Legacy and Regions 401(k) Plans, including Morgan Keegan & Co. and Morgan Asset Management, two nonfiduciary parties in interest, engaged in prohibited transactions by causing the Plans to contract with Defendant Regions Bank d/b/a Regions Morgan Keegan Trust ("Regions Bank") in regards to the RMK Select Funds. Regions Bank is the Plans' trustee ("Trustee") and a party-in-interest, and received and continues to receive excessive fees, revenue sharing, and other "kickbacks" in contravention of ERISA § 406(a) and (b).

22.     As Regions' financial condition became known to the market, the Company's stock fell from $37.40 on January 1, 2007, to $2.64, at the close of the market on February 19, 2009, a decline of nearly 93 percent in share price during the Company Stock Subclass Period.

23.     In addition, two Bond Funds dramatically declined in value. The RMK Select Intermediate Bond Fund declined in value from $9.94 to $0.39 from January 1, 2007 to February 19, 2009, a decline of over 96% during the Bond Fund Subclass Period. The RMK Select High Income Fund declined in value from $10.14 to $0.65 from January 1, 2007 to February 19, 2009, a decline of over 93 percent during the Bond Fund Subclass Period.

24.     As more fully explained below, during all Subclass periods, Defendants imprudently permitted the Plans to hold and acquire millions of dollars in: (1) Regions common stock, despite the dire financial problems facing the Company; (2) the Bond Funds, because, although contrary to the Bond Funds' conservative fixed income design, the Bond Funds were heavily and imprudently invested in high-risk structured finance products; and (3) the RMK Select Funds, despite the fact that they incurred unreasonably expensive fees and were selected as Legacy and Regions 401(k) Plans investment options solely to benefit Regions, without regard for the best interests of Legacy and Regions 401(k) Plans participants.

25.     Based on publicly available information, Defendants' breach of duties have caused the Plans to lose million dollars of Plan participants' retirement savings, in violation of ERISA §§ 404(a)(1)(A) and (B), § 405(a) and § 406.

26.     This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

27.     ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by plans as a result of breach of fiduciary duties. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of participants and beneficiaries of the Plans whose Plan accounts: (1) were invested in Regions common stock at any time from January 1, 2007 to the present; (2) were invested in the

Bond Funds at any time from January 1, 2007 to the present; and/or (3) were invested in one or more of the RMK Select Funds at any time from May 1, 2003 to the present.

28.     Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity made on information and belief.  Plaintiffs have received only limited core plan documents from Defendants, and these limited documents have permitted only a narrow picture of the workings of the Plans and the specific actions of various Defendants.  Further, the Company has not yet issued its 2008 audited financial statements.   Once Plaintiffs have conducted full discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

### III.    JURISDICTION AND VENUE

29.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

30.     **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Tennessee.

31.     **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as some Defendants reside in, have principal executive offices in, and/or regularly do business in this District.  Further, many of the fiduciary breaches for which relief is sought are

believed to have occurred in this District.  Lawsuits by public investors challenging the

unauthorized and undisclosed risks of investments by the Bond Funds are also currently pending

in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because

Regions systematically and continuously does business in this District.

## IV.  PARTIES

### A.  Plaintiffs

32.     Terry Hamby is a resident of Pinson, Alabama.  She was employed by AmSouth

from 1996 until April 4, 2006, when AmSouth merged with Regions and she became a Regions

employee.  Ms. Hamby left employment with Regions in December 2007.  She is a "participant"

in the AmSouth Thrift Plan within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and her

account was invested in Regions common stock in the Regions Stock Fund until January 30,

2008.

33.     Nancy Jackson is a resident of Oakland, Tennessee.  She was employed by

Regions from July 2003 until December 31, 2007.  She is a "participant" in the Legacy and

Regions 401(k) Plans within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and her

accounts have been invested in Regions common stock in the Regions Stock Fund.  She is a

participant of the current Regions 401(k) Plan.

34.     Robert H. Harrison is a resident of Muscle Shoals, Alabama.  He was employed

by Regions from May 1999 until October 2007.  He is a "participant" in the Legacy Plan within

the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and his account was invested in Regions

common stock in the Regions Stock Fund and the RMK Select Funds during the applicable

subclass periods.

35.     Ceasar L. Smith is a resident of Memphis, Tennessee.  He was employed by Regions from November 1998 until March 2008.  He is a "participant" in the Legacy Plan within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and his account was invested in Regions common stock in the Regions Stock Fund and the following RMK Select Funds during the applicable subclass periods.

36.     Barbara Williams is a resident of Cumming, Georgia.  She was employed by Regions from July 11, 2002 to July 31, 2007.  She is a "participant" in the Legacy Plan, which merged with the AmSouth Plan and was renamed the Regions Financial Corporation 401(K) Plan, within the meaning of § 3(7) of ERISA, 20 U.S.C. § 1102(7), and her account was invested in Regions common stock in the Regions Stock Fund from at least July 11, 2003 to the present.  In addition, Ms. Williams' account was invested in the RMK Select Tr. Money Market-A Fund during the Excessive Fee Subclass period.  As a result, Ms. Williams is a member of the Company Stock Subclass and Excessive Fee Subclass.

37.     Plaintiff Gary Shamblin is a resident of Hoover, Alabama.  He began employment with Regions in August 1996 and remains a current employee.  He is a "participant" in the Legacy Plan and Regions 401(k) Plan within the meaning of § 3(7) of ERISA, 20 U.S.C. § 1102(7).  Mr. Shamblin's accounts were invested in Regions common stock in the Regions Stock Fund from at least January 1, 2007 to August, 2007.  Further, his account was invested in the RMK Select High Income Bond Fund from April 1, 2003 to August, 2007, and in the RMK Select Intermediate Bond Fund from January 4, 2005 to August 2007.  His account has been invested in one or more of the RMK Select Funds and one or more of the Bond Funds.  As a result, Mr. Shamblin is a member of all three Subclasses.

**B.     Defendants**

38.     **Defendant Regions Financial Corporation** is a Delaware corporation with its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama.  Regions is the successor by merger of several financial institutions, including Memphis-based Union Planters Corporation ("Union Planters"), which merged with Regions on July 1, 2004, and AmSouth Bancorporation, which merged with Regions on November 4, 2006.  Regions is a full-service provider of consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services, and, as of November 2007, was one of the nation's largest banks with $141 billion in assets.  Regions common stock is listed on the New York Stock Exchange and trades under the ticker symbol "RF."  As described more fully below, Regions is a fiduciary for the Plans.

39.     At all applicable times, Regions has been and is the Plan Sponsor of the Plans ("Plan Sponsor").

40.     At all applicable times, Regions has been and is plan administrator of the Plans ("Plan Administrator").

41.     Regions exercises discretionary authority with respect to management and administration of the Plans, and/or management and disposition of the Plans' assets, and is therefore a fiduciary to the Plans.  Regions acts through its board of directors ("Board of Directors" or "Board"), as well as through its officers, employees, and members of its administrative and/or investment committees appointed by Regions to perform Plan-related fiduciary functions.

42.     At all applicable times, Regions has had effective control over the activities of its directors, officers, and employees, including over their Plan-related activities.  Through its Board

11

of Directors or other means, Regions has had the authority and discretion to hire and terminate its officers and employees.

43. **Defendant Regions Bank** is an Alabama-chartered commercial bank which has its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama. Regions Bank is a wholly-owned banking subsidiary of Regions and therefore a party in interest to the Plans. Regions Bank is one of the nation's largest trust companies with more than $87 billion in assets. Regions Bank serves as Trustee for the Plans and therefore is a fiduciary under ERISA § 403 with respect to the investment of Plan assets. *See* Regions Financial Corporation 401(k) Plan Trust Agreement (March 25, 2008) at 1 (RFC00002544).

44. **Defendant Morgan Keegan & Co. (aka Regions Morgan Keegan)** is a wholly owned subsidiary of Regions Financial Corporation and is a regional brokerage and investment banking firm. It is a party in interest, as that term is used by ERISA. Morgan Keegan offers a variety of financial services and products, including the Regions Morgan Keegan Mutual Funds at issue in this Complaint. Morgan Keegan provides trust services pursuant to the trust powers of Regions Bank. Morgan Keegan is one of the largest investment firms in the South, employing approximately 1,300 financial advisors in various offices. It served or serves as the underwriter as well as the distributor of the Regions Morgan Keegan Select funds shares and as the shareholder servicing agent. It also served as the Administrator of the Trust for the Funds for which it receives a fee. Morgan Keegan also serves as the conduit for the payment of certain investment professionals of the funds. Morgan Keegan is a nonfiduciary party in interest that knowingly participated in breaching ERISA § 406(a) and (b), engaging in transactions prohibited by ERISA that caused substantial harm to the Plans. ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3). Though the exact relationship between the parent and subsidiary is not completely known and

subject to discovery, during the Subclass Periods, Allen Morgan served on both the Morgan Keegan & Co. Board and the Regions Board of Directors.

45. **Defendant Morgan Asset Management** is also a wholly-owned subsidiary of Regions Financial Corporation that provides investment management and advisement services. Up until mid-2008, it was the Investment Advisor to the RMK Select Funds. Upon information and belief, Morgan Asset Management has also provided investment services to the Plans during the Subclass Periods. It is a party in interest, as that term is used by ERISA. Morgan Asset Management is a nonfiduciary party in interest that knowingly participated in breaching ERISA § 406(a) and (b), engaging in transactions prohibited by ERISA that caused substantial harm to the Plans. ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3).

## —Legacy Plan Defendants—

46. **Legacy Plan Compensation Committee Defendants**. As explained in more detail below, the Legacy Plan Compensation Committee of the Regions Board of Directors was appointed by the Board and has oversight responsibility over the Legacy Plan. Specifically, the Compensation Committee has the "authority and responsibility to establish, administer, amend and terminate employee benefit plans for [Regions] and its subsidiaries . . . and to delegate certain of those responsibilities to individuals or a committee appointed by the Compensation Committee." Regions Meeting Minutes (July 14, 2004) at 1 (RMK00004971). Defendants identified in this paragraph are referred to collectively as the "Legacy Plan Compensation Committee Defendants." The Legacy Plan Compensation Committee appointed the Legacy Plan Benefits Management Committee. Plaintiffs list as John and Jane Does 1-20 the individual Legacy Plan Compensation Committee member defendants, because the documents identifying

these individuals are held by Defendants.  Once the Legacy Compensation Committee Members are identified, Plaintiffs will seek leave to join them under their true names.

47.    **Legacy Plan Benefits Management Committee Defendants**.  As explained more fully below, the Compensation Committee established the Benefits Management Committee, which has the "authority and responsibility" to amend the Plan, provide recommendations to the Compensation Committee regarding amendments to the Plan, and establish, amend, or terminate the Plan.  Compensation Committee Board Meeting Minutes (July 14, 2004) at 1 (RMK00004971).  The Benefit Management Committee owes a fiduciary duty to the Legacy Plan.  Through limited discovery of core plan documents, Plaintiffs have identified only a limited number of members of the Legacy Benefit Management Committee.  Plaintiffs list as John and Jane Does 21-40 those Legacy Plan Benefits Management Committee member defendants who remain unknown.  Once the additional Legacy Plan Benefits Management Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names.  The Legacy Plan Benefits Management Committee and its members (including John and Jane Does 21-40) are referred to collectively as the "Legacy Plan Benefits Management Committee Defendants."  Those members currently identified include:

A.    **Defendant Ken Alderman**.  Defendant Alderman was the Chairman of the Benefits Management Committee for the Legacy Plan as of at least September 17, 2004.  Defendant Alderman became a non-voting member as of at least June 7, 2007.  Benefits Management Committee Minutes at RFC00005067.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Alderman's service on the Committee.

B.    **Defendant Alan Deer**.  Defendant Deer was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Deer's service on the Committee.

C.    **Defendant Bryan Jordan**.  Defendant Jordan was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Jordan's service on the Committee.

14

D.  **Defendant Harry Dinken**.  Defendant Dinken was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Dinken's service on the Committee.

E.  **Defendant John Daniel**.  Defendant Daniel was a member of the Benefits Management Committee as of at least September 17, 2004.   Plaintiffs are without specific information as to the termination date, if any, of Defendant Daniels' service on the Committee.

F.  **Defendant David B. Edmonds**.  Defendant Edmonds was a member of the Benefits Management Committee as of at least December 28, 2006.  As of at least March 14, 2007, he was the Chairman of the Committee.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Edmonds' service on the Committee.

G.  **Defendant W. Charles Mayer, III**.  Defendant Mayer III was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Mayer III's service on the Committee.

H.  **Defendant William C. Wells, II**.  Defendant Wells II was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Wells II's service on the Committee.

I.  **Defendant O. B. Grayson Hall, Jr**.  Defendant Hall Jr. was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Hall Jr.'s service on the Committee.

J.  **Defendant Candice W. Bagby**.  Defendant Bagby was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Bagby's service on the Committee.

K.  **Defendant John Buchanan**.  Defendant Buchanan was a member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Buchanan's service on the Committee.

L.  **Defendant David Turner**.  Defendant Turner was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  As of at least August 15, 2007, Defendant Turner was a non-voting member of the Committee.  (RFC00005073).  Plaintiffs are without specific information as to the termination date, if any, of Defendant Turner's service on the Committee.

M.  **Defendant Jill Shelton**.  Defendant Shelton was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Shelton's service on the Committee.

N.    **Defendant Chris Glaub**.  Defendant Glaub was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Glaub's service on the Committee.

O.    **Defendant Alton E. Yother**.  Defendant Yother, previously identified as a Director Defendant, was a member of the Benefits Management Committee as of at least June 7, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Yother's service on the Committee.

P.    **Defendant Tim Laney**.  Defendant Laney was a member of the Benefits Management Committee as of at least August 15, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Laney's service on the Committee.

48.    **Legacy Plan Benefits Administration Committee Defendants**.  The Compensation Committee of the Regions Board of Directors also created and appointed the Legacy Plan Benefits Administration Committee, which was appointed as the Plan Administrator with responsibility to select Plan investments until at least February 2007.  The Compensation Committee granted the Benefits Administration Committee the authority to administer all employee benefit plans of the Company and its subsidiaries, and to establish procedures for such administration.  *See* Benefits Administration Committee Claims, *Procedure for Retirement and Non-Medical Benefits Determinations*, at 1 (RMK00001185).  This included the authority to oversee Plan administration, interpret Plan provision, issue rules and regulations, determine eligibility for benefits, decide claims, appoint consultants and advisors for the efficient administration of the Plan, maintain Plan records, file tax returns, and make recommendations to the Benefits Management Committee.   Compensation Committee Meeting Minutes (July 14, 2004) at 3 (RMK00004973).  Upon information and belief, the Benefits Administration Committee also had duties to communicate with Plan participants.  The identities of the Legacy Plan Benefits Administration Committee Defendants are largely unknown to Plaintiffs, although those who are known are listed below.  The remaining unknown members of the Committee are

named as John and Jane Does 41-60. Once additional Legacy Plan Benefits Administration

Committee Defendants are identified, Plaintiffs will seek leave to join them under their true

names. The Legacy Plan Benefits Administration Committee Defendants (including John and

Jane Does 41-60) are referred to collectively as the "Legacy Plan Benefits Administration

Defendants." The members currently identified are:

A. **Defendant Tusa McNary**. Defendant McNary was the chairperson of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006. Plaintiffs are without specific information as to the termination date, if any, of Defendant McNary's service on the Committee.

B. **Defendant Ronnie Jackson**. Defendant Jackson was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006. Plaintiffs are without specific information as to the termination date, if any, of Defendant Jackson's service on the Committee.

C. **Defendant Tom Thompson**. Defendant Thompson was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006. Plaintiffs are without specific information as to the termination date, if any, of Defendant Thompson's service on the Committee.

D. **Defendant Lea Stokes**. Defendant Stokes was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least April 5, 2005. Upon information and belief, Defendant Stokes was no longer a member of the Committee as of September 6, 2005. Plaintiffs are without specific information as to the termination date, if any, of Defendant Stokes' service on the Committee.

E. **Defendant David Godofsky**. Defendant Godofsky was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006. Plaintiffs are without specific information as to the termination date, if any, of Defendant Godofsky's service on the Committee.

F. **Defendant Sharon Davis**. Defendant Davis was a member of the Benefits Administration Committee as of at least September 6, 2005 through at least January 31, 2006. Plaintiffs are without specific information as to the termination date, if any, of Defendant Davis' service on the Committee.

49. **Additional Legacy Plan Defendants**. Through investigating Plan materials,

Plaintiffs have identified several persons and parties that are Plan Fiduciaries and Legacy Plan

Defendants. They are referred to herein as the "Additional Legacy Plan Defendants." They are:

A. **Defendant Dowd Ritter.** Defendant Ritter has been the Director of Regions since November 2006. He has also been the Chairman, President, and CEO of

Regions and Regions Bank since January 2008. As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the Legacy Plan with authority to appoint the Compensation Committee members.

B. **Defendant Harry J. Dinken**. In addition to serving on the Member Benefits Committee, Defendant Dinken was Plan Administrator to the Legacy Plan, as disclosed in the 2003 Form 5500, filed July 13, 2004. He was also designated as Plan Sponsor/Employer/DFE for that year.

C. **Defendant Tusa McNary**. In addition to serving as Chairperson to the Benefits Administration Committee, Defendant McNary was the Plan Administrator to the Legacy Plan according to the Form 5500 for the plan year ending December 31, 2004, which is dated October 14, 2005. Defendant McNary was also the Plan Administrator to the Legacy Plan for the plan year ending December 31, 2005, according to the Form 5500 dated October 11, 2005.

D. **Defendant Sherry Anthony**. Defendant Anthony was the Plan Administrator to the Legacy Plan according to the Form 5500 for the plan year ending on December 31, 2005, which is dated October 11, 2006.

E. **Defendant Christopher Glaub**. In addition to being a member of the Benefits Management Committee, Defendant Glaub was the Plan Administrator to the Legacy Plan according to the Form 5500 for the plan year ending on December 31, 2006, which is dated October 12, 2007. Defendant Glaub was also the Plan Administrator to the Legacy Plan for the plan year ending December 31, 2007 according to the Form 5500 dated August 27, 2008.

F. **Defendant John Daniel**. In addition to serving on the Benefits Management Committee, Defendant Daniel was Executive Vice President and Director of Human Resources of Regions Financial Corporation as of June 23, 2006. He signed the Legacy Plan's 11-K forms on behalf of the Plan on June 23, 2006 and June 28, 2005. Upon information and belief, Defendant Daniel served as a Plan fiduciary who exercised control and authority over Legacy Plan assets and/or managed and administered the Plan.

### —AmSouth Thrift Plan Defendants—

50. **AmSouth Thrift Plan Compensation Committee Defendants.** As explained more fully below, the Regions Compensation Committee has oversight responsibility over the AmSouth Thrift Plan. Defendants identified in this paragraph are referred to collectively as the "AmSouth Thrift Plan Compensation Committee Defendants." The AmSouth Thrift Plan Compensation Committee appointed the AmSouth Thrift Plan Benefits Management Committee.

Based on review of limited core plan documents obtained from Defendants, Plaintiffs allege that the Compensation Committee Defendants are as follows:

A. **Defendant Claude B. Nielsen**. Defendant Nielsen was the chairman of the Committee as of at least November 9, 2006. Defendant Nielsen is also identified as a member of the Director Defendants.

B. **Defendant George W. Bryan**. Defendant Bryan was a member of the Committee as of at least November 9, 2006. Defendant Bryan is also identified as a member of the Director Defendants.

C. **Defendant Earnest W. Deavenport, Jr**. Defendant Deavenport, Jr. was a member of the Committee as of at least November 9, 2006. Defendant Deavenport, Jr. is also identified as a member of the Director Defendants.

D. **Defendant Susan W. Matlock**. Defendant Matlock was a member of the Committee as of at least November 9, 2006. Defendant Matlock is also identified as a member of the Director Defendants.

E. **Defendant Martha R. Ingram**. Defendant Ingram was a member of the Committee as of at least November 9, 2006. Defendant Ingram is also identified as a member of the Director Defendants.

F. **Defendant Lee J. Styslinger III**. Defendant Styslinger III was a member of the Committee as of at least November 9, 2006. Defendant Styslinger III is also identified as a member of the Director Defendants.

51. **AmSouth Thrift Plan Benefits Committee Defendants**. As explained more fully below, the AmSouth Thrift Plan assigned the roles of Plan Administrator and named fiduciary to the AmSouth Benefits Committee. As Plan Administrators, the AmSouth Thrift Plan Benefits Committee members have full authority and power to administer and construe the AmSouth Thrift Plan; and to the extent not delegated to an Investment Committee, have the responsibility for selecting the investment funds in the AmSouth Thrift Plan; and responsibility for monitoring the performance of those funds. Through limited disclosures from Defendants, Plaintiffs have identified some of the AmSouth Thrift Plan Benefits Committee Defendants. Plaintiffs name unidentified Committee members as John and Jane Does 61-70. Once the identities of the AmSouth Thrift Plan Benefits Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names. The AmSouth Thrift Plan Benefits

Committee and its members (including John and Jane Does 61-70) are referred to collectively as the "AmSouth Thrift Plan Benefits Committee Defendants." Based on limited core plan documents obtained from Defendants, Plaintiffs allege that the following individuals were the AmSouth Thrift Plan Benefits Committee Defendants as of at least August 24, 2006:

A. **Defendant Edmonds**. Defendant Edmonds, previously identified as the Chairman of the Legacy Plan Benefits Management Committee *supra*, is identified as the Chairman of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

B. **Defendant Buchanan**. Defendant Buchanan, previously identified as a member of the Legacy Plan Benefits Management Committee *supra*, was a member of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

C. **Defendant Susan Martinez**. Defendant Martinez was a member of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief she retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

D. **Defendant Mayer III**. Defendant Mayer III, previously identified as a member of the Legacy Plan Benefit Management Committee *supra*, was a member of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

E. **Defendant Alton E. Yother**. Defendant Yother, previously identified as a member of the Legacy Plan Benefit Management Committee *supra*, was a member of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

F. **Defendant Rusty Stephenson**. Defendant Stephenson was a member of the AmSouth Benefits Committee as of at least May 11, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

52. **Additional Fiduciary Defendants**. Through investigating Plan materials, Plaintiffs have identified several persons and parties that are Plan Fiduciaries and AmSouth Plan Defendants. They are referred to herein as the "Additional AmSouth Plan Defendants." They are:

20

A. **Defendant Dowd Ritter.** Defendant Ritter has been the Director of Regions since November 2006. He has also been the Chairman, President, and CEO of Regions and Regions Bank since January 2008. As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the AmSouth Thrift Plan with authority to appoint the Compensation Committee members.

B. **Defendant Barbara H. Watson**. Defendant Watson was a Senior Vice President of AmSouth. She signed the form 11-K on behalf of the AmSouth Thrift Plan as a Trustee on June 29, 2007. Upon information and belief, Defendant Watson served as a fiduciary to the AmSouth Plan who exercised authority and control over Plan assets and/or managed and administered the Plan.

C. **Defendant Chris A. Glaub**. Defendant Glaub, previously identified as member of the Legacy Benefits Management Committee and Plan Administrator of the Legacy Plan, was the designated Plan Administrator to the AmSouth Thrift Plan for the year ending Dec. 31, 2006, as identified in the Form 5500 signed on October 12, 2007. He is also identified as the employer/plan sponsor/DFE for that year. Defendant Glaub was also the designated Plan Administrator to the AmSouth Thrift Plan for the year ending Dec. 31, 2007, as identified on the Form 5500 he signed on October 14, 2008. He is also identified as the employer/plan sponsor/DFE for that year.

**—Regions 401(k) Plan Defendants—**

53. **Regions 401(k) Plan Compensation Committee Defendants.** As explained more fully below, the Compensation Committee of the Regions Board of Directors is appointed by the Board and has oversight responsibility over the Regions 401(k) Plan. Defendants identified in this paragraph are referred to collectively as the "Regions 401(k) Plan Compensation Committee Defendants." The Regions 401(k) Plan Compensation Committee appointed the Regions 401(k) Plan Benefits Management Committee. On information and belief, the Regions 401(k) Compensation Committee Defendants are as follows:

A. **Defendant George W. Bryan** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

B. **Defendant Earnest W. Deavenport, Jr.** is a current member of the Compensation **Committee** and has served as a member since the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

C.	**Defendant James S.M. French** served as a member of the Compensation Committee as of the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

D.	**Defendant Martha R. Ingram** served as a member of the Compensation Committee as of **the** initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

E.	**Defendant Susan W. Matlock** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

F.	**Defendant Claude B. Nielsen** is a current member of the Compensation Committee and has **served** as a member since the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

G.	**Defendant Michael S. Starnes** served as a member of the Compensation Committee as of the **initiation** of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

H.	**Defendant Lee J. Styslinger III** is a current member of the Compensation Committee and has **served** as a member since the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

I.	**Defendant Kemmons Wilson, Jr.** served as a member of the Compensation **Committee** as of the initiation of the Regions 401(k) Plan. Defendant Bryan is also identified as a Director Defendant.

54.	**Regions 401(k) Plan Benefits Management Committee Defendants**. As explained more fully below, the Regions 401(k) Plan assigned the roles of Plan Administrator and named fiduciary to the Regions Financial Corporation Benefits Management Committee. As Plan Administrator, the Benefits Management Committee has full authority and power to administer and construe the Regions 401(k) Plan, and to the extent not delegated to an Investment Committee, has the responsibility for selecting the investment funds in the Regions 401(k) Plan and for monitoring the performance of those funds. The identities of the Regions 401(k) Plan Benefits Management Committee Defendants are currently unknown to Plaintiffs and are therefore named as John and Jane Does 71-80. Once the Regions 401(k) Plan Benefits Management Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names. The Regions 401(k) Plan Benefits Management Committee and its members

(John and Jane Does 71-80) are referred to collectively as the "Regions 401(k) Plan Benefits

Management Committee Defendants." Those members of the Committee currently known

include:

A. **Defendant Edmonds**. Defendant Edmonds, previously identified as the Chairman of the Legacy Plan Benefit Management Committee, is the Chairman of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Edmonds' service on the Committee.

B. **Defendant Hall, Jr**. Defendant Hall Jr., previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Hall, Jr.'s service on the Committee.

C. **Defendant Laney**. Defendant Laney, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Laney's service on the Committee.

D. **Defendant Wells**. Defendant Wells, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Wells' service on the Committee.

E. **Defendant Buchanan**. Defendant Buchanan, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Buchanan's service on the Committee.

F. **Defendant Irene Esteves**. Defendant Esteves is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Esteves' service on the Committee.

G. **Defendant David Rupp**. Defendant Rupp is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Rupp's service on the Committee.

55. **Regions 401(k) Plan Investment Committee Defendants**. As explained more

fully below, to the extent that the Regions 401(k) Plan Benefits Management Committee

appointed such a committee and delegated to it such authority, the Regions 401(k) Plan

Investment Committee Defendants have the responsibility for selecting the investment funds in the Plan and for monitoring the performance of those funds. The identities of the Regions 401(k) Plan Investment Committee Defendants are currently unknown to Plaintiffs and are therefore named as John and Jane Does 81-90. Once the Regions 401(k) Plan Investment Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names. The Regions 401(k) Plan Investment Committee Defendants (John and Jane Does 81-90) are referred to collectively as the "Regions 401(k) Plan Investment Committee Defendants."

56. **Additional Regions 401(k) Defendants**. Through investigating Plan materials, Plaintiffs have identified several persons and parties that are Plan Fiduciaries and Regions 401(k) Plan Defendants. They are referred to herein as the "Additional Regions 401(k) Plan Defendants." They are:

> A. **Defendant Dowd Ritter.** Defendant Ritter has been the Director of Regions since November 2006. He has also been the Chairman, President, and CEO of Regions and Regions Bank since January 2008. As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the Regions 401(k) Plan with authority to appoint the Compensation Committee members.

## V.   THE PLANS

**A.   Background**

57. As described above, three ERISA Plans are relevant to the allegations contained in this Complaint. All three Plans are related because, *inter alia*, Regions and many of the individual defendants were fiduciaries of one or more of the Plans during the Subclass Periods.

58. Regions has provided retirement benefits to eligible employees since it initiated the Legacy Plan on January 1, 1976. (REGIONS401(k)000486 (SPD)).

59. This remained true after Regions merged with Union Planters Corporation effective July 1, 2004 and with AmSouth Bancorporation effective April 4, 2006.

60.     After the Union Planters merger with Regions, the Regions Member Benefits Management Committee oversaw the merger of the Union Planters 401(k) Plan into the Legacy Plan.  Regions Benefits Administration Committee Minutes (January 31, 2006) at 1 (RMK00001202).  When the Plans merged, all Union Planter 401(k) funds were mapped over to the "Regions platform."  *Id.*  At the time, there were approximately 28,000 participants in the Union Planters 401(k) Plan.  *Id.*  Upon information and belief, those participants became vested members of the Legacy Plan with investment in the Regions Common Stock Fund as of at least January 31, 2006.

61.     The April 4, 2006 merger of Regions and AmSouth Bancorporation made Regions the Plan Sponsor of two plans simultaneously, the Legacy Plan and the AmSouth Thrift Plan.  Following the merger, Regions continued to operate the Legacy Plan, but limited it to employees hired by Regions before January 1, 2007.  (RFC00003453).  Regions continued to operate the AmSouth Thrift Plan for AmSouth employees hired by AmSouth prior to November 3, 2006, and for new Regions employees hired after the merger.  AmSouth Bancorporation Thrift Plan Summary Plan Description January 2007 ("AmSouth Thrift Plan SPD 2007") at 1 (RFC00003396);[5] *see* Regions Financial Corporation 401(k) Plan Amended and Restated Effective as of January 1, 2002, dated March 2008 (the "March 2008 Plan Document"), at 1 (REGIONS401(k)000185).

62.     Effective April 1, 2008, Regions merged the Legacy Plan and the AmSouth Thrift Plan, and changed the Plan's name to the Regions 401(k) Plan.  March 2008 Plan Document at 2 (REGIONS401(k)000186).

63.     This action is filed on behalf of participants in: (1) the Legacy Plan at any time from May 1, 2003 to April 1, 2008; (2) the AmSouth Thrift Plan at any time between January 1, 2007 and April 1, 2008 and whose 401(k) accounts were invested in Regions stock; and (3) the Regions 401(k) Plan since its inception on April 1, 2008.

## B.     Plan Structures

### 1.     Plan Assets are Held in Trust

64.     The Plans are defined contribution plans and are subject to the provisions of ERISA.  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, plans are neither defendants nor plaintiffs.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is on behalf of the Plans for the benefit of the Plans and their participants and beneficiaries.

### 2.     Plan Eligibility

65.     **Legacy Plan**.  As of January 1, 2003, participants were eligible to participate in the Legacy Plan as soon as they had completed three months of service.  Regions Financial Corp. 401(k) Summary Plan Description Effective January 1, 2003 ("Legacy SPD 2003") at 8 (RFC00005272).  Employees who were rehired immediately became eligible so long as they were eligible at termination.  *Id.*  In 2005, however, employees immediately became eligible to participate on the first day of the payroll period beginning after their initial date of employment, so long as the employee had entered a contribution election.  Regions Financial Corp. 401(k) Summary Plan Description January 2005 ("Legacy SPD 2005") at 6 (RFC00002213);

---

[5] Plaintiffs note that employees hired by Regions between November 4, 2006 and January 1, 2007 were eligible for either the Legacy Plan or the AmSouth Thrift Plan.

Addendum II to March 2008 Plan Document at 22 (REGIONS401(k)000361). Employees remained eligible until termination or transfer to a Regions affiliate that did not offer the Plan. Legacy SPD 2005 at 6. As of August 2007, employees hired after January 1, 2007 were not eligible to participate in the Legacy Plan. Regions Financial Corp. 401(k) Summary Plan Description August 2007 ("Legacy SPD 2007") at 6 (RFC00003453). However, employees hired before the merger with AmSouth on November 4, 2006 were eligible "in general." *Id.* Employees hired after November 4, 2006 but before January 1, 2007 were eligible to participate in the Plan if they were hired into a legacy Regions department. *Id.* With a valid contribution election, eligible employees could participate on the first day of the payroll period after their initial date of employment. *Id.* at 7 (RFC00003454).

66. **AmSouth Thrift Plan**. Prior to January 1, 2006, AmSouth employees became eligible to participate in the AmSouth Plan following their completion of 1,000 hours of service during the eligibility computation period. AmSouth Employees who were not participants on January 1, 2006 and employees hired on or after that date by AmSouth or by Regions after the April 4, 2006 merger were eligible to participate in the AmSouth Thrift Plan after completing one year of service. Effective January 1, 2007, any employee hired by AmSouth on or before November 3, 2006 or hired by Regions on or after November 4, 2006 became eligible to participate in the AmSouth Thrift Plan. AmSouth Bancorporation Thrift Plan Summary Plan Description January 2007 ("AmSouth Thrift Plan SPD 2007") at 2 (RFC00003396). This excluded associates hired on or after November 4, 2006 on the PeopleSoft payroll system. For

non-Highly Compensated Employees,[6] participation could commence on the first day of the month following the date of hire. *Id.* Highly Compensated Employees could participate following the completion of one year of service. *Id.* Employees paid by the hour who worked fewer than thirty hours per week were required to complete 1,000 hours before becoming eligible. *Id.* Effective January 1, 2008, Regions employees, excluding Highly Compensated Employees, were immediately eligible to make personal contributions to the AmSouth Thrift Plan. March 2008 Plan Document at 12, 29-30 (REGIONS401(k)000196; REGIONS401(k)000213-214).

67. **Regions 401(k) Plan**. Eligibility for the Regions 401(c) Plan differed from Legacy Plan eligibility. Employees who were participants in the Legacy Plan became eligible to participate in that Plan effective April 1, 2008, unless they are employed by a subsidiary that participates in a different plan. Regions Financial Corp. 401(k) Plan Summary Plan Description April 2008 ("Regions 401(k) SPD 2008") at 5 (REGIONS 401(k)000490). Similarly, prior participants in the AmSouth Thrift Plan are eligible to participate on the first day of the payroll period beginning after the date their enrollment is processed. *Id.* However, Highly Compensated Employees are only eligible after completing one year of service. *Id.* Employees who qualify as "seasonal workers," meaning those working for more than five months per year, are not eligible to participate in the Plan. *Id.*

### 3. Participant Contributions

68. Legacy Plan Participants were permitted to contribute up to 80 percent of their pretax annual compensation, subject to Internal Revenue Code limitations. Legacy SPD 2005 at

---

[6] The term "Highly Compensated Employees" is used herein as defined in the Internal Revenue Code.

7 (REGIONS401(k)000461); Regions 401(k) 2008 SPD at 6 (REGIONS401(k)000491); 2007

Form 11-K at 4; March 2008 Plan Document at 34 (REGIONS401(k)000218).  As of January

2005, AmSouth Thrift Plan participants, were only allowed to contribute up to 25 percent of pre-

tax salary to that Plan.   AmSouth Thrift Plan Summary Plan Description January 2005

("AmSouth SPD 2005") at 75 (RFC00006335).  After Regions became plan sponsor for the

AmSouth Thrift Plan, however, the contribution/deferral level increased to 80 percent of pretax

annual compensation.  AmSouth Thrift Plan Summary Plan Description January 2007

("AmSouth Thrift SPD 2007") at 2 (RFC00003396).  The Regions 401(k) Plan had the same 80

percent contribution/deferral limit.  Regions 401(k) 2008 SPD at 6 (REGIONS401(k)000491).

### 4.      Company Matching Contributions to the Plans

69.     Individual accounts are maintained for each participant and are credited with the

participant's contributions, Company matching contributions ("Company Matching

Contributions") and earnings.

70.     Legacy Plan participants were immediately vested in their contributions and

earnings on those contributions.  Legacy SPD 2003 at 15 (RFC00005278).  However, the Legacy

Plan required three years of service for an employee to become 100 percent vested in the

Company Matching Contributions.  *Id.*  Effective January 1, 2003, Regions made Company

Matching Contributions to the Regions Common Stock Unitized Fund.  *Id.* at 13

(RFC00005276).  Regions made matching contributions on a graduated scale based on up to 3

percent of a participant's Plan contributions.  *Id.*  For participants employed from three months

to four years, Regions contributed 150 percent of the first 3 percent that the participant placed

into the Plan.  *Id.*  For participants employed for between five and nine years, Regions

contributed 175 percent of the first 3 percent that the participant placed into the Plan.  *Id.*  For

participants employed for ten years or more, Regions contributed 200 percent of the first 3 percent that the participant placed into the Plan. *Id.* Company Matching Contributions were made with the same frequency as employee contributions. *Id.* at 14 (RFC00005277).

71.     Effective January 1, 2005, Company Matching Contributions to the Legacy Plan changed. Legacy SPD 2005 at 8 (RFC00002215). The Company agreed to match dollar-for-dollar the first 6 percent of pre-tax employee contributions not to exceed $12,600 in Company Matching Contributions in 2005, so long as the employee contributed at least 6 percent of his or her eligible compensation for each pay period. *Id.* If the employee contributed less, the Company calculated its matching contribution based on the employees' percent of compensation deferred into the Plan. *Id.*

72.     Effective August 1, 2007, Company Matching Contributions to the Legacy Plan changed again. Legacy SPD 2007 at 8 (RFC00003455). Employees with at least one year of service were to receive a matching contribution equal to 100 percent of the employee's pre-tax contribution, up to 6 percent of an employee's eligible compensation. *Id.* The maximum Company contribution for 2007 was $13,500. *Id.*

73.     As of January 1, 2005, AmSouth Thrift Plan participants were to receive a dollar-for-dollar match of up to 4 percent of their pre-tax compensation in a match of Regions common stock ("Company Stock Match"), and only 50 cents for every dollar of post-tax compensation added to a Plan account. AmSouth Thrift SPD 2005 at 76 (RFC00006336). Effective January 1, 2007, AmSouth Thrift Plan participants become eligible for Company Matching Contributions upon completion of one year of service. March 2008 Plan Document, at 31 (REGIONS401(k)000215).

30

74.     Effective January 1, 2007, Legacy and AmSouth Thrift Plan participants immediately became 100 percent vested in the Company Matching Contributions and were allowed to diversify out of the Company Stock Match that was held in the Regions Financial Corporation Stock Fund ("Regions Stock Fund") through April 1, 2008. 2007 Form 11-K at 4. Previously, participants could not diversify out of the Company Stock Match for one year. *Id.*

75.     Regions 401(k) Plan participants are immediately vested in their contributions and in the actual earnings on those contributions. Regions 401(k) 2008 SPD at 7 (REGIONS401(k)000492); Regions 401(k) 2007 Form 11-K at 5. For Regions 401(k) Plan participants with at least one year of service, Regions makes matching contributions equal to 100 percent of the participant's pre-tax contributions, up to 6 percent of eligible compensation, and will make a matching contribution equal to 50 percent of after-tax contributions, up to 6 percent of eligible compensation. The combined match is made, first, on pre-tax deferrals, and, second, after tax contributions, with the combined match limited to 6 percent. 2008 SPD at 7 (REGIONS 401(k)000483). Matching contributions are made in Regions common stock.

76.     For pre-Plan merger Legacy Plan participants, all Company Matching Contributions after January 1, 2005 are 100 percent vested and/or credited to participants' accounts. 2005 SPD at 9 (REGIONS401(k)000463); 2008 SPD at 8 (REGIONS401(k)000494).

C.     **Funds in the Plans**

77.     Throughout the three Subclass Periods, the Plans' fiduciaries, by and through the Legacy and Regions 401(k) Benefits Management Committees and the AmSouth Benefits Committee and as otherwise noted, selected the Plans' investment options. April 2008 SPD at 8 (REGIONS 401(K)000493).

78.     Selection of the Plans' investment options was a discretionary decision made by Defendants subject to the fiduciary duty requirements of ERISA.  Nothing in the Plans limits the ability of the Plans' fiduciaries to remove particular Plan investment options or divest assets invested in any Plan investment options as prudence dictates.

     **1.     Regions Common Stock**

79.      All three Plans have continued to offer Regions common stock in the Regions Stock Fund as an investment alternative.

80.     As reported in the 2007 Form 11-K, the Regions Stock Fund represented 36.5 percent of the Legacy Plan's assets at the end of 2006.  2007 Form 11-K at 2.  As reported in the 2007 11-K for the AmSouth Thrift Plan, the Regions Stock Fund represented roughly 43 percent of the AmSouth Thrift Plan's assets at the end of 2006.  As of September 30, 2008, roughly 20 percent of the Regions 401(k) Plan's assets were invested in the Regions Stock Fund. (RMK00002178).

81.     As a result of Regions' serious mismanagement and improper business practices, the stock price has decreased nearly 93 percent since the beginning of the Company Stock Class Period, causing hundreds of millions in losses to the Plans.

82.     Throughout the Subclass Periods, the Legacy Plan Benefits Administration Committee, the AmSouth Thrift Plan Benefits Committee, and the Regions 401(k) Plan Benefits Management and Investment Committees selected the investment options made available to participants of the Plan.  *See* Legacy Plan Document Amended and Restated as of Jan. 1, 2001, at 8 (REGIONS401(k)000013) (authorizing the Plan Administrator responsible for investment selection to "make a number of investment options available under the Plan, with a view to providing Participants and Beneficiaries investment options differing in anticipated risk and rate

of return"); Addendum 3 to Plan Document effective Apr. 1, 2008 at 9

(REGIONS401(k)000348). Thus the decision to offer Regions common stock as an investment

alternative is and has been discretionary—one made by the Plan fiduciaries.

83. Regardless of any language in the Plan documents purporting to mandate that the

fiduciaries offer Regions common stock, ERISA mandates that plan fiduciaries follow plan

documents only to the extent that they are consistent with ERISA's requirements. Accordingly,

the Legacy Plan Benefits Administration Committee, the AmSouth Thrift Plan Benefits

Committee, and the Regions 401(k) Plan Benefits Management and Investment Committees had

the authority and responsibility to require that Plan participants transfer their investment in the

Regions Common Stock Fund to another Plan investment option, and the authority and

responsibility to liquidate those investments, once it became imprudent to remain invested in the

Regions common stock and the Regions Common Stock Fund to the extent that it was comprised

of Regions stock.

### 2. Bond Funds

84. A variety of RMK Select Bond Funds were offered to the Bond Fund Subclass

members. In particular, two of the RMK Select Funds, the RMK Select High Income Bond Fund

and the RMK Select Intermediate Bond Fund (collectively the "Bond Funds"), offered as

retirement investments to participants in the Legacy and Regions 401(k) Plans, suffered huge

losses during the Bond Fund Subclass Period. As a result of the mismanagement of the Bond

Funds, the Bond Funds became far too risky an investment alternative for the Legacy and

Regions 401(k) Plans.

### 3. RMK Select Funds

85. During the Excessive Fee Subclass Period, the Legacy and Regions 401(k) Plans maintained several investment funds, the overwhelming majority of which were the RMK Select Funds.[7] Regions Financial Corporation 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2002) (hereinafter the "2002 Form 11-K") at Schedule H; Regions Financial Corporation 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2003) (hereinafter the "2003 Form 11-K") at Schedule H; Regions Financial Corporation 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2004) (hereinafter the "2004 Form 11-K") at Schedule H; Regions Financial Corporation 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2005) (hereinafter the "2005 Form 11-K") at Schedule H; Regions Financial Corporation 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2006) (hereinafter the "2006 Form 11-K") at 11; 2007 Form 11-K at 7.

86. The RMK Select Funds are advised and/or managed by subsidiaries and affiliates of Regions that are parties-in-interest.

87. Of the RMK Select Funds offered in the Legacy and Regions 401(k) Plans, three—the RMK Select Balanced Fund, the RMK Select Limited Government Maturity Fixed Income Fund, and the RMK Select Growth Fund—were offered to Plan participants even though those funds had no track record of investment performance that the fiduciaries (and participants) could review. The Mid Cap Value Fund had a relatively high expense ratio and estimated transaction costs of 3.48 percent of assets and, according to Morningstar, underperformed its category on both a 3 and 5 year basis. Three other funds also underperformed their categories according to Morningstar on a 3 and 5 year basis—RMK Select High Income, RMK Select Intermediate Bond, and RMK Select Short Term Bond. Despite these insufficiencies, and

without regard to the best interests of Plan participants, Regions offered these funds as Plans' investment options.

88.     On information and belief, Plaintiffs aver that the RMK Select Funds offered under the Legacy and Regions 401(k) Plans to Plan participants were not selected exclusively for the benefit of the Plan participants but rather were selected because of the income, fees and other benefits they would yield to Regions and its subsidiaries and affiliates.  A prudent investment selection and monitoring process would not have yielded this array of funds in the Plans.

## VI.     DEFENDANTS' FIDUCIARY STATUS

### A.     The Nature of Fiduciary Status

89.     **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

90.     ***De Facto* Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  A person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any

---

[7] See footnote 1 *infra* for list of RMK Select Funds.

discretionary authority or discretionary responsibility in the administration of such plan."

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

91.     Each Defendant was a fiduciary with respect to the relevant Plan and owed fiduciary duties to that Plan and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

92.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

93.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

94.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, on information and belief, Regions chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn selected Regions employees, officers and agents to perform most fiduciary functions.

95.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan Sponsor.

36

**B.      Regions Financial Corporations' Fiduciary Status**

96.      Regions was at all applicable times, on information and belief, the Plan Sponsor of the Plans.  Regions was a fiduciary of the Legacy Plan because it had the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator.  Regions Financial Corporation 401(k) Plan Document Amended and Restated As of January 1, 2001 at 2, 19 (REGIONS401(k)000001 & REGIONS401(k)000024).  Regions was a fiduciary of the AmSouth Thrift Plan because it had the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator.  *See* Regions Plan Document at 2, 20 (REGIONS401(k)000341 & REGIONS401(k)0003359).  Regions is a fiduciary of the Regions 401(k) Plan because it has the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator.  March 2008 Plan Document at 24 (REGIONS401(k)000208).  Regions, therefore, had a duty to monitor the Plan Administrator and the Trustee for each Plan.  Regions has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plans and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Regions, therefore, is responsible for the activities of its employees through traditional liability principles of agency and *respondeat superior*.

97.      In addition, under basic tenets of corporate law, Regions is imputed with knowledge regarding the misconduct alleged herein of certain other Defendants, such as Regions' officers, directors, and employees.

98.      Consequently, in light of the foregoing duties, responsibilities, and actions, Regions was, on information and belief, a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Subclass Periods because it exercised discretionary authority or discretionary control over management of the Plans, exercised

authority or control over management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

99.     During the Subclass Periods, on information and belief, Regions relied on the Compensation Committee Defendants to carry out its fiduciary responsibilities under the Plans and ERISA.  Thus, the Compensation Committee Defendants acted on behalf of Regions in this regard.

**C.     Regions Bank's Fiduciary Status**

100.     Defendant Regions Bank is a Plan fiduciary of the Legacy and Regions 401(k) Plans because it served as Plan "trustee" within the meaning of ERISA, § 403, 29 U.S.C. § 1103. As the Plans' trustee and custodian, Regions Bank holds the Plans' investment assets and executes transactions.  2007 Form 11-K at 9.  On information and belief, Regions Bank was not a "directed trustee" as to the Plans within the meaning of ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1).  To the extent that Regions Bank purported to be a directed trustee of the Plans, it was improperly conflicted because it was deeply involved in the conduct complained of below, including but not limited to: (1) facilitating or causing Regions' exposure to losses from residential construction loans and mortgages; (2) failing to maintain adequate risk management controls; and (3) failing to report on Regions' books and records the full extent of financial problems and risks related to the Company's involvement with the Bond Funds, which were heavily invested in overly risky CDOs and other unacceptably low quality and risky investments. To the extent Regions Bank was a directed trustee, it failed to act in accordance with the terms of the Plans.  Moreover, it acted contrary to ERISA's mandates by following directions that it knew or should have known was contrary to ERISA.  For example, Regions Bank caused the Legacy and Regions 401(k) Plans to engage prohibited transactions, in violation of ERISA.  Similarly,

Regions Bank failed to take actions to protect the Plans from investing in or continuing to invest in imprudent securities, particularly given Regions Banks' possession of non-public information about those securities.

101.    Defendant Regions Bank served as a Plan fiduciary of the AmSouth Thrift Plan from April 4, 2006 to April 1, 2008 because it then served as Plan trustee within the meaning of ERISA § 403, 29 U.S.C. § 1103.  As the Plan trustee and custodian, Regions Bank held the Plan's investment assets and executed transactions.  On information and belief, Regions Bank was not a "directed trustee" as to the AmSouth Plan Thrift within the meaning of ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1).  Alternatively, to the extent that Regions Bank purported to be a directed trustee of the AmSouth Thrift Plan, it was improperly conflicted because it was deeply involved in the conduct complained of below, including but not limited to: (1) facilitating or causing Regions' exposure to losses from residential construction loans and mortgages; (2) failing to maintain adequate risk management controls; and (3) failing to report on Regions' books and records the full extent of financial problems and risks related to the Company's involvement with the Bond Funds which were heavily invested in overly risky CDOs and other unacceptably low quality and risky investments.  To the extent Regions Bank was a directed trustee, it failed to act in accordance with the terms of the Plans.  Moreover, it acted contrary to ERISA's mandates by following directions that it knew or should have known was contrary to ERISA.  For example, Regions Bank failed to take actions to protect the Plans from investing in or continuing to invest in imprudent securities, particularly given Regions Banks' possession of non-public information about those securities.

**D.      All Plans' Compensation Committee Defendants' Fiduciary Status**

102.     The Compensation Committee is a committee of Regions' Board of Directors. Variously composed, the Compensation Committee has been and is a fiduciary to the Legacy Plan, AmSouth Thrift Plan, and the Regions 401(k) Plan.  According to the Compensation Committee's Charter, the Compensation Committee Defendants had various responsibilities, including the authority and responsibility to:

> Review periodically the administration of all of the Company's pension, profit sharing, and welfare employee benefit plans, other than executive compensation plans ("Plans"), select and appoint Plan administrators, trustees, Named Fiduciaries, actuaries and investment managers (and allocate assets of the Plans among investment managers, if any) and, consistent with the terms of the Plans the committee may  delegate, to the fullest extent permitted by applicable law, to the Chief Executive Officer of the Company or another body or committee the authority to make such selections, appointments and allocations.
>
> Review annually the actuarial assumptions and reports for the Plan.
>
> Establish and, as appropriate, review the investment and funding policies and objectives of the Plans.

*See* Charter of the Compensation Committee at 4 (*available at* http://media.corporate-ir.net/media_files/irol/65/65036/corpgov/compensation1.pdf).

103.     Accordingly, on information and belief, the Compensation Committee Defendants, acting on behalf of the Company, exercised oversight responsibility for the Plans and appointed the members of the Benefits Management Committee and the Trustee.  As to the latter function, the Compensation Committee Defendants had the duty to monitor and to remove their appointees.  Thus, according to Department of Labor ("DOL") regulations, the Compensation Committee Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

40

104.     Consequently, in light of the foregoing duties, responsibilities, and actions, the

Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning

of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Subclass Periods in that they exercised

discretionary authority or discretionary control over management of the Plans, exercised

authority or control over management or disposition of the Plans' assets, and/or had discretionary

authority or discretionary responsibility in the administration of the Plans.

**E.     Legacy Plan Benefits Management Committee Defendants' Fiduciary Status**

105.     The Legacy Benefits Management Committee was a "named fiduciary" of the

Legacy Plan, as that term is defined under ERISA, with authority to manage and control the

operation and administration of the Plan. *See* Amended and Restated Employees' Profit-Sharing

Trust of First Alabama Bancshares, Inc. ("Legacy Trust Agreement") at 3 (RFC00005392) ("The

Committee, as appointed under the terms of the Plan, shall be the named fiduciary and

administrator of the Plan and Trust.").

106.     To comply with ERISA, the Legacy Benefits Management Committee was

responsible for communicating with participants regarding the Legacy Plan in a plan-wide and

uniform manner by providing participants with information and materials required by ERISA.

*See, e.g.*, ERISA § 101(a)(1) (requiring the plan administrator to furnish a summary plan

description to each participant covered under the plan and to each beneficiary who is receiving

benefits under the plan). On behalf of the Company, on information and belief, the Benefits

Management Committee disseminated the Plan documents and related materials which, among

other things, incorporated by reference misleading filings which Regions made with the

Securities and Exchange Commission ("SEC"), thus converting such materials into fiduciary

communications. *See* Regions 401(k) Plan Summary Plan Description (Apr. 2008) at 12.

107.     Further, the Benefits Management Committee has the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds.  *See* Legacy Trust Agreement at 9 (RFC00005398).

108.     Consequently, on information and belief, the Benefits Management Committee Defendants were both named fiduciaries of the Legacy Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**F.     Legacy Plan Benefit Administration Committee Defendants' Fiduciary Status**

109.     On information and belief, the Legacy Plan's Benefit Administration Committee is a "named fiduciary" of the Legacy Plan for investment purposes as that term is defined under ERISA.

110.     On information and belief, the Legacy Plan Benefit Administration Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**G.   Additional Legacy Plan Defendants' Fiduciary Status**

111.    On information and belief, the Additional Legacy Plan Defendants include "named fiduciaries" of the Legacy Plan for administrative purposes as that term is defined under ERISA.

112.    Many of the Additional Legacy Plan Defendants are Plan Administrators, having full authority and power to administer and construe the Legacy Plan.  All of the Additional Legacy Plan Defendants had fiduciary responsibilities to the Plan.

113.    On information and belief, the Additional Legacy Plan Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised discretionary authority or discretionary responsibility in the administration of the Plan.

**H.   AmSouth Thrift Plan Benefits Committee Defendants' Fiduciary Status**

114.    On information and belief, the AmSouth Thrift Plan's Benefits Committee is a "named fiduciary" to the AmSouth Thrift Plan for investment purposes as that term is defined under ERISA.  *See* AmSouth Bancorporation Thrift Plan (Revised Feb. 2002) at 20 (RFC00002382).

115.    The AmSouth Thrift Plan Benefits Committee Defendants had the responsibility for selecting the investment funds in the AmSouth Thrift Plan and for monitoring the performance of those funds.

116.    On information and belief, the AmSouth Thrift Plan Benefits Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of

the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## I.     Additional AmSouth Thrift Plan Defendants' Fiduciary Status

117.    On information and belief, the Additional AmSouth Thrift Plan Defendants include "named fiduciaries" of the AmSouth Thrift Plan for administrative purposes as that term is defined under ERISA.

118.    Many of the Additional AmSouth Thrift Plan Defendants are Plan Administrators, having full authority and power to administer and construe the AmSouth Thrift Plan.  All of the Additional AmSouth Thrift Plan Defendants had fiduciary responsibilities to the Plan.

119.    On information and belief, the Additional AmSouth Thrift Plan Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised discretionary authority or discretionary responsibility in the administration of the Plan.

## J.     Regions 401(k) Plan Benefits Management Committee Defendants' Fiduciary Status

120.    The Benefits Management Committee is a "named fiduciary" of the Regions 401(k) Plan, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plan (March 2008 Plan Document at 23 (REGIONS401(k)000207)) as well as the Plan Administrator.  2005 SPD at 25 (REGIONS401(k)000479); 2008 SPD at 24 (REGIONS401(k)000509).

121.    As Plan Administrator, the Benefits Management Committee has the duty to "administer the Plan for the exclusive benefit of the Participants and their beneficiaries…[having] full and exclusive discretion and authority to determine all questions of coverage and eligibility arising under the Plan, and full power and discretion to construe the

44

provisions of the Plan" as well as being "charged with the general administration of the Plan" and having "the authority to appoint one or more Investment Managers." March 2008 Plan Document at 23-27 (REGIONS401(k)000207-211).

122. To comply with ERISA, the Benefits Management Committee exercised responsibility for communicating with participants regarding the Regions 401(k) Plan in a plan-wide, uniform manner by providing participants with information and materials required by ERISA. *See, e.g.*, ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). *Id.* at 27 (REGIONS401(k)000207-211). On behalf of the Company, on information and belief, the Benefits Management Committee disseminated the Plan documents and related materials which, among other things, incorporated by reference Regions' misleading SEC filings, thus converting such materials into fiduciary communications.

123. Further, to the extent that it did not delegate such authority to an Investment Committee, the Benefits Management Committee has the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds. March 2008 Plan Document at 17, 97, Addendum 3 at 9, Addendum 3 at 49 (REGIONS401(k)00017, 000281, 000348, 000388).

124. Consequently, on information and belief, the Benefits Management Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's

assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**K.      Regions 401(k) Plan Investment Committee Defendants' Fiduciary Status**

125.    On information and belief, to the extent one exists, the Investment Committee is a "named fiduciary" of the Regions 401(k) Plan for investment purposes as that term is defined under ERISA.  March 2008 Plan Document, Addendum 3 at 9 (REGIONS401(k)000348).

126.    To the extent that the Benefits Management Committee delegated such responsibility to the Investment Committee, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Regions 401(k) Plan and for monitoring the performance of those funds.

127.    The Regions 401(k) Plan Investment Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## VII.   FACTS

**A.      Regions Common Stock**

128.    During the Company Stock Subclass Period, Regions consistently touted itself as a sound financial institution, conservative in focus, with a stable portfolio that gave it the ability to manage risk in the real estate market.  Contrary to this false image, Regions was a poorly managed corporation that failed to maintain a diverse, stable portfolio, manage its risk, and make known complete and accurate information about its financial condition.  Indeed, details of Regions' risky and imprudent management have been publically disclosed only slowly,

incompletely, and piecemeal.  Throughout the Subclass Period, Defendants knew or should have known that Regions' common stock was over-inflated and too risky an investment alternative for the Plans.    The Company now sits on the brink of total collapse.

### 1.    The Rise of Subprime Lending

129.    The term "subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."  Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit*, Committee on Financial Services, Mar. 27, 2007, http://www.federalreserve.gov/newsevents/ testimony/Braunstein20070327a.htm.  Subprime mortgage lending generally involves issuing high or variable interest loans to individuals who otherwise would not qualify under underwriting standards used by prime lenders.

130.    Originating subprime mortgages has become increasingly popular in recent years– climbing from $120 billion in 2001 to $625 billion in 2005.  Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind–Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006, at A1.  Between 2003 and 2005, loans to subprime borrowers industry-wide increased from 8 percent to 20 percent of total originations.  By 2004, many mortgage originators across the United States began to focus on so-called "innovative" subprime products that relied on, among other things, inappropriately lax underwriting standards and temporary payment reductions which greatly increased risk for borrowers and lenders alike.  Plaintiffs do not have the figures related to the increase in such

originations by Regions during that period, but Regions has admitted that it was actively involved in "non-conforming" real estate loan originations.

131.     To take advantage of this new market, some lenders began weakening their underwriting standards.  For example, lenders lowered the minimum credit score borrowers needed to qualify for certain loans, allowed borrowers to finance a greater percentage of their home's value, and, in some cases, allowed borrowers to carry a higher debt load (e.g., "no money down").  *See* Ruth Simon, *Mortgage Lenders Loosen Standards–Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down*, USA Today, Jan. 18, 2006, at A1.

132.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers, including interest-only mortgages, pick-a-payment loans, and adjustable rate loans.  *See* Sandra Block, *"Pick-a-Payment" Mortgage Risks are High*, USA Today, July 18, 2005, at B3; *see also* Ruth Simon, *New Type of Mortgage Surges in Popularity– Fixed-Rate Interest-Only Loans Offer Lower Initial Payments but Delay Debt Reduction*, Wall St. J., Apr. 19, 2006, at D1.

133.     When home prices are appreciating and interest rates are low, subprime borrowers are generally able to stay current on or refinance their loans because their equity interest in their property is rising.  However, when housing prices depreciate, default rates increase, often dramatically.  The rise of subprime lending unsurprisingly led to high rates of borrower defaults. Regions and its subsidiaries and affiliates made an imprudent number of subprime loans to persons whom Regions or its subsidiaries and affiliates knew or should have known were unlikely to repay the loans, and who have proven unable to do so.

134. Trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes, which caused the interest rates on variable rate loans, including mortgage loans, to rise. In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005. Simon, *Mortgage Lenders Loosen Standards*, *supra*.

135. However, most subprime lenders, including Regions, failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards. Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005." Simon & Hagerty, *supra*. Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate rest significantly higher rates. And because housing prices were falling, borrowers could not readily re-sell their property for a profit when they could not pay their increased monthly payments, causing a rapid rise I mortgage defaults.

136. By the end of 2005, foreclosures and delinquency rates had risen substantially. Simon & Hagerty, *supra*. As of October 2005, the delinquency rate recorded on new subprime loans had doubled from a year earlier. *Id.*

137. Nonetheless, subprime mortgage exposure grew even riskier in 2006 as lenders originated a large number of no-documentation and low-documentation loans, also known as "liar loans." This practice constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001. Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007, at 1. In April 2006, mortgage industry research revealed that 90

percent of borrowers had overstated their incomes by 5 percent or more and had inflated their incomes by more than half in 60 percent of these cases.  *Id.*

138.    In September 2006, Reuters reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against subprime-related securities since late 2005."  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Market*, Reuters, Sept. 25, 2006.

139.    In response to the increasing risks inherent in subprime lending, "the Federal Reserve and the other banking agencies issued guidance on nontraditional mortgage products" on September 29, 2006.  Testimony of Sandra L. Thompson, *supra*.  The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration jointly issued the *Interagency Guidance on Nontraditional Mortgage Product Risks* ("OCC Guidance").  The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which entail a credible analysis of a borrower's repayment capacity.  *See Interagency Guidance on Nontraditional Mortgage Product Risks*, Sept. 29, 2006, *available at* http://www.federalreserve.gov/boarddocs/srletters/ 2006/SR0615a2.pdf.

140.    The OCC Guidance provided that subprime loans should be underwritten based on a borrower's ability to make fully-amortizing payments at the fully-indexed interest rate.  *Id.* For products like payment option adjustable rate mortgages ("ARMs") that permit negative amortization, the OCC Guidance provided that a lender's underwriting analysis should be based

on the initial loan amount plus any balance increase that could accrue given the maximum

potential amount of negative amortization permitted by the loan.

141.    The OCC Guidance also addressed the practice of relying on reduced

documentation, particularly unverified income, to qualify borrowers for subprime mortgages.  *Id.*

This practice substituted assumptions and alternative information for verified data in analyzing a

borrower's creditworthiness and ability to pay.  Because such practices presented significant risk,

including the risk of fraud, they were to be used sparingly.  Accordingly, the OCC Guidance

cautioned that reduced documentation should be accepted <u>only</u> where there were mitigating

factors that minimized the need for verification of repayment capacity.

142.    On December 20, 2006, the Center for Responsible Lending issued a report

predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study*

*Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006, at C1.  Shortly

thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults,

triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.  *Id.*

143.    On January 3, 2007, Consumer Affairs published an article that warned that "as

the housing market slows to a crawl, many subprime lenders are collapsing faster than homes

made of substandard materials, and the signs point to even more pain in the housing market as a

result."  Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing*, Consumer

Affairs, Jan. 3, 2007, http://www.consumeraffairs.com/news04/2007/01/mln_subprime.html.

144.    Indeed, by early 2007, the collapse of the subprime lending industry was in full

stride.  Notably, after experiencing a sharp increase in defaults from new borrowers, Ownit

Mortgage Solutions, Inc. closed its doors in early December 2006 and filed for Chapter 11

bankruptcy just a few weeks later.  E. Scott Reckard, *Demise of Ownit Mortgage Hits Home*,

51

L.A. Times, Jan. 3, 2007, at C1. "Across the industry, 2.6 percent of the subprime loans securitized in the second quarter of 2006 had been foreclosed on or repossessed within six months. That is up from 1 percent for loans securitized in the second quarter of 2005," as reflected in the chart below:



Vikas Bajaj and Christine Haugheny, *Tremors at the Door - More People With Weak Credit Are Defaulting on Mortgages*, N.Y. Times, Jan. 26, 2007, at C2.

145.     On March 11, 2007, the New York Times reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy. Morgenson, *Crisis Looms In Market for Mortgages*, *supra*.

146.     Two weeks later, the Wall Street Journal reported that New Century Financial Corp., the largest U.S. subprime lender, was on the "brink of bankruptcy," because it could not pay back loans it took from Wall Street banks. Gregory Zuckerman, *How Street Hit Lender – 'Subprime' King New Century Was Down but Not Quite Out; Then, Banks Shut Cash Spigot*, Wall St. J., Mar. 29, 2007, at C1.

147.     Four days later, New Century filed for Chapter 11 bankruptcy.  Julie Creswell and

Vikas Bajaj, *Home Lender is Seeking Bankruptcy*, N.Y. Times, Apr. 3, 2007, at C1.

148.     In total, from the end of 2006 through July 1, 2007, 15 mortgage companies had

gone bankrupt and close to 50 more had suspended loans or closed entirely.  Rick Green,

*Lehman Shuts Unit; Toll of Lenders Tops 100: Subprime Scorecard*, Bloomberg.com, Aug. 23,

2007, http://www.bloomberg.com/apps/news?pid=20601206&sid=aQBUrPcefMtc&refer=

realestate.

149.     The Wall Street Journal reported that in 2006 alone, roughly 80,000 subprime

borrowers had fallen into delinquency, many shortly after loan origination.  Simon & Hagerty,

*supra*.

150.     It is against this backdrop that Regions sold subprime mortgages in areas subject

to the most dramatic over-inflation of home values.  Given these publically available facts about

the risks and potential failures of the subprime lending market and Defendants' high-level

positions within the Company, Defendants knew or should have known that, by the start of the

Company Stock Subclass Period, Regions common stock was an imprudent investment

alternative for the Plans.

151.     Defendants had a fiduciary duty under ERISA to monitor and control the level of

risk to which the Plans were exposed and to take action to protect the Plans from massive losses

caused by imprudent investment in Regions common stock.

    **2.**      **During the Company Stock Subclass Period, Regions Common Stock Was an
Imprudent Investment for the Plans Due to Regions' Real Estate Loan
Portfolio**

152.     Throughout the Company Stock Subclass Period, Regions' real estate loan

portfolio was rife with imprudent and improperly managed risks.  The real estate loan portfolio

contained excessive subprime loans to mortgage buyers, housing contractors, and for home equity lines of credit, loans concentrated in regions with over-inflated home values, and risky commercial loans. Given the opacity of Regions' public filings and Regions' failure to show in a timely manner how the housing crisis would impact future losses in the loan portfolio, it is virtually impossible for Plan participants to assess whether underwriting and credit quality standards were maintained for the loans held in the portfolio. However, it is clear that recent huge increases in underperforming loans indicate that Regions had undisclosed credit quality issues. Rather than being a victim of the credit crisis, as it now portrays itself, Regions was a major contributor to it, because it engaged in precisely the kinds of activities and transactions that caused the credit crisis.

153.    Upon information and belief, Regions issued progressively more and progressively riskier subprime mortgages to feed more and more loan product into asset backed securities. By lowering their lending standards, Regions increased its subprime mortgage originations, adjustable rate mortgages, lower documented Alt-A mortgages, home equity loans, and similar risky products. Regions also sold loans to real estate contractors whose ability to repay the loans turned on the unrealistic assumption that the real estate boom would last forever. Moreover, Regions made numerous loans which they never would have made only a few years earlier because the new loans involved higher loan-to-value ratios than the bank had allowed historically. Rather than realistically estimating the likely losses on such loans, Regions did not reasonably adjust its assumptions based on the greater risk of default on these new, riskier loans.

154.    There were increasing indications during this period that at least portions of the country were in an unstable housing bubble. Regions were particularly active in some of those areas, including Florida and other parts of the Southeast. However, on information and belief,

Regions predicted risk assuming that real estate values would increase at a rate unprecedented before 2000.  Regions was unreasonably slow to recognize the problems of a depreciating real estate environment to the assumptions it used for properly reserving for losses.  Moreover, Regions' lack of a geographically diverse real estate loan portfolio exposed the Company to even greater risk of loss.

155.     As a result of these activities, Regions was increasingly engaged in unprecedentedly risky lending well into the collapse of subprime lending.  At least by January, 2007, Regions knew or should have known about the risks of its involvement in these highly risky lending activities.

156.     In January, 2007, Regions announced that it would be exiting the subprime mortgage business by selling EquiFirst Corporation ("EquiFirst"), Regions' wholly-owned subprime origination business, and that mortgage originations had increased notwithstanding "a challenging environment."  Regions Current Report (Form 8-K) (Jan. 19, 2007) at Ex. 99.1.  Given the downturn in the subprime market, sale of EquiFirst proved difficult.

157.     On December 31, 2006, EquiFirst held subprime loans for sale totaling $1.17 billion.  Yet, just weeks later on January 19, 2007, Regions announced that it would receive only $225 million for EquiFirst, less than a quarter of the value of loans for sale on EquiFirst's books just three weeks earlier.  Moreover, Barclays finalized the purchase of EquiFirst on March 30, 2007, the price Regions received was only $76 million. Indeed, Regions has disclosed that "[p]rior to the sale of EquiFirst, Regions recorded, during 2007, approximately $142 million in after-tax losses related to the operations of EquiFirst."  2007 10-K.  Regions reported a mere $1 million gain on the transaction.

158.     Regions' exposure to subprime mortgages was not the only source of risk Regions

faced from its real estate dealings.  In an important strategic error, Regions took an enormous

stake in the Florida real estate market by concentrating a huge portion of its real estate loans

there.  By 2005 it was widely reported that Florida's housing market was one of the biggest

housing bubbles, with prices soaring at unsustainable and unrealistic rates.  *See* Robert Trigaux,

*Florida's housing bubble, is it ready to burst?*, St. Petersburg Times, May 25, 2005.  The precise

percentage of Regions' investment in Floridian real estate is not currently known, but Regions

has admitted it was substantial.  *See* Regions Financial Corporation 10-Q filed June 30, 2008 at

31.  For example, Regions had 427 branches in Florida as of December 31, 2007, which

constituted nearly one quarter of all Regions' branches that spread across 16 states.  2007 10-K

at 3.  Indeed, Regions increased its loans concentration in Florida from 13 percent in 2005 to 24

percent in 2006.  Moreover, by the end of 2007, 27.9 percent of Regions' residential

homebuilder portfolio was concentrated in Florida.  2007 10-K at 45.  Regions' lack of

geographical real estate loan diversification was imprudent and not properly disclosed to Plan

Participants.  By staking much of its real estate loan portfolio, subprime and prime, on Floridian

real estate, Regions exposed itself and the Plans to massive losses.

159.     The percentage of Regions' real estate portfolio invested in residential real estate

also exposed the Company to greater risks.  The Regions 2007 Form 10-K reported that: "For

residential real estate mortgages, home equity lending, and other consumer-related loans,

individual products are reviewed on a group basis or in loan pools (e.g., residential real estate

mortgage pool).  The total of all residential loans, including residential real estate mortgages and

home equity lending, represents approximately 34 percent of total loans."  Regions 2007 Form

10-K at 29.  If one includes the residential construction loans and home equity loans, the total

percentage of Regions' residential exposure is much closer to 50 percent, a figure showing an acute lack of diversification. *Id.* at 43.

160.    For example, the day after the Company filed its 2007 10-K, on February 28, 2008, Regions reported that a major borrower, a condominium developer in Fort Lauderdale, filed Chapter 11 proceedings, leaving Regions and a lending partner with $18.6 million in unpaid loans. These non-performing loans in Regions' commercial loan portfolio have increased throughout the Company Stock Subclass Period.

161.    In addition to residential loans, Regions' commercial real estate loans presented further risk of loss. Regions invested heavily in commercial real estate projects in areas with artificially inflated real estate values, where the loan repayment was contingent on the commercial projects being completed. As the demand for new building and commercial ventures slowed in these over-saturated markets, Regions' loan portfolio took a substantial hit. Regions lacked proper loan diversification and risk management. In its 2007 10-K, Regions disclosed that roughly 50 percent of its real estate loan portfolio was commercial-related. This heavy concentration in commercial loans, especially in areas of artificially inflated real estate prices, exposed the Company to huge risks.

162.    Regions' unsound, risky, and unstable real estate loan portfolio, the core of its financial statement, exposed the Company, and therefore the Plan Participants, to massive risks of loss. Because of their high-level positions as directors, officers, and executives at Regions, Defendants knew or should have known about these risks and taken actions to protect the Plans.

**3.    Regions Failed to Reserve For Losses**

163.    Throughout the Company Stock Subclass Period, Regions improperly reserved for losses arising out of its real estate lending practices. Specifically, it failed to increase its

57

provisions for loan losses and allowance for loan losses.[8]  Such failures are unsurprising, as the Company took every step to cover up the weaknesses of its real estate loan portfolio to keep its stock artificially inflated.

164.  Throughout the Company Stock Subclass Period, Defendants knew or should have known that they needed to increase Regions' provisions for loan loss and allowance for loan loss.  *See* Section VII.A.1, *supra*.  For example, in October 2006, the *American Banker* reported:

> The Southeast has been one of the nation's stronger markets for loan growth, but analysts said they plan to watch how banking companies there reserved for such growth in the third quarter.
>
> In recent quarters the hot topic was margin pressure and its effects on earnings.  But analysts and executives now call margin compression an obvious and inevitable headwind and are shifting their commentary to asset quality . . . .

Paul Davis, *Reserves Under Microscope in Southeast*, American Banker, Oct. 16, 2006.

165.  Notwithstanding this "obvious and inevitable headwind," "Regions Financial Corp . . . gave little indication that it is preparing for a slide in credit quality."  *Id.*  Rather, Regions "increased its allowance for loan losses **marginally** from a quarter earlier, adding $25 million of provisions in the third quarter, compared with $24.3 million of net charge-offs."  *Id.* (emphasis added).  Thus, despite taking on greater risks, Regions did not provide for commensurate loan loss reserves.

---

[8] A provision for loan loss is generally an expense set aside as an allowance for bad loans.  The provision for loan loss is charged against the corporation's income on it statement.  An allowance for loan loss, however, is not an expense, but what is essentially a pool of money set aside by a corporation to cover potential future losses.  It is not deducted from the corporation's income.  Plaintiffs use the term "allowance for loan loss" rather than the synonymous term "loan loss reserve" in order to track the language used by Regions on its financial statements.

166.     Regions failed to reserve properly for loan losses as the loan portfolio's value deteriorated, and the Defendant fiduciaries knew or should have known about this problem.

167.     For example, Regions lowered its underwriting standards but failed to timely adjust its allowance for loan losses and reserves consistent with the Company's changing risk profile.  Throughout the Company Stock Subclass Period, Regions rapidly expanded the riskier aspects of its business, including construction and development loans for residential projects, residential mortgages in areas of high real estate speculation, and secondary home equity loans. Regions consistently described its asset value as "strong" without regard to the lowered quality of many of its assets, and, until very recently, delayed providing appropriate loan loss reserves. As recently as in its August 3, 2007 Quarterly Report, Regions claimed to maintain "a high quality credit portfolio" which is "well-diversified . . . diversified by product type, collateral and geography."  Regions Quarterly Report (Form 10-Q) (Aug. 3, 2007) at 41.

168.     Specifically, Regions sharply increased its provisions for loan losses at near exponential rates, without giving adequate indication of such a need.  Between 2006 and 2007, Regions' provision for loan loss jumped from $143 million to $555 million.  Remarkably, between 2007 and 2008, Regions was forced to provide over $2 billion for loan losses, a near 400 percent increase from the year before.

169.     Regions knew or should have known that it needed to increase its allowances for loan loss in response to assuming substantially increased risks.  Defendants, given their positions as directors, officers, and executives within Regions, knew or had access to information, including but limited to publically available and internal information about the need to increase allowances for loan loss and provisions for loan loss.  Moreover, delaying recognition of

troubled assets inflated the value of the Company while the Plans continued to purchase shares of Regions stock.

170.    In 2008, Regions identified a startling volume of loan assets as "troubled," with their value more than tripling in eighteen months.  "Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.  Impaired loans totaled approximately $1,246.3 million at June 30, 2008, compared to $660.4 million at December 31, 2007 . . . ."  *Id.* at 32.  As of December 31, 2006, impaired loans were $237.5 million.  Regions Financial Corporation Form 10-Q filed June 30, 2007 at 26. Similarly, Regions nearly doubled its inventory of foreclosed property and real estate, going from $72.7 million by the end of 2006 to $120.5 million by the end of 2007.  Regions 2007 Form 10-K at 68.

171.    In addition to provisions for loan loss, Regions' allowance for loan losses spiked up at astonishing rates, suggestive of Regions' risky real estate loan portfolio that was rapidly deteriorating.  Not increasing the provision of loan losses directly increased Regions' bottom line.  Regions did so to protect its bottom line, since as provisions for loan loss goes up, net income goes down.  Thus, the allowances were kept too small for too long; Regions knew or should have known to increase its allowances for loan loss much earlier.

172.    Specifically, Region's allowances for loan loss jumped from $1.05 billion in the Fourth Quarter of 2006 to $1.321 billion in the Fourth Quarter of 2007.  Regions' allowances for loan loss rose sharply again to $1.826 billion in the Fourth Quarter 2008.  Such large increases in allowances for loan loss provide further evidence of the risks inherent in Regions' real estate loan portfolio.

173.    Defendants, given their positions and access to critical information, knew or should have known by the start of the Company Stock Subclass Period that Regions' unsound

real estate loan portfolio required it to provide for and allow for losses commensurate to its risks. The failure to do so caused Regions' common stock to be over-inflated during the Subclass Period, exposing the Plans to huge and sudden losses.

### 4. Regions Failed to Manage Its Risk Properly

174. On May 16, 2005, the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS") and the National Credit Union Administration issued "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance"). The Credit Risk Guidance stated that the agencies had "found that, in many cases, institution's credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards." The Credit Risk Guidance also stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios."

175. The Credit Risk Guidance instructed that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."

176. The Credit Risk Guidance also found that "prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt. Given the home equity products' long-term nature and the large credit amount typically extended to a consumer and evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score."

177. Upon information and belief, Regions delayed assessing or ignored its portfolio's vulnerability and relied upon asset valuations and modeling that failed to take into account the possibility of wide-scale decreases in real estate property values.

178.     As late as mid-2007, Regions claimed that while the number of its non-performing loans had increased, the loans were all "well-secured by real estate collateral." Regions Financial Corporation Form 10-Q filed June 30, 2007 at 24.  Many of the loans were based on extremely high loan-to-value ratios, on the assumption that real estate values would increase.  Similarly, Regions made substantial builder loans with high loan-to-value ratios where there was little real estate collateral because many of the projects had not been built.

179.     Despite the mid-2005 Credit Risk Guidance, it was not until late 2007 and the first half of 2008 that Regions significantly increased its loan allowances related to "losses within the home equity portfolio."  "Home equity credits accounted for over half of the increase in net charge-offs, rising to an annualized 1.94 percent of outstanding loans and lines during the second quarter of 2008 . . . .   These loans and lines represent approximately $5.4 billion of Regions' total home equity portfolio.  Of that balance . . . second liens, which total $3.5 billion are the main source of losses."  Regions Financial Corporation Form 10-Q filed June 30, 2008 at 31.

180.     Had Regions properly managed its risk, it would have maintained a diverse real estate loan portfolio that was not geographically limited, overly invested in real estate, or concentrated in regions where home values were over-inflated.  Moreover, Regions failed to abide by the Credit Risk Guidance.

**5.       Regions' Securities Portfolio Contains Massive Exposure to Risky Mortgage-Backed Securities**

181.     In yet another incredibly risky business decision, Regions invested the lion's share of its securities portfolio (its investment portfolio) in mortgage-backed securities ("MBS") when it knew or should have known that such an investment was imprudent.  Indeed, contrary to every standard of prudence, Regions' touted its "securities portfolio [a]s one of Regions' primary

sources of liquidity." 2007 10-K at 60. Yet, by 2007, Regions knew or should have known that mortgage-backed securities were a dubious source of liquidity. Thus, Regions' belief that "[m]aturities of securities provide a constant flow of funds available for cash needs" was based on completely inappropriate assumptions and improper risk management. Regions could in no way rely on cash flow from illiquid MBS.

182. Several indices tracking mortgage-backed securities put or should have put Regions on notice of the risks inherent in its investment portfolio as of at least the beginning of the Company Stock Subclass Period. For example, the ABX 06-2 index, used to track the value of securities backed by subprime mortgages, lost 80 percent of its value from the fall of 2006 to the end of 2007. By January 2007, Regions knew or should have known from this and other similar indices tracking mortgage-backed securities to diversify its investment portfolio to avoid losses. However, Regions failed to heed this red flag, and, instead, continued to maintain roughly two-thirds of its investment portfolio in MBS through 2007 and, upon information and belief, to the present. *See* 2006 10-K at 53; 2007 10-K at 47; Regions Quarterly Report (Form 10-Q) (filed Oct. 30, 2008) at 36. (showing that as of Sept. 31, 2008, over two-thirds of Regions' investment portfolio was concentrated in MBS).

183. The risks of mortgage-backed securities are directly tied to the default rates on the mortgages that compose the securities. Thus, the downturn in subprime mortgages had particularly adverse impact on MBS composed of such loans. Upon information and belief, these MBS were particularly invested in subprime mortgages. Thus, Defendants knew or should have known as early as the beginning of the Company Stock Subclass Period (January 1, 2007), that the downturn in the subprime lending and mortgage market had and would continue to

adversely impact its securities portfolio.  Regions' failure to maintain a diversified investment

portfolio exposed the Company and the Plans to an imprudent level of risk.

184.    Regions had substantial exposure to subprime securities through its large

investment in MBS.   Regions reported in its 2006 Annual Report that *roughly two-thirds of its*

*securities available for sale were mortgage-backed securities*.  Regions Annual Report 2006

(Form 10-K) at 53.  The total amount of MBS in Regions' portfolio was over $12 billion in 2006.

In 2007, Regions reported a slight drop in MBS value to a tad over $11 billion, but MBS still

comprised over two-thirds of its investment portfolio.  2007 10-K at 47.

185.    Such a massive wager on mortgage-backed securities was imprudent given that

these securities were based on inherently risky loans that suffered exponential rates of

nonperformance.  The investment in MBS also caused Regions to increase its exposure to the

risks already captured in its real estate portfolio, given that the MBS were tied to the same

unstable and risky real estate market.  Indeed, the MBS market began to freeze in early 2007 as

mortgage default rates rose and investors lost confidence in subprime mortgages as collateral.

By 2008, the entire market was essentially frozen.  As a result, Regions' substantial MBS

holdings are now potentially worthless, and at the least, incredibly risky.

186.    Regions' failure to diversify its securities portfolio has now left it with two-thirds

of its investment portfolio invested in the riskiest securities available on the market.  These poor

business decisions are further examples of serious mismanagement of the Company that exposed

the Plans to massive losses.  Such improper business management caused the Plans' investment

in Regions common stock to be imprudent throughout the Company Stock Subclass Period.

ERISA does not require companies to be well managed, but when a company decides, as

Regions did, to load up its retirement plan with Company stock, the Plans' fiduciaries–

Defendants in this action–must take action to protect the Plans from the consequences of the mismanagement.

**6.    Regions' Imprudent and Improperly Disclosed Off-Balance Sheet Exposure**

187.    Regions common stock was also exposed to substantial risk because of Regions' off-balance sheet holdings.

188.    Regions disclosed in its 2007 10-K that "Regions issues off-balance sheet financial instruments in connection with lending activities." The credit risk associated with the off-balance sheet financial instruments at the end of 2007 and 2006 was $39.6 billion and $41.9 billion respectively, an amount equivalent to more than 40 percent of Regions' deposit base. Regions also nearly doubled its loan commitments from June 30, 2006, when they were $22.0 billion, to $41.3 billion by June 30, 2007. Standby letters of credit also greatly increased from $3.6 billion on June 30, 2006 to $6.9 billion by June 30, 2007. Regions Financial Corporation Form 10-Q filed June 30, 2007 at 19. Off-balance sheet financial instruments have many beneficial purposes, such as allowing Regions to reduce regulatory capital requirements and funding costs, and increasing critical financial ratios. The high potential exposure to loss for Regions in off-balance sheet activity puts Plan participants' holdings of company stock at risk. Also, Regions' minimal financial statement disclosures make it more difficult, if not impossible, for Plan participants to have complete and accurate information for investment decisions.

189.    Off-balance sheet financing has become a highly, if not completely, illiquid activity. Off-balance sheet financial instruments, which were once considered risk-free investments, are now worth as much as the paper they were written on.

190.    In its 2007 10-K, Regions states that its off-balance sheet exposure is one of its greatest risks: "Regions' business risks, uncertainties and other factors include . . . Regions'

ability to manage fluctuations in the value of assets and liabilities and off-balance sheet exposure so as to maintain sufficient capital and liquidity to support Regions' business." Regions' sees its off-balance sheet exposure as a business risk factor concerning the company's ability to maintain sufficient capital and liquidity.

191.    Regions' recent acknowledgment of the off-balance sheet loss exposure, similar to the sudden and massive impairment to goodwill, described *infra*, is a major source of uncertainty and risk to Plan participants.  Under the accounting rules, it is easy for Regions to avoid fully disclosing its off-balance sheet activity.  The Enron debacle was a classic example of the riskiness of off-balance sheet activity and the way this risk can be left out of the financial statements.  The immediate cause of the Enron bankruptcy was a loss of confidence among investors caused by the company's misleading disclosure of off-balance sheet activity.  Regions' incomplete and opaque disclosures regarding its off-balance sheet exposure raises substantial questions as to the risks these assets pose to Plan participants.  What is clear, however, is that the markets to which Regions' have off-balance sheet exposure has become increasingly frozen, and, therefore, illiquid.

192.    Corporate balance sheets should properly disclose and make transparent a company's financial condition.  Here, the Defendant fiduciaries knew or should have known that Regions' off-balance sheet exposure was not and could not be adequately known or evaluated by Plan participants, and required monitoring, disclosure, and prudent consideration by Regions in maintaining Company Matching Contributions in Company common stock and offering Company stock as an investment option for retirement savings in the Plan.

**7.    Throughout the Company Stock Subclass Period, Regions Failed to Value Properly its Goodwill**

193.    Regions recently announced a $6 billion write-down of its goodwill.  *See* Regions Financial Corp. Current Report for the Fourth Quarter of 2008 (Form 8-K) at Ex. 99.1.  This included a loss of $9.01 per diluted share for the quarter ending December 31, 2008.  By allocating this write-down to goodwill, the Company was able to claim that the "[r]egulatory and tangible capital ratios were unaffected by the goodwill impairment."  *Id.*

194.    Pursuant to the Financial Accounting Standards Board Standard No. 142, the goodwill testing should have been performed at the occurrence of "an event . . . or circumstance that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  FASB Standard No. 142 at 28.  Examples of such events include:

a.    A significant adverse change in legal factors or business climate;
b.    An adverse action or assessment by a regulator;
c.    Unanticipated competition;
d.    A loss of key personnel;
e.    A more-likely-than-not expectation that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of;
f.    The testing for recoverability under Statement 144 of a significant asset group within a reporting unit; or
g.    Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

*Id.*

195.    Regions claims that it repeatedly and consistently tested its goodwill for impairment.  In 2006, for example, the Company stated that it "tested for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment."  Regions 2006 10-K at 86.  In the Second Quarter 2008 Quarterly Report, Regions stated that:

During the second quarter of 2008, Regions performed an interim impairment test due to the downturn in the economic environment. The interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill);

therefore, goodwill was not impaired as of June 30, 2008. Regions will continue to assess the economic environment and determine whether or not further testing of goodwill is appropriate.

Regions Second Quarter 2008 Report (Form 10-Q).  Regions then reported in its Third Quarter

2008 Report that:

> During the third quarter of 2008, Regions performed an interim impairment test due to the downturn in the economic environment. The interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of September 30, 2008. Regions will continue to assess the economic environment and determine whether or not further testing of goodwill is appropriate.

Regions Third Quarter 2008 Report (Form 10-Q).

196.    During the Second and Third Quarters of 2008 alone, Regions experienced a

massive decline in the value of its stock with the inevitable implosion of the mortgage industry.

By at least the Fourth Quarter of 2007, Regions should have written down its goodwill

substantially, given the fact that its stated book value greatly exceeded its market value.  These

factors should have caused it to test and downgrade its goodwill well before it reported the $6

billion impairment in the Fourth Quarter of 2008.  Regions' failure to undertake any proper

accounting of its goodwill caused its stock to be over-inflated and is further evidence of financial

mismanagement.

**8.      During the Common Stock Subclass Period, Regions Common Stock Was an Imprudent Investment for the Plans Due to the Company's Involvement in the Sale of Auction Rate Securities**

197.    Through its subsidiary Morgan Keegan, Regions was involved in the sale of

auction rate securities ("ARS") as an alternative to money market funds.  Plaintiffs have been

unable to determine the full extent of that involvement.  However, on May 31, 2006, the SEC

settled a proceeding against a number of broker-dealers, including Morgan Keegan, for engaging

in practices that violated federal securities laws with respect to the ARS market. *See* SEC Press Release, *15 Broker-Dealer Firms Settle SEC Charges Involving Violative Practices in the Auction Rate Securities Market*, May 31, 2006 *available at* http://www.sec.gov/news/press /2006/2006-83.htm. The SEC alleges that Morgan Keegan violated the securities laws by, *inter alia*, allowing customers to place open or market orders in auctions; intervening in auctions by bidding for a firm's proprietary account or asking customers to make or change orders to prevent failed auctions, to set a "market" rate, or to prevent all-hold auctions; submitting or changing orders, or allowing customers to submit or change orders, after auction deadlines; not requiring certain customers to purchase partially-filled orders even though the orders were supposed to be irrevocable; having an express or tacit understanding to provide certain customers with higher returns than the auction clearing rate; and providing certain customers with information that gave them an advantage over other customers in determining what rate to bid. *Id.*

198.    Until at least 2005, the ARS were improperly marketed and accounted for as cash equivalents when they were, in fact, securities. Even after that time, Regions, through its subsidiary Morgan Keegan, continued to fail to disclose the real risks of these ARS. In February 2008, the market for ARS collapsed, and hundreds if not thousands of auctions (which are not really auctions) collapsed. Plaintiffs have been unable to determine whether the Plan held or holds ARS or the extent of the effect, if any, of the collapse of the ARS market on Regions, its affiliates, and the Plans, but will further investigate this matter in discovery.

**9.    Regions Faces Substantial Downgrades Due to Its Failed Business Practices**

199.    Regions' recent history has been marked by internal turmoil, including replacement its Chief Financial Officers with startling regularity. *See* Crystal Jarvis, *CFO Turnover at Regions raises analyst questions*, Birmingham Business J. Feb. 22, 2008. Since

1990, Regions and AmSouth have collectively had *six* CFOs, including Regions' current CFO, Irene Esteves. *Id.* Esteves replaced Alton E. Yother in February 2008, after Yother had served less than a year. Prior to Yother's tenure, which began in April 2007, D. Bryan Jordan served as Regions' CFO. *Id.* This history prompted Jeff Davis, senior analyst and managing director of FTN Midwest Security Corporation's Nashville office, to state that "[a]nother CFO at the company will raise questions with investors that something is amiss in the executive offices." *Id.* Tony Plath, a finance professor at University of North Carolina at Charlotte added: "That's a huge number . . . . That's a real cause for concern—anytime you see a revolving door in the CFO office." *Id.* Plan fiduciaries should have investigated this problem to determine its impact on the prudence of maintaining company stock in the Plans.

200.    As Regions' mismanagement has come to light, the Company has received continuing downgrades from financial analysts.

201.    Indeed, during the first quarter of 2008, Regions was downgraded by a number of analysts and credit reporting agencies. S&P Equity Research downgraded Regions from Hold to Sell on January 31, 2008. Citi's Greg Ketron downgraded his recommendation on Regions to Sell on February 8, 2008. Moody's downgraded Regions on March 11, 2008, citing concerns about commercial lending. Such downgrades further affect Regions' capital costs, its ability to raise capital and, in turn, its liquidity.

202.    On March 28, 2008, Fitch Rating downgraded Regions' to "B." Fitch stated in pertinent part as follows:

> The downgrades and Outlook revision reflect Fitch's increased concerns regarding the company's asset quality, specifically its U.S. residential homebuilder portfolio. Contributing to the rating action, RF's [Regions'] profitability will likely remain pressured given asset quality deterioration and a challenging operating environment.

203.     As further evidence of threat of Regions' collapse, on Friday, October 25, 2008, Regions announced that it had received a $3.2 billion investment by the United States government from the $700 bailout funding approved by Congress under the Troubled Asset Relief Program ("TARP").

204.     On January 7, 2009, Credit Suisse downgraded Regions stock from neutral to "Underperform."

205.     Regions stock has fallen steadily, closing at $4.14 a share on January 29, 2009. The Company also announced that it may cut dividends by 90 percent because there "is no likelihood of the company's earnings turning positive in 2009."  Reuters, *Regions Financial may cut dividend by 90 pct*, Jan. 26, 2009.  The Company's ongoing viability has been and remains in serious question.

206.     On the coattails of this dismal news, Regions stock closed at $2.92 on February 2, 2009, after Moody's downgraded it from a B- to a C+ and its long-term deposits from A1 to A2. Moody's explains its ratings as follows: "Obligations rated C are the lowest rated class of bonds and are typically in default, with little prospect for recovery of principal or interest."  Moody's Rating Symbols & Definitions (Aug. 2003) at 6.  A company whose debt is rated as low-level and highly speculative is not an appropriate investment for participants' retirement savings. Indeed, on news of this downgrade, the Company stock fell 15 percent from the prior day's trading.

## 10.     Defendants Knew or Should Have Known that Regions Common Stock Was an Imprudent Investment.

207.     During the Company Stock Subclass Period, as described herein, Regions' stock was an imprudent investment for the Plans because of, among other things, the Company's: (1)

risky real estate loan portfolio containing geographically undiversified, subprime and prime loans; (2) failure to provide for and reserve for losses; (3) inadequate risk management controls; (4) imprudent and undiversified focus of two-thirds of its investment portfolio in risky and illiquid MBS; (5) off-balance sheet exposure to risky markets; (6) improper valuation of its goodwill; and (7) risky and improper ARS practices. These improper business practices artificially inflated Regions common stock and placed Regions in dire financial circumstances. In addition, repeated downgrades, sell recommendations, and various objective measures of Regions dire financial conditions should have alerted Defendants to the imprudence of continued investment in Regions common stock.

208. Members of the Compensation Committee, which had oversight over and monitored all other Plan-related committees, were also members of Regions' Board of Directors and therefore knew or should have known of the mismanagement and risks within the Company that exposed the Plans to great risk of loss by continued investment in Regions Company Stock. Moreover, Defendants had access to all necessary information to understand and react to the risks to Regions common stock.

209. Defendants had several available options that would have satisfied or contributed to satisfying their fiduciary duties, including: (1) making appropriate public disclosures, as necessary; (2) divesting the Plans of Regions stock; (3) discontinuing further investment in Regions stock under the Plans; (4) consulting independent fiduciaries regarding appropriate measures that would prudently and loyally serve the Plans' participants; and/or (5) resigning as Plan fiduciaries to the extent that as a result of their employment by or association with Regions, they were unable to loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Regions stock.

210. In the end, when the severity of the circumstances came to light, the Plans suffered enormous losses, all or some of which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

211. A reasonably prudent fiduciary would have and should have taken a different approach to managing the Plan assets in light of the imprudence of Regions Company Stock as an investment alternative.

**11. Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Regions Common Stock in the Plans**

212. ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

213. During the Company Stock Subclass Period, on information and belief, Defendants made direct and indirect communications to Plan participants which included statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan documents and/or Plan-related materials. Since these communications were incorporated into the Plans, they were undertaken in a fiduciary capacity. However, Defendants failed to disclose that Company stock was not a prudent retirement investment. The Company regularly communicated with employees, including Plan participants, about the performance and

future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plans during much of the Company Stock Subclass Period.

214.    Public reporting and disclosure by Regions has been and continues to be in many material aspects so opaque as to render it incomprehensible to Plan participants. By failing to properly record and disclose its financial condition, Regions has lost its reputation for integrity, and undermined the confidence of investors.

215.    Throughout the Company Stock Subclass Period, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.  As such, participants in the Plans could neither assess nor appreciate the true risks presented by investments in Company stock, and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

216.    Defendants have failed to provide the Plans' participants with complete and accurate information regarding the Company's risky real estate loan portfolio, which was overinvested in subprime loans, lacked geographical diversity, and was over-concentrated in areas of over-inflated real estate values.  Rather than disclose these risks, Regions consistently touted its conservative risk culture and high underwriting standards.  *See, e.g.*, Regions Quarterly Report (Form 10-Q) (Aug. 3, 2007) at 41; Regions Current Report (Form 8-K) (Oct. 16, 2007) at Ex. 99.1.

217.    Throughout the Company Stock Subclass Period, Defendants have failed to provide the Plans' participants with complete and accurate information about the Company's inadequate allowance for and provisions for loan losses.  Instead, Regions consistently described its asset value as "strong," even though Defendants knew or should have known that the quality was poor.  *See* Regions Quarterly Report (Form 10-Q) (Aug. 3, 2007) at 41.

74

218.     Additionally, Defendants continue not to provide the Plans' participants with complete and accurate information about its inadequate risk management controls.  Instead, Regions has told Plan participants that it lacked exposure to the subprime market's downturn, that it had sufficient reserves for loan losses, and that its loans were all "well-secured by real estate collateral."  Regions Quarterly Report (Form 10-Q) (June 30, 2007) at 24, 31.  These inaccurate and incomplete statements made it impossible for Plan participants to understand the risks of investment in the Regions Stock Fund.

219.     Similarly, Regions has failed to provide complete and accurate information about the risks of its massive investment in MBS.  Rather than explain that the MBS market was rife with risks and uncertainty, Regions told Plan participants that its investment in MBS was its "primary source[] of liquidity" that would "provide a constant flow of funds available for cash needs."  2007 10-K at 60.  This made it impossible for Plan participants to understand and appreciate the risks of investing in the Regions Common Stock fund throughout the Company Stock Subclass Period.

220.     Throughout the Company Stock Subclass Period, Regions have failed to make complete and accurate disclosures about its off-balance sheet exposure.  Although Regions has stated that its off-balance sheet exposure is one of its greatest risks, it has never made available for public view what constitutes its off-balance sheet exposure.  *See* 2007 10-K.  This lack of clear disclosure makes it impossible for Plan participants to understand the risks of investment in the Regions Common Stock fund.

221.     Similarly, Regions has not properly disclosed complete and accurate information about the value of its goodwill.  Regions told Plan participants by stating that it constantly tested

any impairment to goodwill, which was inaccurate.  Had Regions so tested its goodwill, it knew or should have known to write down its goodwill well before it did so in January 2009.

222.    Lastly, throughout the Company Stock Subclass Period, Regions has not provided complete and accurate information about the risk of its ARS practices.  Regions kept accurate and information from Plan participants by improperly marketing and accounting ARS as cash equivalents instead of as securities.  This deception made it impossible for Plan participants to understand the risk and impacts of Regions' ARS practice on the prudence of investing in the Regions Common Stock fund.

223.    The complexity of the financial transactions engaged in by Regions combined with the opacity of its financial disclosures prevented Plan participant from having access to complete and accurate information of the risks of receiving, selecting and maintaining retirement assets in Regions common stock in the Plans.  These failures caused substantial losses to the Plans throughout the Company Stock Subclass Period.

**B.    The Bond Funds Were Grossly Mismanaged**

**1.    The Bond Funds Were Invested in High Risk Assets, Mortgage Backed Securities and CDOs**

224.    During the Bond Fund Subclass Period, the Bond Funds held portfolios of high-risk assets that exposed the Bond Funds hem to huge losses and made it imprudent for fiduciaries to continue to offer the Bond Funds as investment options for the Plans.  The Bond Funds failed to diversify their holdings sufficiently to meet even their own policy restrictions.  As a result, the Bond Funds posed an unduly high risk of significant loss that could not prudently be borne by employee retirement plans.

225.    These risks were exacerbated by inaccurate and incomplete statements about the value of the Bond Funds and faulty assumptions in valuations of the Bond Funds' underlying

assets. A fiduciary has a duty of prudence which includes a duty not to ignore circumstances, such as those here, which increase risk of loss for Plan participants and beneficiaries and the overall magnitude of that potential loss to an imprudent and unacceptable level.

226. A variety of circumstances contributed to the unacceptable level of risk born by Plan participants as a result of the Plans' investment in the Bond Funds, including, but not limited to:

- The Bond Funds' reckless investment in high-risk mortgage-backed and asset-backed securities and CDOs throughout the Bond Fund Subclass Period, despite recognizable signs of distress in the mortgage and credit markets, including rapidly rising delinquency rates on subprime loans;

- The decision to drastically alter the Bond Funds' risk profiles without putting in place managers who had the knowledge and skill-sets to understand the changing circumstances and to manage the corresponding risk created by these changes;

- The Bond Funds' aggressive concentration in thinly-traded structured investment vehicles despite clear signs of a collapsing market for these products;

- The deteriorating market for CDOs, which led Defendants to deviate from the Bond Funds' investment policy restrictions and hold an excessive concentration of high-risk, illiquid assets;

- The continued inflation of the Bond Funds' Net Asset Values ("NAV") due to calculations based on false assumptions about the actual value and liquidity conditions affecting the market for asset-backed securities and CDOs;

- Defendants' failure to adequately diversify the Bond Funds' holdings to protect against deteriorating conditions in one market;

- The sheer magnitude of the Bond Funds' exposure to loss in complex structured debt products, which made it difficult, if not impossible, to shield Plan participants from substantial losses as the real value of the Bond Funds' assets came to light; and

- The incomplete and inaccurate information regarding the dire circumstances the Bond Funds faced as a result of their concentrated investments in high-risk structured finance products, which artificially inflated the NAVs of the Bond Funds.

227. Astonishingly, given the purpose of the Plans–to allow employees to save for retirement–and the skyrocketing risks of investment in the Bond Funds during the Bond Fund Subclass Period, the Plans' fiduciaries did not undertake any meaningful action to protect the

Plans from losses in the Bond Funds. Given the fact that Morgan Keegan & Co. is a wholly owned subsidiary of Regions Financial Corporation whose activities are reported in detail on Regions' SEC filings, Defendants knew or should have known of the mismanagement of the Bond Funds. Moreover, given the overlap between the Boards of Morgan Keegan & Co. and Regions, Defendants had access to and responsibility to access the information about the mismanagement of the Bond Funds. A prudent fiduciary facing similar circumstances would not have stood idly by as participants' investments in the Bond Funds were destroyed.

228. The Bond Funds were supposed to be conservative retirement options for risk-averse investors, and there was no shortage of well-run, safe and secure bond funds available in the marketplace. Had Defendants prudently managed the Bond Funds, substantial Plan losses would have been avoided.

**2. During the Bond Fund Subclass Period, the Bond Funds Were Imprudent Investments for the Plans Because they Contained Mortgage and Asset Backed Securities and CDOs in Far Higher Percentages than was Appropriate Under the Circumstances**

229. Neither Plaintiffs nor any member of the Bond Fund Subclass had the discretion to direct the manner in which funds were invested in any of the assets of the Bond Funds. Defendants misrepresented the RMK Select Intermediate Bond Fund as a fixed-income fund with standard investment directives similar to many fixed-income products marketed by other investment firms. However, contrary to Defendants' representation, the Bond Funds were heavily invested in poor quality, high risk mortgage and asset-backed securities and CDOs to a far greater extent than appropriate under the circumstances or that Defendants disclosed to participants. The Bond Funds were managed recklessly and deviated greatly from how a purportedly conservative fixed-income bond portfolio should be administered.

230. Compounding the problem, Regions, Regions Bank, and Morgan Keegan & Co. represented to participants that the Bond Funds reflected a disciplined, risk-controlled investment process that would protect investors from risk driven by random and unpredictable events. While pressures felt by the bond markets in 2007 affected all bond funds, the losses suffered by the Bond Funds here resulted from portfolios that were more highly concentrated in poor quality, high risk assets than other similar investment products in the general bond fund market.

231. The marketing materials and other information about the Bond Funds which Morgan Keegan & Co. provided to participants failed to disclose the uncharacteristic and extremely risky portfolio holdings that exposed the Bond Funds to losses. Indeed, Regions touted the Bond Funds and their managers to participants as well as to the investing public, citing disproportionate profits while failing to temper this with any caution that high results generally are, and certainly were here, an indication of higher risk. As a result, Plan participants lacked information to make informed investment decisions regarding the Bond Funds.

232. For example, as of March 31, 2007, the RMK Select High Income Bond Fund, a closed end fund, was invested in extremely high risk structured derivatives as follows:

|  |  |
|---|---|
| Asset-backed Securities-Investment Grade (including CDO's, CBO's, equipment lease and home equity loan securities) | 16.2% |
| Asset-backed Securities-Below Investment Grade or Unrated (including CDO's, CBO's, CLO's and equipment lease, franchise and home equity loan securities) | 35.1% |
| Mortgage-backed Securities-Investment Grade (CMOs) | 8.0% |
| Mortgage-backed Securities-Below Investment Grade or Unrated (CMOs) | 12.4% |
| Total | 71.7% |

Thus, 20.4 percent of the High Income Fund's net assets were invested in mortgage-backed securities, most of them below investment grade. Another 53.3 percent were invested in asset-backed securities based in part on risky home equity loans, 35.1 percent of which were below investment grade. Fully 47.5 percent of the portfolio was below investment grade.

233.     Gretchen Morgenson of *The New York Times* reported in December 2007 that 17 percent of the Intermediate Bond Fund's net assets were invested in mortgage-related securities. Thus, both the Intermediate and the High Risk Bond Funds had similar levels of mortgage related securities in their portfolios. Gretchen Morgenson, *The Debt Crisis, Where It's Least Expected*, N.Y. Times, Dec. 30, 2007.

234.     On July 19, 2007, *Bloomberg News* published an article regarding the Bond Funds, which stated in pertinent part:

> Kelsoe's fund ranks last of 93 high-yield rivals and it was the eighth-worst performer this year of more than 550 U.S.-based bond funds tracked by Bloomberg. Losses accelerated in June after the collapse of two hedge funds run by Bear Stearns partly because of bad bets on bonds linked to subprime mortgages. The $1 billion Regions Morgan Keegan Select Intermediate Bond Fund, which Kelsoe manages, also is the worst in its class, down 2.1% this year including reinvested dividends.
> . . .
> "A lot of mutual funds didn't own much of this stuff," said Lawrence Jones, an industry analyst at the research firm Morningstar, referring to the subprime market. The Morgan Keegan fund "is the one real big exception."
> . . .
> Kelsoe had $4 million at the end of last year in a security backed by second mortgages that Goldman Sachs Group created in January 2006. The bond was downgraded twice this year by Moody's Investors Service to the lowest rating.
> Another holding was an unrated piece of a CDO overseen by Deerfield Capital Management that was sold a year ago by Royal Bank of Scotland Group. The $4.8 million security, which a semiannual report listed with a 15% coupon, is mostly backed by subprime and "mid-prime" mortgage securities. Moody's lowered its ratings on $5.2 billion of bonds backed by

> subprime loans last week, and put another $5 billion of CDOs on review. Standard & Poor's cut its assessment of $6.39 billion of debt.

Jody Shenn, *Subprime Mortgages Take Toll on Fund Manager*, Bloomberg News, July 19, 2007.

235.    The Bond Funds were in an exposed position with a highly-risky concentration in subprime assets, that, among other things, undermined the Bond Funds' liquidity.  In an article analyzing the tiered ramifications of the subprime collapse, the *Wall Street Journal* tracked the effects of increasing default rates to losses in the Bond Funds:

> One buyer was Mr. Kelsoe, a senior portfolio manager at the asset-management unit of Morgan Keegan & Co., a Memphis, Tenn., investment firm and unit of Regions Financial Corp. At the time, Mr. Kelsoe was riding the housing boom by investing heavily in mortgage-backed securities. At the end of 2005, his RMK Select High Income Fund showed a five-year average annual gain of nearly 14%, according to Morningstar Inc. That performance beat all U.S. high-yield funds as well as the Dow Jones Industrial Average. His success brought him a bit of celebrity. He appeared on CNBC, was quoted in The Wall Street Journal and gave investing lectures at universities.
> "He talked about the importance of identifying and assessing risk," says Wilburn Lane, head of the business school at Lambuth University in Jackson, Tenn. Mr. Kelsoe spoke there in October 2006 to some 300 local businesspeople over a chicken-and-vegetables lunch. Mr. Lane, who says he was impressed with the 44-year-old's track record, later invested in one of the seven funds managed by Mr. Kelsoe.

*Behind Subprime Woes, A Cascade of Bad Bets -- One Loan's Journey Shows Culture of Risk*, Wall St. J., Oct. 17, 2007.

236.    In several messages sent to investors in the RMK Select Funds, beginning in August 2008, Jim Kelsoe alerted investors of the increased risks of the RMK Select Funds. Given these disclosures, Defendants had even more reason to know of the imprudence of continued investment.  Defendants failed to act on these public disclosures, even though they could have prevented massive losses.

237.     Criticism of the RMK Bond Funds continues to grow.  Russel Kinnell, director of research at Morningstar, recently cited the two former Regions Morgan Keegan mutual funds as "example[s] of the horrendous performance" among the mutual funds that had "miserable returns" in 2008.  Geraldine Fabrikant, *How Safe Is That Nest Egg, Anyhow?*, N.Y. Times, Jan. 11, 2009, Sunday Business at 18.  *The New York Times* noted that the Select High Income fund fell 75.8 percent and the Select Intermediate Bond Fund was down 84.5 percent last year.  According to *The New York Times*, Mr. Kinnel explained that the Regions Morgan Keegan Select High Income Fund's problem "was that it overweighted mortgage bonds and underweighted other types of corporate debt, that backfired when the mortgage market collapsed."  *Id.*  *The New York Times* reported that although these losses may not have been predicted, "the funds' atypically high returns in previous years may have indicated that something was amiss.  In 2004 and 2005, for example, Select High Income was in the top 1 percent in performance for high-yield category.  'It was clear then that it was not doing what everyone else was doing,' Mr. Kinnel said."  *Id.*  A spokesman for Regions Morgan Keegan, Eric Bran, stated that "[t]hese funds were unfortunately on the leading edge of the credit crisis."  *Id.*

238.     Additionally, Regions faces increased exposure from litigation arising out of its improper actions related to the Bond Funds.[9]  The trust funds of Regions Bank customers were divested from other investments and invested in the inferior and highly risky Bond Funds.  These trust account customers now have sued for more than $300 million in losses (representing about

_____

[9] Regions recently announced on January 22, 2009 that it reached a transaction agreement with Pioneer Investment Management, Inc. for the sale of eleven RMK Select Funds. Crystal Jarvis, *Regions to Sell Mutual Funds to Pioneer Investments*, Birmingham Bus. J., Jan. 22, 2009. Regions has stated that once the transaction is complete, the eleven RMK Select Funds with

$370 million in purchases), and have claims against Regions Bank and others related to the same conduct that injured Plaintiffs. Other investors have additional related claims. As a result, Regions and Regions Bank are now embroiled in litigation which further impairs the value of Company common stock.

3.      **The Bond Funds' Over-Concentration in High Risk Mortgage Backed Securities and CDO Assets Comes to Light**

239.    By the Second or Third Quarter of 2007, it should have been apparent to the Defendants that the credit and mortgage markets were exposed to great risk. Indeed, the crippling of two Bear Stearns hedge funds left analysts wary of heightened risks in the marketplace. *See* Michael M. Grynbaum, *Bear Stearns Profit Plunges 61% on Subprime Woes*, N.Y. Times, Sept. 21, 2007. By that time, it was obvious to professional investors that the credit and mortgage markets were under intense pressure. All this should have signaled to Defendants the urgent need to adjust risk management practices and fund options. During this time, the Bond Funds stood out with their extensive losses and glaring risk-management failures. The *Wall Street Journal* pinpointed victims of the suffering market, including investors in the Bond Funds:

> Fund manager Jim Kelsoe has written several items this summer, in one case outlining exact subprime-loan holding percentages in certain closed-end funds. His Regions Morgan Keegan Select High Income Fund has been particularly hard hit by the turmoil, and is down more than 30% so far this year; the next-worst performer in the junk-bond fund category is down about 5% in that period.

Diya Gullapalli, *Fund Firms Draw Back The Curtain*, Wall St. J., Sept. 6, 2007.

---

approximately $2 billion in assets under management will be reorganized into mutual funds managed by Pioneer with generally similar investment objectives, strategies and risks. *Id.*

240.     The Bond Funds' balance sheets were so overloaded with thinly traded illiquid assets that the Bond Funds could not generate enough cash to maintain self-sufficiency. A capital crisis struck the Bond Funds. Investors sought to withdraw before they suffered additional losses. The Bond Funds were so strapped for cash during the Bond Fund Subclass Period that they had to be bailed out for liquidity purposes. According to the *Wall Street Journal*:

> The annual report that covers these funds also outlines some important steps taken by the funds' adviser and affiliates to help cope with recent losses. These include stepping in to buy about $55.2 million in shares of the High Income Fund and $30 million in the Intermediate Bond Fund from the beginning of July to the end of August to help provide liquidity.

Diya Gullapalli, *Mutual Fund Opens a Subprime Window -- Regions Morgan Keegan Says One Is Down 35%*, Wall St. J., Oct. 5, 2007.

241.     The Bond Funds were forced to liquidate assets when prices were depressed and buyers were scarce, reducing the NAVs of the Bond Funds to handle redemptions. According to the *Wall Street Journal*:

> The Intermediate Bond Fund was hit hard amid the turmoil in the credit markets since this summer, as many of fund's investments in mortgage-backed and other asset-backed securities couldn't find buyers. The fund also had redemptions from investors, which forced the managers to sell in a down market and reduced the value of the portfolio.
>
> The fund is currently down around 45% since the start of the year, the worst performer in the intermediate-term bond-fund category of funds, according to research firm Morningstar Inc. The average fund in this category is up 5% since the start of the year.

Shefali Anand, *First the Losses, Now Bond-Fund Lawsuits -- Indiana Charity Is Latest To Seek Recourse as Values Of Debt Portfolios Decline*, Wall St. J., Dec. 6, 2007.

242.     According to *Bloomberg L.P.,* as of May 5, 2008, the Intermediate Fund's NAV was down more than 75 percent from a year previous. Compared to other funds in the same Morningstar category, the Intermediate Fund was disproportionately invested in complex structured investment vehicles tied to the subprime mortgage market. This management failure caused the Bond Funds to collapse—an unusual event even within current market conditions. Indeed, the Bond Funds have the dubious distinction of being the worse performing fixed-income bond funds in the country. Defendants knew or should have known that the Bond Funds managers, a Regions affiliate, had violated their own investment objectives and guidelines, taken on astonishingly high levels of risk, and transformed themselves from fixed-income retirement savings funds to high-risk gambles.

243.     During the Bond Fund Subclass Period, the market for high-risk mortgage-backed and asset-backed securities dried up, which affected many of the Intermediate Fund's underlying assets. As a result, Plan participants continue to suffer losses as the thinly traded assets in the Intermediate Fund continue to decline in value and salability. The following chart demonstrates the RMK Intermediate Fund's standard fixed-income returns changing course as a result of the fund's reckless, high-risk speculation in poor quality high risk securities:



244.    The Intermediate Bond Fund suffered a precipitous decline beginning in July of 2007 and continuing through Spring of 2008 to the present as the Intermediate Bond Fund essentially became worthless.

245.    According to *Bloomberg L.P.,* as of May 5, 2008, the High Income Fund NAV was down more than 75 percent from a year previous.  Similar to the Intermediate Fund, the RMK Select High Income Fund's assets were disproportionately concentrated in complex structured finance vehicles compared to other funds in its Morningstar category.  The High Income Fund suffered a precipitous decline beginning in July of 2007 and continuing through the Spring of 2008 to the present as the High Income Fund became worthless.



**RMK Select High Income Fund**

246.     On April 21, 2008, Morgan Keegan Select Fund, Inc., the Regions subsidiary

owning the Bond Funds, announced that Jim Kelsoe of Morgan Asset Management, Inc., another

Regions subsidiary, would be replaced by Hyperion Brookfield Asset Management, Inc.

247.     Transfer of management of the Bond Funds to Hyperion was finalized July 11,

2008.  On July 29, 2008, Hyperion announced a strategy to "reposition the portfolios in favor of

investment grade and high yield corporate securities along with asset-backed securities."

Hyperion explained the benefits of greater diversification:

>      Achieving better diversification across different sectors of the
>      fixed income market should allow the funds to increase the
>      predictability of income, provide a base for net asset value
>      stability, and preserve total return potential.

Hyperion characterized the new strategy as "portfolio repositioning."

248.     The firing and replacement of the high flying Jim Kelsoe as fund manager and the

new managers' dramatic "portfolio repositioning" provides strong evidence of the utter failure of

the Bond Fund management, a failure which wiped out Plan participants' Bond Fund investments.

249.    Throughout the Bond Funds' highly publicized collapse in value, Defendants took no steps to remove the Bond Funds as investment options in the Plan.  They failed to do so even through they knew or should have known, given the fact that Morgan Keegan & Co. is a wholly-owned subsidiary whose actions are integral to Regions Financial Corporation and whose Boards overlap.  Indeed, information about the risks and imprudence of keeping the Bond Funds as investment alternatives to the Plan was available publically by August 2008.  Even now, with the Bond Funds valued at $0.39 (Intermediate) and $0.65 (High Income), Defendants continue to offer the Bond Funds as investment options in the Regions 401(k) Plan.

### 4.    Defendants Selected the Bond Funds to Benefit Regions and its Subsidiaries Instead of Plan Participants

250.    During the Bond Fund Subclass Period, as described herein, Defendants caused the Plans to invest in the Bond Funds when Defendants knew or should have known that less risky, better-performing, comparable funds were available from unaffiliated financial services companies.

251.    The Legacy and Regions 401(k) Plan Benefits Management Committees and/or the Investment Committee Defendants, if any, had the sole discretion to select the investments available under the Plans.  Over many years, the Benefits Management Committee and/or the Investment Committee Defendants used that discretion to direct millions of dollars of the Plans' assets into the Bond Funds.

252.    Rather than engaging in a prudent process to select alternative fixed income bond funds, the Benefits Management and Investment Committees made the imprudent decision to

select the Bond Funds, for the apparent purpose of providing Regions with more business for its wholly-owned subsidiary, Defendant Regions Morgan Keegan, Inc.

253. Given that Morgan Keegan & Co. ran the Bond Funds and is an integral component of Regions Financial Corporation, Defendants knew or should have known that the Bond Funds were improper Plan investments. Moreover, given the overlap between the Morgan Keegan & Co. and Regions Board, the Defendants had access to and should have known of that the Bond Funds were imprudent Plan investments. Despite this, Defendants failed to act to protect Plan assets.

**5. Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in The Bond Funds**

254. ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

255. During the Bond Fund Subclass Period, on information and belief, Regions, Regions Bank, and Morgan Keegan & Co. made direct and indirect communications to participants in the Plans, which included statements regarding investments in the Bond Funds. These communications, which were plan-wide and uniform and issued to all Plan participants, included Plan-related materials, including, but not limited to the SPDs and fund prospectuses and, thus, were Plan communications undertaken in a fiduciary capacity, in which Defendants failed to disclose that the Bond Funds were not prudent retirement investments. Defendants misrepresented the Bond Funds as safe, fixed-income funds with standard investment directives similar to many fixed-income products marketed by other investment firms. Yet, the Bond

Funds deviated from sector-wide risk management and investment practices and exposed the Bond Funds and the retirement savings of Plan participants to huge losses in a volatile market.

256. As averred above, Defendants provided inaccurate information to the Plans' participants regarding the Bond Funds' investment profile.

257. Even though Defendants knew or should have known of the subprime fallout and the heightened risks in the marketplace, that the credit and mortgage markets were under intense pressure, and that the Bond Funds' balance sheets remained overloaded with thinly traded illiquid assets, the Plans continued to offer the Bond Funds and represent that they were appropriate retirement investments.

258. In addition, in a uniform, plan-wide manner, Defendants failed to provide participants with complete and accurate information regarding the true nature of the Bond Funds. As such, participants in the Plans could not appreciate the true risks presented by investments in the Bond Funds and therefore could not make informed decisions regarding their investments in the Bond Funds in the Plans.

259. Specifically, Defendants failed to provide the Plans' participants with complete and accurate information regarding the Bond Funds': (a) deviation from sector-wide risk management and investment practices; (b) undisclosed, disproportionate investment in poor quality complex structured investment vehicles tied to the subprime mortgage market; (c) failure to adjust risk management practices; and (d) inability to generate enough cash to maintain the Bond Funds' balance sheets, which were overloaded with thinly traded illiquid assets. As such, the Plans' participants were not informed of the true risks of investing their retirement assets in the Plans in the Bond Funds.

C.      **Excessive Fees and the RMK Select Funds**

1.      **The RMK Select Funds Were Imprudent Investments for the Legacy and Regions 401(k) Plans During the Excessive Fee Subclass Period and Defendants' Fiduciary Breaches Have Caused the Plans to Incur Substantial Losses**

*Fees and Expenses Charged by the RMK Select Funds Were Excessive*

260.    There is no shortage of reasonably priced, well managed investment options in the 401(k) plan marketplace.  Nonetheless, Defendants ignored these options and instead assembled for the Legacy and Regions 401(k) Plans a list of proprietary mutual funds managed by a subsidiary of Regions that charged unreasonably high fees and expenses.  Indeed, proprietary funds selected by Defendants had expense ratios in some cases upwards of ***six times*** the expense ratios for readily available comparable funds.  As a result, the Legacy and Regions 401(k) Plans wasted participants' retirement savings–large sums of money–on inferior investment products.

261.    By failing to implement a prudent and adequate procedure for evaluating, selecting and monitoring fund investment options and for ensuring that reasonably priced, prudent investment options were selected for the Legacy and Regions 401(k) Plans, Defendants caused the Legacy and Regions 401(k) Plans to incur substantial losses.  Thus, Defendants violated their fiduciary duties under ERISA.

262.    An adequate investigation in this respect would have revealed to Defendants that the RMK Select Funds were imprudent, and a reasonably prudent fiduciary would have acted differently under the circumstances.  Defendants failed to comply with this duty. Moreover, given the available alternatives which would have generated the same or better return on investment without the excessive fees of the RMK Select Funds, Defendants breached their fiduciary duties under ERISA to the Excessive Fee Subclass.  Upon information and belief, the Defendants failed to undertake any prudent or reasonable investigation of investment alternatives

that would not have caused Plaintiffs and the Excessive Fee Subclass to incur such substantial monetary losses.

263.     Many of the RMK Select Funds hold Retail Class shares. Retail Class shares are generally intended for individual investors, not large pools of retirement savings. Large retirement plans, such as the Legacy and Regions 401(k) Plans, have the ability to obtain Institutional Class shares for company-sponsored retirement plans. Institutional Class shares are far cheaper than Retail Class shares, while offering the same or better performance. For this reason, prudent retirement plan fiduciaries often select Institutional Class shares for inclusion in large plans. The relatively higher fees for the Retail Class shares held by the Legacy and 401(k) Plans in some RMK Select Funds were unwarranted when better options featuring Institutional Class shares were readily available.

264.     Further, the RMK Select Funds predominantly were actively managed funds. Upon even the most cursory inspection of fund performance, one can see that many of the actively-managed funds selected by Defendants frequently yielded lower returns than passively-managed funds in the same categories due at least in part to the higher cost to the Legacy and Regions 401(k) Plans. Even as compared to other actively managed funds, the performance of the RMK Select Funds did not justify the high fees that the Plans paid to Regions and its affiliates.

265.     To demonstrate the extent of losses in Legacy and Regions 401(k) Plans participants' retirement savings caused year after year by Defendants' failure to ensure that the fees and expenses charged to the Legacy and Regions 401(k) Plans were reasonable, Plaintiffs provide the following tables that: (1) summarize the expense ratios of the RMK Select Funds; (2) compare the RMK Select Funds to less expensive investment alternatives available in the

marketplace; and (3) provide an estimate of the losses to the Plan from December 31, 2002 to December 31, 2007, the dates during the Excessive Fee Subclass Period for which Legacy and Regions 401(k) Plans asset information is available.[10]  The estimated losses are based on rates published by Vanguard, a prominent investment management company.  On information and belief, investment houses such as Vanguard offer even lower rates than those included in the tables below to large institutional clients like Regions with tens of millions of dollars to invest.  Thus, to the extent that the Legacy and Regions 401(k) Plans could have negotiated even lower fees, or excessive fees continued to be assessed against the funds after December 31, 2007, the actual losses to the Legacy and Regions 401(k) Plans are even greater than these estimates.  Plaintiffs reserve the right to claim such higher damages following discovery.

266.    As of December 31, 2007, the Legacy Plan had in excess of $126 million in the RMK Select Balanced Fund (the "Balanced Fund").  2007 Form 11-K at 10.  Even though the Plans had over $126 million invested in the Balanced Fund, the Legacy Plan held Class A shares, which are Retail Class shares within the Balanced Fund.  As discussed above, Institutional Class shares, which should have been available for the Plans' investment in the Balanced Fund given the size of the investment, are less expensive than Retail Class shares, yet providing the same or better performance.  The participants' investments were assessed a gross expense ratio of 1.25 percent.  The Defendants chose this fund despite the existence of high-quality alternatives with lower fees that are available in the market place.  *For example*: Vanguard's Asset Allocation Fund, an actively managed fund in the same Morningstar category as the Balanced Fund, offers

---

[10] All calculations of losses use actively-managed and passively-managed Vanguard funds of the same Morningstar category as points of comparison. These funds are chosen as examples of investment products available in the marketplace.

an expense ratio of 0.37 percent to *retail* investors.  The Plans' investments in the Balanced Fund resulted in more than $5.1 million in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Balanced Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | RMK Select Balanced Fund |
|---|---|
| Expense Ratio: | 1.25% |
| Actively Managed Alternative Expense Ratio: | 0.37% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.19% |
| Initial Plan Assets in Fund: | $64,244,510 |
| Estimated Losses (Active): | ($5,143,796) |
| Estimated Losses (Passive – Retail Class): | ($6,217,892) |

267.    As of December 31, 2007, the Legacy Plan had in excess of $64 million in the RMK Select Mid Cap Growth Fund (the "Mid Cap Growth Fund").  2007 Form 11-K at 10. Even though the Legacy Plan had over $64 million invested in the Mid Cap Growth Fund, the Legacy Plan held Class A shares in the Mid Cap Growth Fund, which are Retail Class shares. The participants' investments were assessed a gross expense ratio of 1.23 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class that are available in the marketplace.  *For example*: Vanguard's Mid Cap Growth Fund, an actively managed fund in the same Morningstar category as the Mid Cap Growth Fund, offers an expense ratio of 0.56 percent to *retail* investors.  The Plans' investments in the Mid Cap Growth Fund resulted in more than $2.4 million in losses due to excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund.   The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select MidCap Growth Fund |
|---|---|
| Expense Ratio: | 1.23% |
| Actively Managed Alternative Expense Ratio: | 0.56% |
| Initial Plan Assets in Fund: | $31,126,152 |
| Estimated Losses (Active): | ($2,479,036) |

268.    As of December 31, 2007, the Legacy Plan had in excess of $59 million in the RMK Select Growth Fund (the "Growth Fund"). 2007 Form 11-K at 10. Even though the Legacy Plan had over $59 million invested in the Growth Fund, the Legacy Plan held Class A shares within the Growth Fund, which are Retail Class shares. The participants' investments were assessed a gross expense ratio of 1.21 percent. Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. **_For example_**: Vanguard's U.S. Growth Fund, an actively managed fund in the same Morningstar category as the Growth Fund, offers an expense ratio of 0.50 percent to **_retail_** investors. The Plans' investments in the Growth Fund resulted in more than $2.7 million in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Growth Fund is compared to either a retail or institutional index fund in the same asset category. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select Growth Fund |
|---|---|
| Expense Ratio: | 1.21% |
| Actively Managed Alternative Expense Ratio: | 0.50% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Initial Plan Assets in Fund: | $50,538,048 |
| Estimated Losses (Active): | ($2,747,564) |
| Estimated Losses (Passive – Retail Class): | ($3,707,175) |

269.     As of December 31, 2007, the Legacy Plan had in excess of $32 million in the RMK Select Value Fund (the "Value Fund").  2007 Form 11-K at 10.  Even though the Legacy Plan had over $32 million invested in the Value Fund, the Plan held Class A shares within the Value Fund, which are Retail Class shares.  The participants' investments were assessed a gross expense ratio of 1.22 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  ***For example*:** Vanguard's Growth and Income Fund, an actively managed fund in the same Morningstar category as the Value Fund, offers an expense ratio of 0.31 percent to ***retail*** investors.  The Plans' investments in the Value Fund resulted in more than $1. 7 million in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund.  The contrast is even starker when the Value Fund is compared to either a retail or institutional index fund in the same asset category.  The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select Value Fund |
|---:|:---:|
| Expense Ratio: | 1.22% |
| Actively Managed Alternative Expense Ratio: | 0.31% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.15% |
| Initial Plan Assets in Fund: | $19,941,934 |
| Estimated Losses (Active): | ($1,668,775) |
| Estimated Losses (Passive – Retail Class): | ($1,913,986) |

270.     As of December 31, 2007, the Legacy Plan had in excess of $5 million in the RMK Select High Income Fund (the "High Income Fund").  2007 Form 11-K at 10. The participants' investments were assessed a gross expense ratio of 0.89 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  ***For example*:** Vanguard's High Yield Corporate Fund, an actively

managed fund in the same Morningstar category as the High Income Fund, offers an expense ratio of 0.25 percent to *retail* investors. The Plans' investments in the High Income Fund resulted in more than $135 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive actively managed retail fund. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select High Income Fund |
|---|---|
| Expense Ratio: | 0.89% |
| Actively Managed Alternative Expense Ratio: | 0.25% |
| Initial Plan Assets in Fund: | $30 |
| Estimated Losses (Active): | ($135,527) |

271. As of December 31, 2007, the Legacy Plan had in excess of $15 million in the RMK Select Fixed Income Fund (the "Fixed Income Fund"). 2007 Form 11-K at 10. The participants' investments were assessed a gross expense ratio of 1.00 percent. Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. *For example*: Vanguard's Intermediate-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Fixed Income Fund, offers an expense ratio of 0.21 percent to *retail* investors. The Plans' investments in the Fixed Income Fund resulted in more than $734 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Fixed Income Fund is compared to either a retail or institutional index fund in the same asset category. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select Fixed Income Fund |
|---|---|
| Expense Ratio: | 1.00% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund: | $23,148,166 |
| Estimated Losses (Active): | ($734,759) |
| Estimated Losses (Passive – Retail Class): | ($764,025) |

272. As of December 31, 2007, the Legacy Plan had in excess of $11 million in the RMK Select Ltd. Maturity Fixed Income Fund (the "Ltd. Maturity Fixed Income Fund"). 2007 Form 11-K at 10. Even though the Legacy Plan had over $11 million invested in the Ltd. Maturity Fixed Income Fund, the Plan held Class A shares within the Ltd. Maturity Fixed Income Fund, which are Retail Class shares. The participants' investments were assessed a gross expense ratio of 0.96 percent. The Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. *For example*: Vanguard's Short-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Ltd. Maturity Fixed Income Fund, offers an expense ratio of 0.21 percent to *retail* investors. The Plans' investments in the Ltd. Maturity Fixed Income Fund resulted in more than $799 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Ltd. Maturity Fixed Income Fund is compared to either a retail or institutional index fund in the same asset category. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select Ltd. Maturity Fixed Income Fund |
|---|---|
| Expense Ratio: | 0.96% |
| Actively Managed Alternative Expense Ratio: | 0.21% |

| | |
|---|---|
| **Passively Managed Alternative Expense Ratio (Retail):** | 0.18% |
| **Initial Plan Assets in Fund:** | $30,769,121 |
| **Estimated Losses (Active):** | **($799,577)** |
| **Estimated Losses (Passive – Retail Class):** | **($836,881)** |

273.    As of December 31, 2007, the Legacy Plan had in excess of $3 million in the RMK Select Intermediate Bond Fund (the "Intermediate Bond Fund").  2007 Form 11-K at 10. The participants' investments were assessed a gross expense ratio of 0.60 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  ***For example***:  Vanguard's Intermediate-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Intermediate Bond Fund, offers an expense ratio of 0.21 percent to ***retail*** investors.  The Plans' investments in the Intermediate Bond Fund resulted in more than $41 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund.  The contrast is even starker when the Intermediate Bond Fund is compared to either a retail or institutional index fund in the same asset category.  The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| **Mutual Fund Name:** | **RMK Select Intermediate Bond Fund** |
|---|---|
| **Expense Ratio:** | 0.60% |
| **Actively Managed Alternative Expense Ratio:** | 0.21% |
| **Passively Managed Alternative Expense Ratio (Retail):** | 0.18% |
| **Initial Plan Assets in Fund:** | $30 |
| **Estimated Losses (Active):** | **($41,455)** |
| **Estimated Losses (Passive – Retail Class):** | **($48,224)** |

274.    As of December 31, 2007, the Legacy Plan had in excess of $5 million in the RMK Select Short Term Bond Fund (the "Short Term Bond Fund").  2007 Form 11-K at 10. The participants' investments were assessed a gross expense ratio of 0.65 percent.  Defendants

chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. *For example*: Vanguard's Short-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Short Term Bond Fund, offers an expense ratio of 0.21 percent to *retail* investors. The Plans' investments in the Short Term Bond Fund resulted in more than $72 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Short Term Bond Fund is compared to either a retail or institutional index fund in the same asset category. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| Mutual Fund Name: | RMK Select Short Term Bond Fund |
|---|---|
| Expense Ratio: | 0.65% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund (as of 12/31/05): | $8,722,364 |
| Estimated Losses (Active): | ($72,031) |
| Estimated Losses (Passive – Retail Class): | ($77,642) |

275. As of December 31, 2007, the Legacy Plan had in excess of $15 million in the RMK Select Mid Cap Value Fund (the "Mid Cap Value Fund"). 2007 Form 11-K at 10. Even though the Plan had over $15 million invested in the Mid Cap Value Fund, the Legacy Plan held Class A shares in the Mid Cap Value Fund, which are retail class shares. The participants' investments were assessed a gross expense ratio of 1.31 percent. Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. *For example*: Vanguard's Strategic Equity Fund, an actively managed fund in the same Morningstar category as the Mid Cap Value Fund, offers an expense ratio of 0.25

percent to *retail* investors. The Plans' investments in the Mid Cap Value Fund resulted in more than $409 thousand in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based on a comparison of the fund to an actively managed alternative. The contrast is even starker when the Mid Cap Value Fund is compared to either a retail or institutional index fund in the same asset category. The Regions 401(k) Plan continues to incur the excessive fees linked to the RMK Select Funds.

| | RMK Select Mid Cap Value Fund |
|---|---|
| **Mutual Fund Name:** | |
| **Expense Ratio:** | 1.31% |
| **Actively Managed Alternative Expense Ratio:** | 0.25% |
| **Passively Managed Alternative Expense Ratio (Retail):** | 0.21% |
| **Initial Plan Assets in Fund (as of 12/31/03):** | $5,684,996 |
| **Estimated Losses (Active):** | **($409,155)** |
| **Estimated Losses (Passive – Retail Class):** | **($420,051)** |

276. As of December 31, 2007, total estimated losses to the Legacy Plan for the Excessive Fee Subclass Period from excessive fees and expenses charged to the Plan by the RMK Select Funds were as follows:

| | Estimated Losses |
|---|---|
| Alternative Actively Managed Funds | ($11,694,091) |
| Alternative Passively Managed Funds (Retail Class) | ($11,430,067) |

277. Upon information and belief, damages to the Regions 401(k) Plan are still being incurred due to the excessive fees charged by the RMK Select Funds.

278. Defendants selected the RMK Select Funds because they are proprietary funds that provide substantial fees to Regions and its affiliates, and not because they were and are in the best interests of Plan participants. The excessive fees derived by Regions and its affiliates were and are not credited back to the Plans and are not the result of services provided by the RMK Select Funds to the Plans. Nor are the 12b-1 and other fees charged by the RMK Select

Funds reasonable or paid to parties unaffiliated with Regions. Instead, the high fees are taken by Regions and its affiliates for their own use and benefit to the detriment of participants' retirement savings.

**2.    The Excessive Fees Charged by the RMK Select Funds Cannot Be Justified by Their Performance**

279.    Unlike performance, costs are entirely predictable and certain. Therefore, prudent plan fiduciaries focus not only on performance but also on investment fees and expenses, to ensure that selected funds charge reasonable fees. There is no excuse for throwing away money on excessive fees. Imprudent fiduciaries sometimes attempt to justify unreasonably high fees by pointing to fund performance. This generally is regarded as an unduly risky approach to retirement asset management since performance can change overnight but excessive fees will always be excessive.

280.    Here, however, if Defendants attempt to justify the excessive based on fund performance their effort will fail. The Legacy and Regions 401(k) Plans investment options' performance frequently fell short of far less expensive alternatives in the same Morningstar categories. Moreover, the Bond Funds charged excessive fees while frequently under-performing other mutual funds in their respective Morningstar categories.

281.    Thus, Defendants caused the Legacy and Regions 401(k) Plans to pay too much for the Plan investment options, which were inferior products in any event. Defendants' conduct is an egregious violation of the duties of prudence and loyalty under ERISA.

**3.    Defendants Knew or Should Have Known That the RMK Select Funds Were Imprudent Investments**

282.    During the Excessive Fee Subclass Period, as described herein, Defendants knew or should have known that the RMK Select Funds were imprudent investments for the Legacy

and Regions 401(k) Plans because there were more reasonably priced, high-quality investment options available in the marketplace. Defendants could and should have selected investment options for the Legacy and Regions 401(k) Plans with lower fees and expenses that provided comparable and/or better performance than the RMK Select Funds. Defendants also knew that the RMK Select Funds were selected solely because they are proprietary funds from which Regions and its affiliates derive substantial revenue, and not because the funds were or are in the best interest of Plan participants.

283.    As a result of these fiduciary breaches, the RMK Select Funds continued to be offered in the Legacy and Regions 401(k) Plans and caused participants to lose a significant portion of their retirement savings.

284.    Defendants failed to conduct an appropriate investigation into whether the RMK Select Funds were prudent investments for the Legacy and Regions 401(k) Plans and, in connection therewith, failed to provide the Plans' participants with information regarding the impact that excessive fees and unreasonable expenses had on participants' retirement savings so that participants could make informed decisions regarding their investments in the Legacy and Regions 401(k) Plans. Defendants knew or should have known that less expensive comparable funds yielding superior results were available in the marketplace, but failed to communicate this information to participants. Instead, Defendants selected high cost options that caused the Legacy and Regions 401(k) Plans to squander vast sums on unnecessary fees. Defendants also failed to inform participants that the RMK Select Funds were selected because Regions and its affiliates earned substantial fees from the Plans' investment in the Funds and not because the Funds were in the best interest of the Plan participants.

285.     A reasonable fiduciary would not have invested in these funds, given that the fees were unreasonable and not justified in light of other investment alternatives.

286.     Presumably, Defendants, as Plan fiduciaries of an ERISA Plan with over 700 million dollars in assets, were familiar with DOL guidance on the prudent selection of investment options.  The DOL urges employers and fiduciaries to take their duty to select retirement plan investment options very seriously.  Evaluation of  fees are part of their fiduciary responsibilities:

Why Consider Fees?

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

> In recent years, there has been a dramatic increase in the number of investment options, as well as level and types of services, offered to and by plans in which participants have individual accounts. In determining the number of investment options and the level and type of services for your plan, it is important to understand the fees and expenses for the services you decide to offer. The cumulative effect of fees and expenses on retirement savings can be substantial.

*Understanding Retirement Plan Fees And Expenses*, U.S. Dep't of Labor, May 2004, *available at* http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

287.     In addition, the DOL also has repeatedly cautioned employers that the investment style of a particular fund, *i.e.*, whether it is actively or passively managed, has a major impact on

fees. When funds such as index funds are "passively managed," "little research" is required, and

fees should be much lower:

> Funds that are "actively managed" (i.e., funds with an investment adviser who actively researches, monitors, and trades the holdings of the fund to seek a higher return than the market as a whole) generally have higher fees than funds that are "passively managed" (see below). The higher fees are associated with the more active management provided and increased sales charges from the higher level of trading activity. While actively managed funds seek to provide higher returns than the market, neither active management nor higher fees necessarily guarantee higher returns.

> Funds that are "passively managed" generally have lower management fees. Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index. Thus, passively managed funds require little research and less trading activity.

*Id.*

288. Accordingly, if actively managed funds are offered in an ERISA-protected

retirement plan, the fiduciaries must ensure that the performance of those investment options

justifies the increased expense of the funds. Paying high fees for a fund that underperforms the

applicable index is financially unsound as a matter of basic prudence.

289. The detrimental impact excessive fees have on retirement savings is substantial,

as the DOL has noted. Over the course of an individual's participation in a 401(k) plan,

excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement

savings.

290. *For example*: the DOL has postulated an example which assumes that an

employee with 35 years until retirement has a current 401(k) account balance of $25,000. If

returns on investments in his account over the next 35 years average 7 percent, and fees and

expenses reduce the average returns by 0.5 percent, his account balance would grow to $227,000

at retirement, even if there were no further contributions to the account. However, if fees and expenses are 1.5 percent, his account balance would grow to only $163,000 at retirement. The 1 percent difference in fees and expenses reduces the account balance at retirement by a shocking 28 percent.



*See* Employee Benefits Sec. Admin., U.S. Dep't of Labor, A Look at 401(k) Plan Fees 2 (Aug. 1998), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf.

291.    Because of the enormous impact that excessive fees and expenses can have on participants' retirement savings, plan fiduciaries are required to monitor fees and expenses carefully to ensure that amounts charged against plan accounts are reasonable.

292.    An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, the RMK Select Funds were unduly expensive, and, thus, imprudent. A prudent fiduciary acting under similar circumstances would

have acted to protect participants against unnecessary losses and would have made different investment decisions.

293.    Because Defendants knew or should have known that the RMK Select Funds were not prudent investment options for the Legacy and Regions 401(k) Plans, Defendants had a fiduciary duty to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the RMK Select Funds.

294.    Despite the ready availability in the marketplace of investment options that charge reasonable fees and expenses and provide comparable and often better performance, Defendants failed to take any action to protect participants from losses resulting from the Legacy and Regions 401(k) Plans RMK Select Funds.

295.    In addition, Defendants failed adequately to review the performance of the other fiduciaries of the Legacy and Regions 401(k) Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Had they paid meaningful attention to the RMK Select Funds, the process by which the options were presented, the bases for inclusion of these funds as Plan investment options, the fees and expenses charged to the Legacy and Regions 401(k) Plans year after year for the RMK Select Funds, and their mediocre performance, millions of dollars of participants' retirement savings could have been saved.

**4.    Defendants Failed to Provide Legacy and Regions 401(k) Plan Participants with Complete and Accurate Information Regarding the Excessive Fees Associated With the RMK Select Funds**

296.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA

includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

297. During the Excessive Fee Subclass Period, Defendants, as the Legacy and Regions 401(k) Plans' fiduciaries, knew or should have known certain basic facts about the impact that fees and expenses charged by fund options can have on an individual's retirement savings, including the following:

- Fees charged by the RMK Select Funds were paid directly from Legacy and Regions 401(k) Plan assets, meaning that every excessive dollar paid is a dollar unnecessarily and inappropriately taken from participants' retirement savings;

- Excessive fees have a devastating impact on the total retirement savings of Legacy and Regions 401(k) Plan participants, decreasing total savings by a substantial percentage over time;

- Given the impact of excessive fees on participants' retirement savings, prudent selection of reasonably priced, high-quality fund options is of paramount importance to prudent plan management and administration; and

- Selection of expensive Retail Class shares within the RMK Select Funds for a plan the size of the Legacy or Regions 401(k) Plan is imprudent given the ready availability of Institutional Class shares, and both retail and institutional index funds that offer comparable and often better performance at a fraction of the cost.

298. During the Excessive Fee Subclass Period, Defendants failed to provide complete and accurate information to Legacy and Regions 401(k) Plan participants regarding the impact excessive fees charged by the RMK Select Funds have on their retirement savings, the bases for the Defendants' selection of the RMK Select Funds, and the ready availability of far less expensive, comparable, and better performing options in the marketplace. Accordingly, participants in the Legacy Plan could neither assess nor appreciate the true risks presented by the

RMK Select Funds and therefore could not make informed decisions regarding their investments in the Plans.

299. Of particular note, Defendants failed to disclose to Legacy and Regions 401(k) Plan participants that the sole reason the RMK Select Funds were selected was because they were proprietary funds for which Regions received excessive fees, rather than as a result of a prudent process that evaluates the merits of the funds and compares them to less expensive, comparable and better performing funds that were readily available in the marketplace.

300. These facts were material to Plan participants, who needed to know and appreciate this information to manage their retirement investments in a sound and prudent manner. Armed with this information, participants could have evaluated whether to invest part or all of their retirement savings in vehicles outside of the Plans, confronted the Defendants regarding the imprudent selection of the RMK Select Funds as Plan investment options, complained to the Department of Labor or other relevant authorities, or, more generally, better understand the operation and administration of the Plans.

**5.      Defendants Engaged in Prohibited Transactions Based on Their Selection of the RMK Select Funds as a Plan Investment Option**

301. Furthermore, during nearly all of the Excessive Fee Subclass Period, the RMK Select Funds have provided kickback and royalties to Regions directly and through its wholly-owned subsidiaries, Morgan Asset Management and Morgan Keegan & Co. Morgan Asset Management has been the Investment Adviser to the RMK Select Funds from at least 2003 to July 29, 2008, when Hyperion Brookfield became the Investment Advisor. *See* RMK Select Funds Form 485APOS filed Dec. 3, 2003; RMK Select Funds Form 485APOS filed Dec. 1, 2004; RMK Select Funds Form 485APOS filed Jan. 30, 2006; RMK Select Funds Form 2008 Prospectus at 1, 85; Regions (April 1, 2008). From at least 2003 to 2008, Morgan Asset

Management was designated to receive anywhere from .20 percent to .80 percent of each Fund's average daily net assets as an "Investment Advisory Fee." Moreover, the Legacy and Regions 401(k) Plans paid 12b-1 and other related fees to Morgan Keegan & Co. as part of the Plans' investment in the RMK Select Funds. Upon information and belief, Morgan Keegan & Co. also used or caused Legacy and Regions 401(k) Plan assets to pay commissions to Regions affiliates related to the purchase and sale of RMK Select Fund shares in(?) the Legacy and Regions 401(k) Plans.

302.    Regions Bank caused the Legacy and Regions 401(k) Plans to engage in transactions that each of them knew or should have known constituted a direct or indirect furnishing of services or transactions of Plan assets between the Legacy and Regions 401(k) Plans, on the one hand, and parties in interest, on the other hand.

303.    Regions caused the Legacy and Regions 401(k) Plans to enter a contract or other arrangements through which the Plans paid for services and/or transferred Plan assets to Morgan Asset Management and/or Morgan Keegan & Co., both parties in interest, in relation to the Plans' investment in the RMK Select Funds. This includes, but is not limited to sales commissions charged by Morgan Keegan & Co. These arrangements or contracts caused the Plans to make payments for services which were not reasonable, especially when compared to other comparable, available mutual funds. To the extent that these fees were kickbacks and royalties, they were not and cannot be reasonable as a "service" charge. Moreover, given that these fees were paid to Regions' affiliates, the fees were unreasonable because Regions was using Plan assets to pay itself for services which caused it no increase in value.

304.    Regions received revenue sharing and other kickback payments from Morgan Keegan & Co. and/or Morgan Asset Management, and did so at the expense of Legacy and

Regions 401(k) Plans participants or beneficiaries as the revenue sharing and other kickback payments were not credited to the Plans but instead were kept by Regions. Regions passed the cost of the revenue sharing and other kickback payments through to the Plan by increasing the fees and expenses charged to the Plans by the RMK Select Funds. Thus, Regions dealt with Plan assets for its own benefit, and received consideration from parties in interest by having the Plan invest in and/or offer as an investment option the RMK Select Funds.

305.     The arrangements described above, including the kickbacks and royalties, constitute prohibited transactions under ERISA. *See* ERISA §§ 406(a)(1)(C) & (D), 406(b)(1) & (3). These actions were not in the best interest of the Plan participants.

## VIII.   THE RELEVANT LAW

306.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

307.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

308.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief. This applies to nonfiduciary parties in interest that knowingly participate in a violation of ERISA. *See Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 245 (2000).

309.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

310.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Regions Stock Fund, which invested in Regions stock, the Bond Funds, and the RMK Select Funds to ensure that each investment is a suitable option for the Plans;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

311.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

312. Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as determining the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would have an incentive to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

313.    ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and parties in interest.  Both ERISA §§ 406(a)(1)(C) and (D) are relevant to Plaintiffs' Complaint.  Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect:
>
> (A)    sale or exchange, or leasing, or any property between the plan and a party in interest;
>
> (B)    lending of money or other extension of credit between the plan and a party in interest;
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E)    acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

ERISA § 408(b)(2) provides an exemption for these transactions, but *only* "if no more than reasonable compensation is paid."  Naturally, if the compensation is not "reasonable," then the exemption does not apply.  *See, e.g.*, *Arakelian v. Nat'l W. Life Ins. Co.*, 680 F. Supp. 400, 406 (D.D.C. 1987).

314.    Also relevant to Plaintiffs Complaint, is ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from themselves dealing with assets of the plan for their own interest or account.  Additionally, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits fiduciaries from receiving any consideration for their own account from anyone who conducts a transaction with the plan that involves plan assets.

315.    The Department of Labor has explained that the "prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act."  29 C.F.R. § 2550.408b-2(e)(1).  Moreover, "a fiduciary may not use

the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service." *Id.*

316.     The Department of Labor has created an exemption to both ERISA §§ 406(a) and (b) for "the acquisition or sale of shares of an open-end investment company . . . by an employee benefit plan covering only employees of such investment company, employees of the investment adviser or principal underwriting for such investment company, or employees of any affiliated person . . . of such investment adviser or principal underwriter." PTE 77-3, Fed. Reg. 18743 (1977). In relevant part, this exemption can only apply if the "plan does not pay an investment management, investment advisory, or similar fee to such investment adviser, principal underwriter or affiliated person." *Id.* Such fees are only acceptable if the mutual fund provider, adviser, underwriter, or affiliate, and not the plan, pays such fees. *Id.*

317.     The Department of Labor has also created an exemption to both ERISA §§ 406(a) and (b) for "the purchase or sale by an employee benefit plan of shares of an open-end investment company registered under the Investment Company Act of 1940, the investment advisor for which is also a fiduciary with respect to the plan (or an affiliate of such fiduciary)." PTE 77-4 § II, 42 Fed. Reg. 18,732 (1977). The exemption governs a plan's acquisition of mutual fund shares, in exchange for which the plan gives value to the mutual fund provider who is a fiduciary or an affiliate of a fiduciary. The exemption mentions no other transfer of plan assets, and no other transfer of non-plan property, goods, services, or credit; nor does it mention any party-in-interest other than the mutual fund provider. Consequently, this exemption does not immunize kickbacks from a mutual fund back to the plan fiduciary. The exemption is expressly

115

inapplicable if the plan "pay[s] a sales commission in connection with such purchase or sale." PTE 77-4, § II(a).  Department of Labor, in Advisory Opinion, 2002-05A, has "caution[ed] . . . that where a plan fiduciary, who is an investment adviser to a fund, causes the plan to pay commissions to a broker-dealer who is an affiliate of such adviser or of the fund, such commission payments would be *separate prohibited transactions* under section 406(b) of the Act for which no relief is available under [the exemption in] PTE 77-4."  Dep't of Labor Adv. Op. 2002-05A (June 7, 2002).  Thus, any payment from a mutual fund provider to a plan fiduciary or affiliate thereof (i.e., a kickback or royalty), even if the two are just affiliates, constitutes a separate prohibited transaction from the plan fiduciary's transfer to the mutual fund provider.

318.     In addition, PTE 77-4 does not permit the mutual fund company to cause the *plan* to pay an "investment management, investment advisory, or similar fee," PTE 77-4, § II.c, except under certain limited circumstances.  Specifically, PTE 77-04, § II.c permits payment of investment advisory fees by the "plan based on total plan assets from which a credit has been subtracted representing the plan's pro rate share of investment advisory fees paid by the investment company." *Id.*   Lastly, PTE 77-4, § II.c states that "during any fee period for which the plan prepaid its investment management, investment advisory or similar fee" then the fee is permissible if the prepaid fee was (1) "anticipated and subtracted from the prepaid fee at the time of payment," (2) "is returned to the plan no later than during the immediate following fee period, or (3) is offset against the prepaid fee for the immediately following fee period."  PTE 77-4, § II(c).  Without complete satisfaction of these parameters, PTE 77-4 does not excuse a violation of ERISA §§ 406(a) or (b).

319. Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breach of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

320. The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur. A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. As such, ERISA's prohibited transaction provisions prohibit fiduciaries, such as Defendants here, from causing plans to engage in transactions with the plan sponsor or its subsidiaries and affiliates, here Regions and Morgan Keegan Asset Management, including causing a plan to invest assets in investment management and other products offered by a party-in-interest or plan fiduciary and the payment of investment management and other fees in connection with such investments.

## IX.   CAUSES OF ACTION

### —Counts Relevant To The Company Stock Subclass—

**Count I:  Failure to Prudently and Loyally Manage the Plans and the Plans' Assets**

321. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

322. This Count alleges fiduciary breach against: (1) Regions Financial Corporation; Regions Bank; the Legacy Plan Compensation Committee Defendants; the Legacy Plan Benefits Management Committee Defendants; and the Legacy Plan Benefits Administration Committee Defendants; and the Additional Legacy Plan Defendants (collectively, the "Legacy Prudence Defendants"); (2) the Regions Financial Corporation, Regions Bank, the AmSouth Thrift Compensation Committee, the AmSouth Thrift Benefits Committee, and the Additional

AmSouth Thrift Plan Defendants (collectively the "AmSouth Thrift Prudence Defendants"); and (3) the Regions Financial Corporation, Regions Bank, the Regions 401(k) Compensation Committee, the Regions 401(k) Benefits Management Committee, the Additional Regions 401(k) Defendants, and the Regions 401(k) Benefit Investment Committee (collectively, the "Regions 401(k) Plan Prudence Defendants"). These three groups of Defendants are referred to collectively as the "Company Stock Prudence Defendants."

323. As alleged, during the Company Stock Subclass Period, the Company Stock Prudence Defendants were named fiduciaries of their respective Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence for each individual Plan for which they were responsible.

324. As alleged, the scope of the fiduciary duties and responsibilities of the Company Stock Prudence Defendants included, on information and belief, managing the assets of the Plans for the sole and exclusive benefit of the Legacy, AmSouth Thrift, and Regions 401(k) Plan participants and beneficiaries, respectively, and with the care, skill, diligence, and prudence required by ERISA. The Company Stock Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Legacy, AmSouth Thrift, and 401(k) Plans and directing the trustee regarding the same, evaluating the merits of the Legacy, AmSouth Thrift, and 401(k) Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the three Plans' assets were invested prudently.

325. In contravention of their duties and obligations under ERISA, the Company Stock Prudence Defendants failed to loyally and prudently manage the assets of the Legacy, AmSouth

Thrift, and 401(k) Plans. Specifically, during the Company Stock Subclass Period, these Defendants knew or should have known that Regions common stock was no longer a suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of Region's undisclosed exposure to losses due to risky business strategies, including, without limitation, the deteriorating quality of its real estate loan portfolio, its inadequate provisions and reserves for losses, inadequate risk management, its risky investment in MBS, its off-balance sheet exposure, its improper valuation of Goodwill, and its ARS activities. These actions artificially inflated the price of Regions common stock. These improper and imprudent endeavors and strategies put the viability of the Company in jeopardy, and caused its stock to collapse. Nonetheless, during the Company Stock Subclass Period, these Defendants continued to offer Regions common stock as an investment option for participant contributions. The Company Stock Prudence Defendants also continued to provide Company Matching Contributions in Regions common stock and to maintain the Plans' significant investment in the stock.

326. The Company Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets, including its investment in Regions common stock.

327. The Company Stock Prudence Defendants' duties of prudence and loyalty were especially significant with respect to Regions common stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct, *see Armstrong v. LaSalle Bank Nat'l Ass'n.*, 446 F.3d 728, 732 (7th Cir. 2006) ("[A]n ESOP is imprudent per se, though legally authorized. This built-in 'imprudence' (for which the trustee is of course not culpable) requires him to be especially careful to do nothing to increase the risk faced by the participants still further."); *see Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995); and

(b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.  In view of this, the Company Stock Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Regions common stock.  Had these Defendants conducted a reasonable investigation of the prudence of investment in Company Stock, as required under *Kuper*, Defendants would not have continued to offer Company Stock as an investment. Upon information and belief, they failed to have such a procedure.

328.    Moreover, the Company Stock Prudence Defendants failed to conduct an appropriate investigation into the merits of continued investment in Regions common stock despite significant losses to the Company and Regions' highly risky and inappropriate mortgage origination practices, lack of real estate loan portfolio diversification, inadequate provisions for loss, improper risk management, excessive and imprudent investment in MBS, off-balance sheet exposure, improper valuation of goodwill, risky ARS activities.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Regions common stock under these circumstances and the imprudence of these investment options for the retirement savings of the Plans' participants.

329.    The Company Stock Prudence Defendants' decisions with regard to the Plans' investment in Regions common stock under the circumstances alleged constituted an abuse of their discretion as ERISA fiduciaries because a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Regions common stock was in keeping with the Plans' settlors' expectations of how a prudent fiduciary would operate.

330.    With respect to Region's common stock, the Company Stock Prudence Defendants knew that the stock had declined precipitously, and that Regions was being seriously mismanaged and faced dire financial circumstances as a result.  Though this allegation is not required to state a claim, Regions' mismanagement has created a genuine risk of imminent collapse.

331.    The Company Stock Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

332.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

333.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    ○ The composition of the portfolio with regard to diversification;

    ○ The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    ○ The projected return of the portfolio relative to the funding objectives of the plan.

334.    Given the conduct described above, the Company Stock Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Regions common stock.

335.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  On information and belief, the compensation and tenure of the Company Stock Prudence Defendants was tied to the performance of Regions common stock and/or the publicly reported financial performance of Regions.  To comply with the duty of loyalty, fiduciaries laboring under such conflicts must make special efforts to assure that their decision-making process is untainted by the conflict and that their decisions are made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

336.    The Company Stock Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investments in Regions common stock; failing to notify appropriate federal agencies, including the DOL, of the facts and

circumstances that made Regions common stock unsuitable investments for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; failing in each of the foregoing particulars in order to avoid adversely impacting their own compensation or drawing attention to Regions' inappropriate practices; and otherwise placing their own and Regions' improper interests above the interests of the participants with respect to the Plans' investments in Regions common stock.

337. As a consequence of the Company Stock Prudence Defendants' breach of fiduciary duties alleged in this Count, the Plans suffered significant losses. If the Company Stock Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Plans, and indirectly the Plaintiffs and the other Company Stock Subclass members, lost over millions dollars of retirement savings.

338. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Company Stock Prudence Defendants are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count II: Failure to Monitor Fiduciaries**

339. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

340. This Count alleges fiduciary breach against the following Defendants: Regions Financial Corporations; the Legacy Compensation Committee Defendants; the Legacy Benefits Management Committee Defendants; the AmSouth Thrift Plan Compensation Committee

Defendants; the AmSouth Thrift Plan Benefits Committee; the Regions 401(k) Plan Compensation Committee Defendants; and the Regions 401(k) Plan Benefits Management Committee Defendants (collectively the "Company Stock Monitoring Defendants").

341.    As alleged, during the Company Stock Subclass Period the Company Stock Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

342.    As alleged, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint and remove, and thus monitor, the performance of other fiduciaries.

343.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including their obligations regarding the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to do so.

344.    The monitoring duty further requires that appointing fiduciaries have procedures in place so they may review and evaluate on an ongoing basis whether the "hands-on" fiduciaries are doing an adequate job.  For example, appointing fiduciaries may require periodic reports on the work of the hands-on fiduciaries and the plan's performance, and ensure that they have a prudent process for obtaining the information and resources they need.  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

345.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.  Failure to provide such needed information may have an extreme adverse impact on the plan and the fiduciaries' investment decisions regarding the plan.

346.     The Company Stock Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a)  failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as their respective Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Regions common stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Regions' highly risky and inappropriate business practices and the likely impact of such practices on the value of the Plans' investment in Regions stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate and who breached their fiduciary duties under ERISA by continuing to make and maintain investments in Regions common stock despite their knowledge of practices that rendered these investments imprudent during the Company Stock Subclass Period for participants' retirement savings in the Plans.

347.     As a consequence of the Company Stock Monitoring Defendants' breaches of fiduciary duties, the Plans suffered tremendous losses.  If the Company Stock Monitoring Defendants had discharged their fiduciary monitoring duties as described, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of

the breaches of fiduciary duty alleged, the Plans, and indirectly the Plaintiffs and other Company Stock Subclass members, lost over millions dollars of retirement savings.

348.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Company Stock Monitoring Defendants are liable to restore the losses to their respective Plans caused by their breaches of fiduciary duties alleged in this Count, and to provide other equitable relief as appropriate.

**Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries**

349.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

350.     This Count alleges fiduciary breach against Defendant Regions and the Compensation Committee Defendants of each of the three Plans.

351.     Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans that he or she serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to them, but that such co-fiduciaries need to protect the interests of the plan.  *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542 (6th Cir. 1999).

352.     Defendants Regions and the Compensation Committees possessed non-public information during the Company Stock Subclass Period about the risks posed by Regions common stock which they knew could be used by other fiduciaries of the Plans (in particular, each Plan's Compensation Committee Defendants, Benefits Management Committee Defendants, the Benefit Administration Committee Defendants, and Regions Bank) to protect the Plans and their participants and beneficiaries.  Defendants Regions and the Compensation Committees were *de facto* fiduciaries that exercised authority and control over the conduct of

126

each Plan's respective Compensation Committee Defendants, Benefits Management Committee Defendants, Benefit Administration Committee Defendants, and Regions Bank.

353.     Each Plan's Compensation Committee Defendants, Benefits Management Committee, Benefit Administration Committee and Regions Bank should have sought information concerning the risks posed by an investment in Regions common stock as part of a thorough and careful investigation of the merits of each of these investments during the Company Stock Subclass period, but failed to do so.  Nonetheless, the fiduciaries in possession of such knowledge, including without limitation Defendants Regions and each Plan's Compensation Committee Defendants, should have supplied that information to each Plan's respective Benefits Management Committee Defendants, Benefit Administration Committee Defendants and Regions Bank, the Trustee to each Plan, to fulfill the fiduciary duties they owed to their respective Plans.

354.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant Regions is liable to restore the losses to the Plans caused by its breach of fiduciary duties alleged in this Count, disgorge any profits made through its breach, and provide other equitable relieve as appropriate.

**Count IV: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries**

355.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

356.     This Count alleges fiduciary breach against the Benefits Management Committee Defendants of the Legacy and Regions 401(k) Plans and the AmSouth Benefits Committee (the "Company Stock Communications Defendants").

357. At all relevant times, as alleged, the Company Stock Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

358. At all relevant times, the scope of the fiduciary responsibility of the Company Stock Communications Defendants included the communications and material disclosures to the Plans' participants and beneficiaries.

359. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing incomplete or inaccurate information regarding plan investment options, so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plans' investment options, including investment in Regions common stock, the Bond Funds and the RMK Select Funds.

360. Because investments in the Plans were not diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Regions common stock), such investments carried with them an inherently high degree of risk. This inherent risk made the Company Stock Communications Defendants' duty to provide complete and accurate information particularly important with respect to those investment options.

361. The Company Stock Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding:

      (a)      Regions' high risk loan origination practices;

128

(b)     Regions' undiversified and risky real estate loan portfolio;

(c)     Regions' insufficient provisions for loan loss;

(d)     Regions' inadequate risk management controls;

(e)     Regions' risky and excessive investment in MBS;

(f)     Regions' improper off-balance sheet exposure;

(g)     Regions' inadequate and improper valuation of its goodwill;

(h)     Regions' risky ARS activities;

(i)     Regions' artificial inflation of Regions common stock values, the Company's net income and financial results; and

(j)     The dire circumstances created by Regions' improper business and accounting practices;

These failures were particularly devastating to the Plans and their participants because the resultant losses had a significant impact on the value of participants' retirement assets.

362.    The Company Stock Communications Defendants' omissions were material to participants' ability to exercise informed control over their Plan accounts.  In the absence of this information, participants did not know the true risks presented by the Plans' investments in Regions common stock.

363.    The Company Stock Communications Defendants' alleged omissions and incomplete statements were Plan-wide and uniform.  The Company Stock Communications Defendants failed to provide complete and accurate information to any of the Plans' participants.

364.    The Company Stock Communications Defendants were unjustly enriched by the fiduciary breaches described in this Count.

365.     As a direct and proximate result of the breach of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Company Stock Subclass members, lost a significant portion of their retirement investments.

366.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Company Stock Communications Defendants are liable to restore the losses to the Plan caused by their breach of fiduciary duties alleged in this Count.

**Count V:  Co-Fiduciary Liability**

367.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

368.     This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

369.     As alleged, during the Class Period the Co-Fiduciary Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

370.     As alleged, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three of these provisions.

371.     ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such

other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Here, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, Defendants did not communicate their knowledge of Regions' improper activity to the other fiduciaries.

372.    Regions, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and thus knowledge of such practices is imputed to Regions as a matter of law.

373.    Because the Co-Fiduciary Defendants knew of Regions' failures and inappropriate business practices, they also knew that each Plan's Prudence Defendants were breaching their duties by continuing to invest in Regions common stock.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of Regions' failed and inappropriate business practices, and obfuscating the risk that the practices posed to Regions and, thus, to the Plans.

374.    ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to provide inaccurate or incomplete information, an act or omission of such other fiduciary, knowing that such act or omission is a breach.  Regions knowingly participated in the fiduciary breaches of each Plan's Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plans' participants.  Likewise, each Plan's Monitoring Defendants knowingly participated in the breaches of the respective Plan's Prudence Defendants because, as alleged, they had actual knowledge of the facts that rendered Regions stock an

131

imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted each Plan's Prudence Defendants to breach their duties.

375.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

376.    Each Plan's Monitoring Defendants' failure to monitor the Prudence Defendants for their respective Plans, particularly the respective Plan's Benefits Management Committee and the Investment Committee, enabled those committees to breach their duties.

377.    As a direct and proximate result of the breaches of fiduciary duties alleged, the Plans, and indirectly the Plaintiffs and the Company Stock Subclass members, lost over millions dollars of retirement savings.

378.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to their respective Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### —<u>Counts Relevant To The Bond Fund Subclass</u>—

**Count VI:  Failure to Prudently and Loyally Manage the Legacy and 401(k) Plans and the Plans' Assets**

379.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

380.    This Count alleges fiduciary breach against Defendant Morgan Keegan & Co, Defendant Morgan Asset Management, the Legacy and Regions 401(k) Prudence Defendants, described above in Count I (collectively the "Bond Fund Prudence Defendants").

381.    As alleged, during the Bond Fund Subclass Period, the Bond Fund Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

382.    As alleged, the scope of the fiduciary duties and responsibilities of the Bond Fund Prudence Defendants included, on information and belief, managing the assets of the Legacy Plan and 401(k) Plan, respectively, for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Bond Fund Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions in the Plans, and directing the Trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

383.    In contravention of their duties and obligations under ERISA, the Bond Fund Prudence Defendants failed to loyally and prudently manage the assets of the Legacy and 401(k) Plans. Specifically, during the Bond Fund Subclass Period, these Defendants knew or should have known that the Bond Funds were imprudent investments for retirement savings due to the Bond Funds' excessive investment in high-risk assets that was inappropriate for a fixed income bond fund and which, to a greater extent than was disclosed, exposed them to huge losses. Nonetheless, during the Bond Fund Subclass Period, these Defendants continued to offer the Bond Funds as investment options for participant contributions. The Bond Fund Prudence Defendants knew or should have known this given that Morgan Keegan is a wholly owned subsidiary of Regions Financial Corporation with overlap between members on the Board of

Directors for each company. Moreover, by August 2008, the Bond Fund's manager publically advised Defendants of the certain risks of continued investment in the Bond Funds, which Defendants failed to heed.

384. The Bond Fund Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets, including their investments in the Bond Funds.

385. The Bond Fund Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in the Bond Funds despite significant losses, the Bond Funds' portfolios of high-risk assets investments, and the particular dangers that these practices posed to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Bond Funds under these circumstances and the imprudence of this investment option for the retirement savings of Plans' participants.

386. The Bond Fund Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

387. According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course

of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

388.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of  portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

389.    Given the information described above regarding the poor performance and deviation from the stated investment profile and objectives of the Bond Funds, the Bond Fund Prudence Defendants could not possibly have acted prudently when they continued to invest the Legacy and Regions 401(k) Plans' assets in the Bond Funds.  In addition, the Bond Funds were selected and maintained because of the fees earned by Morgan Keegan, an affiliated entity and wholly owned subsidiary of Regions, and these decisions were not made in the best interests of plan participants.

390.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless

of the interests of the fiduciaries themselves or the plan sponsor. The Bond Fund Prudence Defendants breached their duties to avoid conflicts of interest and to promptly resolve them by, *inter alia*, selecting and maintaining the Bond Funds based on Regions own pecuniary interest in the funds, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investments in the Bond Funds; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made the Bond Funds an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; failing in each of the foregoing particulars in order to avoid adversely impacting their own compensation or drawing attention to Regions' inappropriate practices; and otherwise placing their own and Regions' improper interests above the interests of the participants with respect to the Plans' investments in the Bond Funds.

391. As a consequence of the Bond Fund Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Legacy and Regions 401(k) Plans suffered significant losses. If the Bond Fund Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Legacy and Regions 401(k) Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breach of fiduciary duties alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the Bond Funds and the other Bond Fund Subclass members, lost over millions dollars of retirement savings.

392. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Bond Fund Prudence Defendants are liable to restore the losses to the Legacy and

Regions 401(k) Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count VII: Failure to Monitor Fiduciaries**

393.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

394.     This Count alleges fiduciary breach against the Legacy and Regions 401(k) Monitoring Defendants, described above in Count II, and referred to collectively herein as the Bond Fund Monitoring Defendants.

395.     As alleged, during the Bond Fund Subclass Period, the Bond Fund Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

396.     As alleged, the scope of the fiduciary responsibilities of the Bond Fund Monitoring Defendants included the responsibility to appoint and remove, and thus monitor the performance of, other fiduciaries.

397.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including their obligations regarding the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to do so.

398.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the

information and resources they need).  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

399.    Furthermore, monitoring fiduciaries must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and plan assets. Failure to provide such needed information may have an extreme adverse impact on the plan and the fiduciaries' investment decisions regarding the plan.

400.    The Bond Fund Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a)  failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Legacy and Regions 401(k) Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Bond Funds; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of the Bond Funds' imprudent investment in undisclosed high-risk assets that exposed the Bond Funds' and Plan participants to huge losses; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Legacy and Regions 401(k) Plans' assets; and (d) failing to remove appointees whose performance was inadequate and who breached their fiduciary duties under ERISA in that they continued to make and maintain investments in the Bond Funds despite their knowledge of practices that rendered this investment imprudent during the Bond Fund Subclass Period for participants' retirement savings in the Legacy and Regions 401(k) Plans.

401.     As a consequence of the Bond Fund Monitoring Defendants' breach of fiduciary duties, the Plans suffered tremendous losses.  If the Bond Fund Monitoring Defendants had discharged their fiduciary monitoring duties as described, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investment in the Bond Funds and the other Bond Fund Subclass members, lost millions dollars of retirement savings.

402.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Bond Fund Monitoring Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count VIII:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries**

403.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

404.     This Count alleges fiduciary breach against Defendants Regions Financial Corporation, Morgan Keegan & Co, Morgan Asset Management and the Legacy and Regions 401(k) Compensation Committee Defendants.

405.     Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans that he serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to them, but that such co-fiduciaries need to protect the interests of the plan. *See Krohn*, 173 F.3d 543.

406.     Defendants Regions Financial Corporation, Morgan Keegan & Co., Morgan Asset Management, and the Legacy and Regions 401(k) Compensation Committee possessed non-public information during the Bond Fund Subclass Period about the risks posed by the Bond Funds which it knew could be used by other fiduciaries of the Legacy Plan and Regions 401(k) (in particular, Morgan Keegan & Co., Morgan Asset Management, the Legacy Compensation Committee Defendants, the Legacy and Regions 401(k) Benefits Management Committee, the Legacy and Regions 401(k) Investment Committee and Regions Bank) to protect the Legacy and Regions 401(k) Plans and their participants and beneficiaries. Defendants Regions Financial Corporation and the Legacy and Regions 401(k) Compensation Committees were *de facto* fiduciaries that exercised authority and control over the conduct of the Legacy and Regions 401(k) Compensation Committee Defendants, the Legacy Benefits Management Committee Defendants, the Legacy and Regions 401(k) Investment Committee Defendants and Regions Bank.

407.     The Legacy and Regions 401(k) Compensation Committee Defendants, the Legacy and Regions 401(k) Benefits Management Committee, the Legacy and Regions 401(k) Investment Committee and Regions Bank should have sought information concerning the risks posed by an investment in the Bond Funds as part of a thorough and careful investigation of the merits of each of these investments during the relevant subclass periods, but failed to do so. Nonetheless, the fiduciaries in possession of such knowledge, including without limitation Defendants Regions Financial Corporation and the Legacy and Regions 401(k) Compensation Committee Defendants, should have supplied that information to the Legacy and Regions 401(k) Benefits Management Committee Defendants, the Legacy and Regions 401(k) Investment

Committee Defendants and Regions Bank, the Trustee, voluntarily in the fulfillment of the fiduciary duties they owed to the Legacy and Regions 401(k) Plans.

408.     Defendant Regions Financial Corporation profited from its breach of this duty.

409.     Pursuant to ERISA § § 409, 502(a)(2) and (a)(3), 29 U.S.C. § 1109(a), 1132(a)(2) and (a)(3), Defendant Regions Financial Corporation is liable to restore the losses to the Legacy and Regions 401(k) Plans caused by its breaches of fiduciary duties alleged in this Count, disgorge any profits made through its breach and provide other equitable relieve as appropriate.

**Count IX: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Legacy and 401(k) Plans' Participants and Beneficiaries**

410.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

411.     This Count alleges fiduciary breach against the Legacy and Regions 401(k) Benefits Management Committee Defendants (the "Bond Fund Communications Defendants").

412.     At all relevant times, as alleged, the Bond Fund Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

413.     At all relevant times, the scope of the fiduciary responsibility of the Bond Fund Communications Defendants included communications and material disclosures to the Legacy and Regions 401(k) Plans' participants and beneficiaries.

414.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, regarding plan investment options so that participants

can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Legacy and 401(k) Plans' investment options, including investment in the Bond Funds.

415.     The Bond Fund Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding:

>  (1)     The Bond Fund's over-loaded investments in poor quality mortgage and asset backed securities, CDOs and related derivatives;
>
>  (2)     The Bond Fund's failure to disclose the Fund's exposure to poor quality asset and mortgage backed securities, and CDOs and related derivatives;
>
>  (3)     The Bond Fund's failure to maintain appropriate diversification; and
>
>  (4)     Region's disclosure of inaccurate and incomplete information regarding the investment strategy and volatility of the Bond Funds.

416.     The Bond Fund Communications Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts. In the absence of this information, participants did not know the true risks presented by the Plans' investments in the Bond Funds, and could not make informed decisions regarding whether to invest their retirement savings in the Bond Funds.

417.     The Bond Fund Communications Defendants' alleged omissions and incomplete statements were Plan-wide and uniform because the Bond Fund Communications Defendants failed to provide complete and accurate information to any of the Legacy and Regions 401(k) Plans' participants.

418.     The Bond Fund Communications Defendants were unjustly enriched by the fiduciary breaches described in this Count.

419.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs with investments in the Bond Funds and the Bond Fund Subclass members, lost a significant portion of their retirement investment.

420.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Bond Fund Communications Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count.

**Count X:  Co-Fiduciary Liability**

421.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

422.     This Count alleges co-fiduciary liability against all of the Legacy and Regions 401(k) Defendants (the "Bond Fund Co-Fiduciary Defendants").

423.     As alleged, during the Bond Fund Subclass Period the Bond Fund Co-Fiduciary Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

424.     As alleged, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same Legacy and Regions 401(k) Plans if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Bond Fund Co-Fiduciary Defendants breached all three provisions.

425.	ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Bond Fund Co-Fiduciary Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate their knowledge of the serious mismanagement of the Bond Funds to the other fiduciaries.

426.	Because the Bond Fund Co-Fiduciary Defendants knew the Bond Funds were selected and maintained as Plan investment options for disloyal and imprudent reasons, and knew that the Bond Funds were being seriously mismanaged, they also knew that the Bond Fund Prudence Defendants were breaching their duties by continuing to invest in the Bond Funds.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the problems with the Bond Funds, and obfuscating the risk that the practices posed to the Bond Funds and, thus, to the Legacy and Regions 401(k) Plans.

427.	ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

428.	The Bond Fund Communications Defendants' failure to provide complete and accurate information to the Legacy and Regions 401(k) Plan participants and beneficiaries breached these Defendants' fiduciary duties under ERISA and the Plans.

429.     As a direct and proximate result of the alleged breach of fiduciary duties, the

Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the Bond

Fund and the Bond Fund Subclass members, lost over millions dollars of retirement savings.

430.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

and (a)(3), the Bond Fund Communications Co-Fiduciary Defendants are liable to restore the

losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to

provide other equitable relief as appropriate.

—<u>Counts Relevant to the Excessive Fee Subclass</u>—

**Count XI:  Failure to Prudently and Loyally Manage the Legacy and Regions 401(k) Plans and the Plans' Assets**

431.     Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

432.     This Count alleges fiduciary breach against the Legacy and Regions 401(k)

Prudence Defendants described in Count I, referred to herein as the "Excessive Fee Prudence

Defendants."

433.     As alleged, during the Excessive Fee Subclass Period, the Excessive Fee

Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. §

1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and

prudence.

434.     As alleged, the scope of the fiduciary duties and responsibilities of the Excessive

Fee Prudence Defendants included, on information and belief, managing the assets of the Legacy

and Regions 401(k) Plans for the sole and exclusive benefit of Plan participants and

beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The

Excessive Fee Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Legacy and Regions 401(k) Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently. ERISA explicitly commands fiduciaries to act solely in the interest of the participants and beneficiaries of the plan by "defraying the reasonable expenses of the plan." 29 U.S.C. § 1104(1)(A)(ii).

435.    In contravention of their duties and obligations under ERISA, the Excessive Fee Prudence Defendants failed to loyally and prudently manage the assets of the Legacy and Regions 401(k) Plans. Specifically, during the Excessive Fee Subclass Period, these Defendants knew or should have known that Regions the RMK Select Funds charged unreasonably high fees and expenses and were selected because of the substantial fees Regions and its affiliates earned by offering the RMK Select Funds to the Plans. Nonetheless, during the Excessive Fee Subclass Period, these Defendants continued to offer the RMK Select Funds as an investment options for participant contributions. The Excessive Fee Prudence Defendants were obliged to prudently and loyally manage all of the Legacy and Regions 401(k) Plans' assets, including its investments in the RMK Select Funds.

436.    The Excessive Fee Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in the RMK Select Fund, and the particular dangers that this posed to the Legacy and Regions 401(k) Plans. Such an investigation would have revealed to a reasonably prudent fiduciary that the RMK Select Funds charged fees that were far in excess of what was necessary given that comparable but far less expensive funds were readily available in the marketplace. Such an investigation also would have revealed that

the funds were selected for inclusion in the Plan in an impermissible basis – namely that Regions itself profited from the fees and expenses charged by the funds. Accordingly, under these circumstances, Defendants breached their duties of prudence and loyalty by offering and maintaining the RMK Select Funds as investment options for the Legacy and Regions 401(k) Plan participants.

437. The Excessive Fee Prudence Defendants' decisions with regard to the Legacy and Regions 401(k) Plans' investment in the RMK Select Funds described, under the circumstances alleged, constituted an abuse of their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

438. The Excessive Fee Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

439. According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

440. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

441. Given the conduct described above, the Excessive Fee Prudence Defendants could not possibly have acted prudently when they continued to invest the Legacy and Regions 401(k) Plans' assets in the RMK Select Funds.

442. The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. The Excessive Fee Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investments in the RMK Select Funds; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made the RMK Select Funds unsuitable investments for the Legacy and Regions 401(k) Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; failing in each of the foregoing particulars in order to avoid adversely

impacting their own compensation or drawing attention to Regions' inappropriate practices; and otherwise placing their own and Regions' improper interests above the interests of the participants with respect to the Plans' investments in the RMK Select Funds.

443.    As a consequence of the Excessive Fee Prudence Defendants' breach of fiduciary duties alleged in this Count, the Legacy and Regions 401(k) Plans suffered significant losses.  If the Excessive Fee Prudence Defendants had discharged their fiduciary duties to prudently invest the Legacy and Regions 401(k) Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Legacy and Regions 401(k) Plan, and indirectly the Plaintiffs with investments in the RMK Select Fund and the other Excessive Fee Subclass members, lost millions dollars of retirement savings.

444.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Excessive Fee Prudence Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count XII:  Failure to Monitor Fiduciaries**

445.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

446.    This Count alleges fiduciary breach against the following Defendants: Regions Financial Corporations; the Legacy and Regions 401(k) Plan Compensation Committee Defendants; the Legacy and Regions 401(k) Plan Benefits Management Committee Defendants; the Regions 401(k) Plan Investment Committee; and the Additional Legacy Plan Defendants (collectively, the "Excessive Fee Monitoring Defendants").

149

447.     As alleged, during the Excessive Fee Subclass Period the Excessive Fee Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

448.     As alleged, the scope of the fiduciary responsibilities of the Legacy Monitoring Defendants included the responsibility to appoint and remove, and thus monitor the performance of other fiduciaries.

449.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including their obligations regarding the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to do so.

450.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

451.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan

assets.  Failure to provide such needed information may have an extreme adverse impact on the plan and on the fiduciaries' investment decisions regarding the plan.

452.    The Excessive Fee Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a)  failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Legacy and Regions 401(k) Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the RMK Select Funds; (b) failing to ensure that the monitored fiduciaries appreciated the impact of the RMK Select Funds' unreasonably high fees and expenses; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Legacy and Regions 401(k) Plans' assets; and (d) failing to remove appointees whose performance was inadequate and who breached their fiduciary duties under ERISA in that they continued to make and maintain investments in the RMK Select Funds despite their knowledge of practices that rendered these investments imprudent during the Excessive Fee Subclass Period for participants' retirement savings in the Legacy and Regions 401(k) Plans.

453.    As a consequence of the Excessive Fee Monitoring Defendants' breach of fiduciary duties, the Legacy and Regions 401(k) Plans suffered tremendous losses.  If the Excessive Fee Monitoring Defendants had discharged their fiduciary monitoring duties as described, the losses suffered by the Legacy and Regions 401(k) Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments

in the RMK Select Fund and the other similarly situated Subclass members, lost over millions dollars of retirement savings.

454.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Excessive Fee Monitoring Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count XIII: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Legacy and Regions 401(k) Plans' Participants and Beneficiaries**

455.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

456.     This Count alleges fiduciary breach against the Legacy and Regions 401(k) Benefits Management Committee Defendants (the "Excessive Fee Communications Defendants").

457.     At all relevant times, as alleged, the Excessive Fee Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

458.     At all relevant times, the scope of the fiduciary responsibility of the Excessive Fee Communications Defendants included the communications and material disclosures to the Legacy and Regions 401(k) Plans' participants and beneficiaries.

459.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information regarding plan investment options so that participants

can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plan's investment options, including investment in the RMK Select Funds.

460. Because investments in the Legacy and Regions 401(k) Plans were not diversified (*i.e.* the Defendants chose to invest the Legacy and Regions 401(k) Plans' assets, and/or allow those assets to be invested heavily in Regions common stock, the Bond Funds and in the RMK Select Funds), such investments carried with them an inherently high degree of risk. This inherent risk made the Excessive Fee Communications Defendants' duty to provide complete and accurate information particularly important with respect to those investment options.

461. The Excessive Fee Communications Defendants breached their duties to inform participants by failing to provide complete and accurate information regarding:

> a. The RMK Select Fund's excessive fees and expenses that were substantially higher than the fees and expenses charged in readily available and comparable fund options;
>
> b. The performance of the RMK Select Funds could not justify the excessive fees charged as far less expensive passively and actively managed funds offered comparable and often better performance,
>
> c. The excessive fees and expenses charged by the RMK Select Funds, which substantially reduced participants' retirement savings because, among other things, all such fees and expenses were paid from Legacy and Regions 401(k) Plan assets.
>
> d. The RMK Select Funds were selected and maintained as Plan investment options because Regions itself profited from inclusion of the funds in the Plans.

These failures were particularly devastating to the Legacy and Regions 401(k) Plans and their participants as the losses had a significant adverse impact on the value of participants' retirement assets.

462. The Excessive Fee Communications Defendants' omissions were material to participants' ability to exercise informed control over their Legacy Plan accounts. In the absence of this information, participants did not know the true risks presented by the Legacy and Regions 401(k) Plans' investments in the RMK Select Funds, and, thus could not make informed decisions regarding investment of their retirement savings in the funds.

463. The Excessive Fee Communications Defendants' alleged omissions and incomplete statements were Plan-wide and uniform because these Defendants failed to provide complete and accurate information to any of the Legacy and Regions 401(k) Plans' participants.

464. The Excessive Fee Communications Defendants were unjustly enriched by the fiduciary breaches described in this Count.

465. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Fund and the Plans' other participants and beneficiaries, including the Excessive Fee Subclass, lost a significant portion of their retirement investment.

466. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Excessive Fee Communications Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count.

**Count XIV: Co-Fiduciary Liability**

467. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

468. This Count alleges co-fiduciary liability against all of the Legacy and Regions 401(k) Plan Defendants (the "Excessive Fee Co-Fiduciary Defendants").

154

469.     As alleged, during the Excessive Fee Subclass Period the Excessive Fee Co-Fiduciary Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

470.     As alleged, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Excessive Fee Co-Fiduciary Defendants breached all three of these provisions.

471.     ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Excessive Fee Co-Fiduciary Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate to the other fiduciaries their knowledge of Regions' improper activity in selecting and maintaining the RMK Select Funds as Plan investment options.

472.     The Excessive Fee Co-Fiduciary Defendants knew that the Excessive Fee Prudence Defendants were breaching their duties by continuing to invest in the RMK Select Funds.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by obfuscating the excessive nature of the fees charged by the RMK Select Funds.

473.     ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to provide incomplete or inaccurate information, an act or omission of such other fiduciary, knowing that such act or omission is a breach.  Regions knowingly participated in the fiduciary breaches of the Excessive Fee Prudence Defendants in that it benefited from the investment in RMK Select Fund while exposing the Legacy and Regions 401(k) Plan participants to increased losses.  Likewise, the Excessive Fee Monitoring Defendants knowingly participated in the breaches of the Excessive Fee Prudence Defendants because, as alleged, they had actual knowledge of the facts that rendered the RMK Select Fund an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Excessive Fee Prudence Defendants to breach their duties.

474.     ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

475.     The Excessive Fee Monitoring Defendants' failure to monitor the Excessive Fee Prudence Defendants, particularly the Legacy and Regions 401(k) Benefits Management Committees and the Legacy and Regions 401(k) Investment Committees, if any, enabled those committees to breach their duties.

476.     As a direct and proximate result of the breach of fiduciary duties alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Fund and the Plans' other participants and beneficiaries, including the Excessive Fee Subclass members, lost millions dollars of retirement savings.

477.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Excessive Fee Co-Fiduciary Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count XV: Prohibited Transactions Regarding Revenue Sharing and Other Kickback Payments**

478.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

479.     This Count alleges prohibited transactions against Defendants Regions, Regions Bank, Morgan Keegan & Co. and Morgan Asset Management, and the Legacy and 401(k) Prudence Defendants (collectively "Prohibited Transaction Defendants"). As alleged, the Prohibited Transaction Defendants, except Morgan Keegan & Co. and Morgan Asset Management, are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence, and the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. 1106. As nonfiduciary parties in interest, Morgan Keegan & Co. and Morgan Asset Management are liable under ERISA § 502(a)(3) for their knowing participation in violation of ERISA § 406, 29 U.S.C. § 1106.

480.     As alleged, except for Morgan Keegan & Co. and Morgan Asset Management, the scope of the Prohibited Transaction Defendants' fiduciary duties includes managing and administering the Legacy and Regions 401(k) Plans and Plans' assets, selecting Plan investment options, and through the exercise of their discretionary authority as fiduciaries, causing the Legacy and Regions 401(k) Plans to enter into transactions with parties in interest. Morgan

Keegan & Co. and Morgan Asset Management are nonfiduciary parties in interest who knowingly participated in transactions involving Plan assets.

481. The Prohibited Transaction Fiduciary Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Legacy and Regions 401(k) Plans to engage in transactions that each of them knew or should have known constituted a direct or indirect furnishing of services between the Legacy and Regions 401(k) Plans, on the one hand, and parties in interest, on the other hand. This includes but is not limited to the following: Regions caused the Legacy and Regions 401(k) Plans to enter a contract or other arrangements through which the Plans paid for services to Morgan Asset Management and/or Morgan Keegan & Co., both parties in interest, related to the RMK Select Funds, in violation of ERISA § 406(a)(1)(C). While the value of services that Regions Bank, Morgan Asset Management, and Morgan Keegan & Co. purportedly provide in exchange for revenue sharing and other kickback payments may be based on small percentages of the RMK Select Funds' daily average balance, the payments are substantial. Moreover, many of the fees charged were not for actual services performed, but were merely kickbacks for inclusion of the RMK Select Funds in the menu of funds made available to Plan participants. Thus, the amounts paid by the Plans were not and cannot be reasonable pursuant to ERISA § 408(b)(2).

482. The Prohibited Transaction Fiduciary Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(D) by causing the Legacy and Regions 401(k) Plans to engage in transactions that each of them knew or should have known constituted a direct or indirect transfer of Plan assets from the Legacy and Regions 401(k) Plans to parties in interest. This includes but is not limited to the following: Regions caused the Legacy and Regions 401(k) Plans to enter a contract or other arrangements which caused Plan assets to be transferred to

Morgan Asset Management and/or Morgan Keegan & Co., both parties in interest, for the use

and benefit of Morgan Asset Management and/or Morgan Keegan & Co. in violation of ERISA §

406(a)(1)(D).  These transfers of Plan assets to Morgan Asset Management and Morgan Keegan

& Co. constituted revenue sharing and other kickback payments there were not for actual

services performed, but were merely kickbacks for inclusion of the RMK Select Funds in the

menu of funds made available to Plan participants.  Thus, the amounts paid by the Plans were not

and cannot be reasonable pursuant to ERISA § 408(b)(2).

483.    Additionally Regions violated ERISA § 406(b)(1) and (3) by receiving revenue

sharing and other kickback payments from Morgan Keegan & Co. and/or Morgan Asset

Management at the expense of Legacy and Regions 401(k) Plans' participants and/or

beneficiaries, as the revenue sharing and other kickback payments were not credited to the Plans

but instead were kept by Regions.  Regions passed the cost of the revenue sharing and other

kickback payments through to the Plan by increasing the fees and expenses charged to the Plans

by the RMK Select Funds.  This violated ERISA § 406(b)(1) and (3), as Regions dealt with Plan

assets for its own benefit, and received consideration from parties in interest by having the Plans

invest in and/or offer as an investment option the RMK Select Funds.

484.    PTE 77-3 does not apply to the allegations alleged herein, because of, but not

limited to the following: the Legacy and Regions 401(k) Plans paid investment advisory fees,

12b-1 fees, and sales commission to the Morgan Keegan & Co. and/or Morgan Asset

Management because of the Plans' investment in the RMK Select Funds.  These fees were not

paid by Regions, but by the Plans themselves.

485.    PTE 77-4 does not apply to the allegations alleged herein, because of, but not

limited to the following:

A.     Upon information and belief, employees of Morgan Keegan & Co. were eligible to participate, and participated in the Legacy and Regions 401(k) Plans. Thus, Morgan Keegan & Co., the mutual fund provider, was the employer of employees covered by the Plans.

B.     In addition, the prospectuses indicate that RMK Select Funds may charge a sales commission in regards to the purchase or sale of RMK shares. To the extent that sales commissions were in fact charged to the Plans, Defendants violated the PTE 77-4, § II.c, for this reason as well.

C.     The Legacy and Regions 401(k) Plans paid investment advisory and other related fees to Morgan Keegan & Co. and/or Morgan Asset Management, wherein the fees charges were not based on Plans' pro rata share based on the Plans' investment in the RMK Select Funds.

D.     Upon information and belief, the Legacy and Regions 401(k) Plans did not prepay any fees for investment management or advisory or similar fees to Morgan Keegan & Co. and/or Morgan Asset Management, and consequently the Plans never received any return of such fees.

E.     The Legacy and Regions 401(k) Plans paid 12b-1 fees, sales commissions and other related fees to Morgan Keegan & Co. and/or Morgan Asset Management.

486.    As a direct and proximate result of the alleged prohibited transactions, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Funds and the other Excessive Fee Class members, lost millions of dollars of retirement savings.

487.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), the Prohibited Transaction Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## X.     CAUSATION

488.     The Legacy, AmSouth Thrift, and Regions 401(k) Plans suffered millions dollars in losses because Defendants imprudently invested or allowed to be invested substantial assets of the three Plans Regions common stock throughout the Company Stock Subclass Period, in breach of Defendants' fiduciary duties.

489.     The Legacy and Regions 401(k) Plans suffered millions dollars in losses because Defendants imprudently invested or allowed to be invested substantial assets of the Plans in the Bond Funds throughout the Bond Fund Subclass Period, in breach of Defendants' fiduciary duties.

490.     The Legacy Plan suffered nearly millions dollars in losses because Defendants imprudently invested or allowed to be invested substantial assets of the Plan in the RMK Select Funds during the Excessive Fees Subclass Period, in breach of Defendants' fiduciary duties.

491.     Defendants of the relevant Plans are liable for those Plans' losses in this case because, *inter alia*: (a) the investment in Regions common stock was the result of the Prudence Defendants' decision to invest Company contributions in Regions common stock; and (b) the Prudence Defendants are liable for losses stemming from the portion of the Plans' assets invested in Regions common stock, the Bond Funds and the RMK Select Funds, because they failed to take the necessary and required steps to ensure effective and informed independent participant

control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

492.     Had Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Regions common stock, the Bond Funds and the RMK Select Funds as investment alternatives when they became imprudent, and divesting the Plans of these investments when maintaining such investments became imprudent, the Plans would have avoided some or all of the losses that it, and indirectly, the participants, suffered.

## XI.     REMEDY FOR BREACHES OF FIDUCIARY DUTY

493.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged, and therefore knew or should have known that the Plans' assets should not have been invested in Regions common stock, the Bond Funds and the RMK Select Funds during the relevant Subclass Periods.

494.     As a consequence of the Defendants' breaches, the Plans suffered significant losses.

495.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan . . . ."  ERISA § 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

496.     With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent

fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them. Alternatively, in determining losses that resulted from the imprudent investment in Regions common stock, damages may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Regions common stock that the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plan. The Court should adopt the measure of loss most advantageous to the Plans. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in had the Plans been properly administered.

497. Plaintiffs and the Subclasses are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

498. Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans to which that Defendant owed a fiduciary duty.

# XII. CLASS ACTION ALLEGATIONS

499. **Class Definitions.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following three classes of persons similarly situated (the "Subclasses").

500. The first Subclass, the Company Stock Subclass, is defined as:

> All persons, other than Defendants, who were participants in or beneficiaries of the Legacy, AmSouth, and/or Regions 401(k) Plans at any time between January 1, 2007 and the present and whose Plan accounts were invested in Regions common stock at any time during this period.

501. The second Subclass, the Bond Fund Subclass, is defined as:

> All persons, other than Defendants, who were participants in or beneficiaries of the Legacy and/or Regions 401(k) Plans at any time between January 1, 2007 and the present and whose Plan accounts were invested in the Morgan Keegan Select Intermediate Bond Fund and/or the Regions Morgan Keegan Select High Income Fund at any time during this period.

502. The third Subclass, the Excessive Fee Subclass, is defined as:

> All persons, other than Defendants, who were participants in or beneficiaries of the Legacy and/or Regions 401(k) Plans at any time between May 1, 2003 and the present for and whose Plan accounts were invested in one or more of the RMK Select Funds at any time during this period.

503. **Class Periods.** Plaintiffs allege three distinct Subclass Periods.

A.   For the Company Stock Subclass, the fiduciaries of the Legacy, AmSouth Thrift, and Regions 401(k) Plans knew or should have known at least by January 1, 2007 that the Company's material weaknesses were so pervasive that Regions common stock could no longer be offered as a prudent investment for retirement Plan assets. Thus, the Company Stock Subclass Period is defined as from January 1, 2007 to the present.

164

B.    For the Bond Fund Subclass, the fiduciaries of the Legacy and/or Regions 401(k) Plans knew or should have known at least by January 1, 2007 that because of over investment in poor quality mortgage backed securities and CDOs and other mismanagement, the Bond Funds could no longer be offered as a prudent investment for retirement Plan assets.  Thus, the Bond Fund Subclass Period is defined as from January 1, 2007 to the present.

C.    For the Excessive Fee Subclass, the fiduciaries of the Legacy and/or Regions 401(k) Plans knew should or should have known at least by May 1, 2003 that the RMK Select Funds charged excessive fees and underperformed similar funds in their investment class and, therefore, could no longer be offered as a prudent investment for retirement Plan assets.  Thus, the Excessive Fee Subclass Period is defined as from May 1, 2003 to the present.

504.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, based on the Plan's Form 5500 for Plan year 2005, more than 22,500 individuals.

505.    **Commonality.**  Common questions of law and fact exist as to all members within each Subclass and predominate over any questions affecting solely individual members within each Subclass.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Subclasses;

(b)        whether Defendants breached their fiduciary duties to Plaintiffs and members of

the Subclasses by failing to act prudently and solely in the interests of the Plan's participants and

beneficiaries;

(c)        whether Defendants violated ERISA; and

(d)        whether the Plan has suffered losses and, if so, what is the proper measure of

damages.

506.    **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the

Subclasses because:  (a) to the extent that Plaintiffs seek relief on behalf of the Plans pursuant to

ERISA § 502(a)(2), their claim on behalf of the Plans is not only typical of but identical to a

claim under this section brought by any relevant Subclass member; and (2) to the extent

Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that

relief would affect each Subclass member equally.

507.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the

members of the Subclasses and have retained counsel competent and experienced in class action,

complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with

those of the Subclasses.

508.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is

warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the

Subclasses would create a risk of adjudications with respect to individual members of the

Subclasses which would, as a practical matter, be dispositive of the interests of the other

members not parties to the actions, or substantially impair or impede their ability to protect their

interests.

509.     **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Subclasses would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Subclasses, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Subclasses as a whole; and (3) questions of law or fact common to members within each Subclass predominate over any questions affecting only individual members within each Subclass and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(a)     A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

(b)     A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

(c)     An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

(d)     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

(e)     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Regions common stock;

(f)     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(g)     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

(h)     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

(i)     An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

DATED this 24th day of February, 2009.

Respectfully Submitted,

/s/Derek W. Loeser_____
Lynn L. Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Margaret E. Wetherald
mwetherald@kellerrohrback.com
Karin B. Swope
kswope@kellerrohrback.com
**KELLER ROHRBACK L.L.P**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.:  (206) 623-1900
Fax:  (206) 623-3384

*Interim Co-Lead Counsel for the Class and Co-*
*Counsel for Plaintiffs Harrison and Smith*


John Stember (with consent)
jstember@stemberfeinstein.com
Ellen M. Doyle
edoyle@stemberfeinstein.com
Stephen M. Pincus
spincus@stemberfeinstein.com
**STEMBER FEINSTEIN DOYLE**
   **& PAYNE, LLC**
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Tel: (412) 281-8400
Fax:(412) 281-1007

*Interim Co-lead Counsel for the Class and Co-*
*Counsel for Plaintiffs Hamby and Jackson*

Jon C. Goldfarb
jgoldfarb@wcqp.com
**WIGGINS CHILDS QUINN**
    **& PANTAZIS, LLC**
The Kress Building
301 19th Street N
Birmingham, AL 35203
Tel.: (205) 314-0500
Fax: (205) 254-1500
*Co-Counsel for Plaintiffs Hamby and Jackson*


Jeffrey Harris
Elizabeth Hutton
**STATMAN, HARRIS & EYRICH**
441 Vine Street
3700 Carew Tower
Cincinnati, OH 45202
Tel: (513) 621-2666
Fax: (512) 345-8289
jharris@statmanharris.com
lhutton@statmanharris.com


*Co-Counsel for Plaintiffs Harrison and Smith*



/s/Peter H. Burke (with consent
Peter H. Burke (with consent)
Peter H. Burke (BPR024012)
pburke@bhflegal.com
**BURKE HARVEY &**
    **FRANKOWSKI, LLC**
2151 Highland Avenue South
Suite 120
Birmingham, AL 35205
Tel.: (205) 930-0991


*Co-Counsel for Plaintiff Shamblin*

Richard S. Frankowski
rfrankowski@bhflegal.com
**BURKE HARVEY &
      FRANKOWSKI, LLC**
One Highland Place
2151 Highland Avenue
Suite 120
Birmingham, AL  35205

*Co-Counsel for Plaintiff Shamblin*

Gregory Porter
**McTIGUE & PORTER LLP**
5301 Wisconsin Ave., NW, Ste. 3500
Washington, DC 20015
Tel:  (202) 364-6900
Fax:  (202) 364-9960
gporter@mctiguelaw.com

*Counsel for Plaintiff Shamblin*

/s/ Joseph H. Meltzer (with consent)
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, L.L.P.**
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
jmeltzer@btkmc.com
ecioko@btkmc.com
jweeden@btkmc.com

*Counsel for Plaintiff Williams*

# CERTIFICATE OF SERVICE

I hereby certify that I have on February 24, 2009 filed the above and foregoing electronically with the Clerk of Court, which will send notification of such filing to counsel in this matter.

| W. Brantley Phillips bphillips@bassberry.com | Matthew M. Curley mcurley@bassberry.com | Michael A. Brady mbrady@bassberry.com |
|---|---|---|
| Michael L. Dagley mdagley@bassberry.com | Shepherd D. Tate state@bassberry.com | Christopher J. Rillo crillo@groom.com |
| Grace Robinson Murphy gmurphy@maycooper.com | Jeffrey A. Lee jlee@maynardcooper.com | Sarah A. Zumwalt szumwalt@groom.com |
| Thomas F. Fitzgerald tff@groom.com | Thomas S. Gigot tsg@groom.com | William B. Wahlheim wwahlheim@maynardcooper.com |
| Peter S. Fruin pfruin@maynardcooper.com | | |

:

/s/ Margaret E. Wetherald
Margaret E. Wetherald