# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

IN RE REGIONS MORGAN KEEGAN
ERISA LITIGATION

MDL No. 2009
Master File No. 2:08-cv-02192
Judge Samuel H. Mays, Jr.
Magistrate Judge Vescovo

---

## MEMORANDUM OF LAW IN SUPPORT OF THE REGIONS DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF ERISA

---

**GROOM LAW GROUP, CHARTERED**
Thomas F. Fitzgerald (admitted *pro hac vice*)
Thomas S. Gigot (admitted *pro hac vice*)
Christopher J. Rillo (admitted *pro hac vice*)
Sarah A. Zumwalt (admitted *pro hac vice*)
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: 202-857-0620
Facsimile: 202-659-4503

**MAYNARD COOPER & GALE, P.C.**
Peter S. Fruin
Jeffrey A. Lee (admitted *pro hac vice*)
William B. Wahlheim, Jr. (admitted *pro hac vice*)
Grace R. Murphy (admitted *pro hac vice*)
2400 Regions Harbert Plaza 1901
6th Avenue South
Birmingham, AL 35203
Telephone: 205-254-1000
Facsimile: 205-254-1999

*Counsel for Regions Financial Corporation, Regions Bank, Ken Alderman, George W. Bryan, John Buchanan, Earnest W. Deavenport, Jr., David B. Edmonds, Irene Esteves, Christopher Glaub, O.B. Grayson Hall, Jr., Tim Laney, Susan W. Matlock, Claude Nielsen, C. Dowd Ritter, David Rupp, Jill Shelton, Lee K. Styslinger, III, Tom Thompson, David Turner, Barbara H. Watson, and William C. Wells (together, the "Regions Defendants")*

## TABLE OF CONTENTS

I.      **INTRODUCTION**.................................................................... 1

II.     **ALLEGATIONS OF THE COMPLAINT** ........................................ 4

    A.     **Regions and its Subsidiaries**........................................ 4

    B.     **The Regions 401(k) Plan and Predecessor Plans** ............ 5

    C.     **Plaintiffs and Their Claims For Relief** ........................ 7

III.     **ARGUMENT** ............................................................................. 7

    A.     **The "Company Stock Subclass" Claims (Counts I-V) are Legally Insufficient** ........................................................ 8

        1.     **The Company Stock Prudence Claim (Count I) Fails as a Matter of Law**........................................ 8

        2.     **The Company Stock Disclosure Claim (Count IV) Fails as a Matter of Law**........................ 16

    B.     **The Prohibited Transaction, Prudence and Disclosure Claims of the Alleged "Excessive Fee Subclass" (Counts XV, XI and XIV) are Legally Insufficient** ......... 25

        1.     **The Prohibited Transaction Claim (Count XV) Fails as a Matter of Law**........................ 25

        2.     **The Excessive Fee Prudence Claim (Count XI) Fails to State a Viable Claim for Relief under ERISA** ................. 32

        3.     **The Excessive Fee Disclosure Claim (Count XIII) Fails as a Matter of Law**........................ 34

    C.     **The Prudence and Disclosure Claims of the Alleged "Bond Fund Subclass" (Counts VI and IX) Fail to State Viable Claims for Relief under ERISA** ............ 36

        1.     **The Bond Fund Prudence Claim (Count VI) Fails as a Matter of Law**........................ 37

        2.     **The Bond Fund Disclosure Claims (Count IX) Fail as a Matter of Law**........................ 39

    D.     **The Complaint Fails to Allege Facts Sufficient to Establish That Certain Defendants Functioned as ERISA Fiduciaries**................................... 39

    E.     **The Monitoring, Co-Fiduciary Disclosure and Co-Fiduciary Liability Claims (Counts II, III, V, VII, VIII, X, XII and XIV) Are Legally Deficient and Should Be Dismissed**..................................... 43

    F.     **ERISA § 404(c) Bars Recovery Because Participants in the Plans Exercised Investment Control Over Their Own Plan Accounts** ................... 44

IV.     **CONCLUSION** ....................................................................... 45

<strong><u>TABLE OF AUTHORITIES</u></strong>

**Cases**

*Akers v. Palmer*, 71 F.3d 226 (6th Cir. 1995) .............................................................. 15

*Ass'n of Cleveland Firefighters v. City of Cleveland*, 502 F.3d 545 (6th Cir. 2007) .................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 7, 8, 23

*Boeckman* v. *A.G. Edwards, Inc.*, No. 05-658-GPM, 2007 U.S. Dist. LEXIS 90251
(S.D. Ill. Aug. 31, 2007) .............................................................................. 30

*Bovee v. Coopers & Lybrand C.P.A.* 272 F.3d 356 (6th Cir. 2001) .............................. 4

*Braden v. Wal-Mart Stores, Inc.*, 590 F. Supp. 2d 1159 (W.D. Mo. 2008) ............... 29, 32, 33, 36

*Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006) ................................................ 39

*Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002) ........................................ 26

*Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222 (W.D.N.Y. 2002) ............................... 40

*DeBruyne* v. *Equitable Life Assur. Soc'y*, 720 F. Supp. 1342 (N.D. Ill. 1989) .......... 37

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ................................... 33, 38

*Dupree v. Prudential Ins. Co.*, No. 99-cv-8337, 2007 U.S. Dist. LEXIS 57857
(S.D. Fla. Aug. 7, 2007) .............................................................................. 33

*Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007) .......................................... 9, 10, 15

*Glennie v. Abitibi-Price Corp.*, 912 F. Supp. 993 (W.D. Mich. 1996) ...................... 33, 38

*Hamilton v. Carell*, 243 F.3d 992 (6th Cir. 2001) ......................................... 39

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ...................................... passim

*Hunter v. Caliber Sys.*, 220 F.3d 702 (6th Cir. 2000) ..................................... 15

*In re Bausch & Lomb, Inc. ERISA Litig.*, No. 06-cv-6297,
2008 U.S. Dist. LEXIS 106269 (W.D.N.Y. Dec. 12, 2008) ................................... 18

*In re Calpine Corp. ERISA Litig.*, No. C-03-1685 SBA, 2005 U.S. Dist. LEXIS 9719
(N.D. Cal. Mar. 31, 2005) ............................................................................ 40

*In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 794-95 (W.D.N.C. 2003) ...... 11

*In re Huntington Bancshares Inc. ERISA Litig.*, No. 2:08-cv-00165,
2009 U.S. Dist. LEXIS 9102, (S.D. Ohio Feb. 9, 2009) ................................... passim

*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 830 (N.D. Cal. 2005) ....... 11, 38

*In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005) ..................... 15

*In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606 (N.D. Tex. 2008) ............ 42

*In re Tyco Int'l Ltd. Multidistrict Litig.*, No. 02-1357-PB,
2004 U.S. Dist. LEXIS 24272 (D.N.H. Dec. 2, 2004) ................................... 38, 41

*In re WorldCom, Inc.*, 263 F. Supp. 2d 745 (S.D.N.Y. 2003) ...................................................... 17

*James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439 (6th Cir. 2002) ................................... 16, 34

*Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854 (6th Cir. 2000)...................... 26

*Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243 (5th Cir. 1008)........................... 10, 11, 17, 18

*Kowal v. MCI Comms. Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................................... 21

*Krim* v. *Coastal Physician Group, Inc.*, 81 F. Supp. 2d 621 (M.D.N.C. 1998) .......................... 22

*Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995)............................................................... 9, 10, 11

*Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir. 1999) ................................................................................................................................. 37

*Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299 (5th Cir. 2007) ...................... 43, 44

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)......................................................................... 26

*Martin v. Caterpillar, Inc.*, No. 07-cv-1009, 2008 U.S. Dist. LEXIS 99465 (C.D. Ill. Sept. 25, 2008) .................................................................................................................................. 35

*Martin v. Feilen,* 965 F.2d 660 (8th Cir.1992) ........................................................................... 9

*Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502 (E.D. Pa.  2001) ........................................ 28

*Mellot v. Choicepoint, Inc.*, 561 F. Supp. 2d 1305 (N.D. Ga. 2007) .......................................... 18

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ...................................................................... 39

*Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995) ...................................................... 9, 10, 11, 39

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) .......................................................... 8, 23

*Pegram v. Herdrich*, 530 U.S. 211 (2000).......................................................................... 17, 39

*Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816 (6th Cir. 2007) ............................................... 39

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008)................................................................. 8, 14

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994)............................................ 37

*Seaway Food Town, Inc. v. Med. Mut.*, 347 F.3d 610 (6th Cir. 2003) ........................................ 40

*Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660 (6th Cir. 1998)..................................................... 15

*Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 U.S. Dist. LEXIS 24490 (S.D. Ohio Jan. 29, 2009) ............................................................................................................................. passim

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998)............................................. 16, 34

*Taylor v. United Techs. Corp.*, No. 3:06cv1494, 2007 U.S. Dist. LEXIS 57807 (D. Conn. Aug. 9, 2007) .................................................................................................................................. 35

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ......................................................................... 17, 18

*Ward v. Avaya, Inc.*, 487 F. Supp. 2d 467 (D.N.J. 2007) .......................................................... 42

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997)....................................................................... 4

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004) .................................. 9, 11

**Statutes**

ERISA § 3(21), 29 U.S.C. § 1002(21) ......................................................... 39

ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1) ................................................ 29

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) .................................................. 5

ERISA § 402(a), 29 U.S.C. § 1102(a) ......................................................... 39

ERISA § 404(a), 29 U.S.C. § 1104(a) ........................................... 8, 10, 14, 37

ERISA § 404(c)(1)(A), 29 U.S.C. § 1104(c)(1)(A) ......................................... 6

ERISA § 404(c), 29 U.S.C. § 1104(c) ...................................................... 2, 43

ERISA § 406, 29 U.S.C. § 1106 ............................................................. 25, 26

ERISA § 407(a), 29 U.S.C. § 1107(a) ......................................................... 10

ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1) ................................................ 10

ERISA § 407(d)(3); 29 U.S.C. § 1107(d)(3) ................................................. 9

ERISA § 408, 29 U.S.C. § 1108 ............................................................ 10, 26

ERISA § 409, U.S.C. § 1109 .................................................................... 7

ERISA §§ 101-11, 29 U.S.C. §§ 1021-1031 ................................................ 16

ERISA §§ 3(14)(A)-(F), 29 U.S.C. §§ 1002(14)(A)-(F) ................................ 26

**Other Authorities**

29 C.F.R. § 2509.75-2(a) ....................................................................... 30

29 C.F.R. § 2520.101 ............................................................................ 16

29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i) ..................................................... 44

29 C.F.R. § 2550.404c-1(b)(3)(i)(B)(3) ..................................................... 38

29 CFR § 2550.404a-1(b)(1), (2) ............................................................. 38

29 CFR 2509.75-8 ............................................................................... 41

41 Fed. Reg. 50,516.............................................................................28

42 Fed. Reg. 18,734.............................................................................28

44 Fed. Reg. 25,533.............................................................................28

71 Fed. Reg. 41,392 ............................................................................ 36

Regions Financial Corporation ("Regions"), Regions Bank and the Individual Regions Defendants[1] respectfully submit this memorandum in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint" or "Compl.") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7.2.

## I.     INTRODUCTION

In this putative class action, six current or former employee participants in a Regions-sponsored "401(k)" retirement plan or its predecessor plans seek an award of damages because, like so many others during the current economic downturn, their 401(k) accounts have lost value. In doing so, these Plaintiffs principally complain not about investment decisions made *for them* by Defendants, but about losses arising from their *own* investment decisions.

The plans at issue here provided participating employees, including Plaintiffs, with individual accounts to which the employee could (but was not required to) contribute. Regions made employer "matching" contributions to the accounts as well. The employees controlled how the money in their individual accounts was invested, and they were given a broad range of investment options from which to choose. Consistent with Congress' stated objective to encourage employees to own the stock of their employer, the plans also included an Employee Stock Ownership Plan ("ESOP") feature that allowed employees to invest in Regions stock. Regions did not recommend or require that Plan participants remain invested in any particular investment option.

Plaintiffs now seek to use the Employee Retirement Income Security Act of 1974, as

---

[1]     The "Individual Regions Defendants" currently are: Ken Alderman, George W. Bryan, John Buchanan, Earnest W. Deavenport, Jr., David B. Edmonds, Irene Esteves, Christopher Glaub, O.B. Grayson Hall, Jr., Tim Laney, Susan W. Matlock, Claude Nielsen, C. Dowd Ritter, David Rupp, Jill Shelton, Lee K. Styslinger, III, Tom Thompson, David Turner, Barbara H. Watson, and William C. Wells, II. The Complaint names at least 17 additional individuals as Defendants, none of whom has entered an appearance to date. It is possible that some of those additional Defendants, if and when they appear, may choose to join in the pending Rule 12(b)(6) motions, in which case they should be considered Individual Regions Defendants for purposes of the pending motions.

amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to recover for losses in two sets of the investments they decided to make, namely investments in Regions stock and in certain mutual funds offered or advised by a Regions affiliate.

As a conceptual matter, the Complaint's attempt to absolve plan participants from responsibility for the individualized investment decisions that they themselves made under these participant-directed plans fails as a matter of law. As shown in Section III.E, *infra*, ERISA § 404(c), 29 U.S.C. § 1104(c), protects Defendants from liability for losses that result from the participants' own investment decisions. Where, as here, a participant chooses his or her own investments within a plan, a plan sponsor or fiduciary does not become the guarantor for these decisions. Rather, the plan participants must accept the outcome of their own investment choices. This is dispositive of all claims, and virtually the entire Complaint can be dismissed for this reason alone.

In attempt to obscure this obvious result, Plaintiffs' 178-page Complaint uses an amalgam of the legal theories advocated by Plaintiffs' counsel and other firms in an ever-growing number of ERISA "stock drop" and "excessive fee" putative class actions. But such cases, attempting to stretch the ERISA laws beyond their intended application, have rightly met with skepticism in the courts. As demonstrated below, this Complaint fares no better—each individual claim is deficient and should be dismissed.

The claims can be grouped into four broad categories and ordered for purposes of this motion as follows:

Counts I and IV of the Complaint (the Company Stock "Prudence Claim" and "Disclosure Claim," respectively) seek to recover alleged losses resulting from investments in Regions' common stock that participants made through the plans' ESOP Funds. The central

allegation behind this set of claims is that the current worldwide credit and liquidity crisis was entirely foreseeable—as was the resulting drop in Regions' stock price—such that the persons allegedly responsible for managing the plans should have removed the ESOP Fund from the plans' lineups of investment options, or urged plan participants to trade out of the ESOP Fund, or both. Federal courts, however, routinely dismiss such hindsight stock drop claims on Rule 12(b)(6) motions, especially where, as here, the governing plan document expressly requires the ESOP Fund to be offered as an investment option, and there is no plausible allegation that the employees who chose to invest in the ESOP Fund were somehow tricked or coerced into doing so. Plaintiffs' formulaic "stock drop" allegations in this case fail to state any plausible claim for relief and should be dismissed for the reasons discussed in Section III.A, *infra*.

Counts XV, XI, and XIII (the Excessive Fee "Prohibited Transaction Claim," "Prudence Claim," and "Disclosure Claim," respectively) seek the recovery of alleged investment losses, and the disgorgement of allegedly unjust profits, resulting from plan investments in a set of mutual funds (the "RMK Select Funds") offered or advised by Regions affiliates, Defendants Morgan Keegan & Co. ("Morgan Keegan") and Morgan Asset Management ("MAM"). The central allegations behind this set of fee claims are (i) that ERISA purportedly prohibits a 401(k) plan from investing in mutual funds that are affiliated with the plan's sponsoring employer or that share their fee revenue with others, and (ii) that the RMK Select Funds charged fees that are "excessive" for ERISA purposes because lower-cost mutual funds are and were available in the marketplace. As shown in Section III.B, *infra*, however, ERISA's regulatory framework has long permitted a 401(k) plan to invest in the financial products offered by the plan's sponsoring employer or its affiliates, and recent authority confirms that the kind of revenue sharing and fee structures alleged here do not violate ERISA.

Counts VI and IX of the Complaint (the Bond Fund "Prudence Claim" and "Disclosure Claim," respectively) combine the central allegations behind the two earlier sets of claims in an effort to recover investment losses resulting from a subset of the RMK Select Funds that, like Regions itself, held portfolios of debt instruments that lost value when credit markets collapsed. As shown in Section III.C, *infra*, this gets Plaintiffs no closer to stating viable claims for relief under ERISA, and both of these Bond Fund claims should be dismissed as a result.

All remaining claims in the Complaint (Counts II, III, V, VII, VIII, X, XII and XIV) are derivative of the Prudence, Disclosure and Prohibited Transaction Claims alleged in the primary Counts of the Complaint. Because those primary Counts fail to state viable ERISA claims, all of these derivative claims must also be dismissed for the reasons shown in Section III.E, *infra*.

## II.    ALLEGATIONS OF THE COMPLAINT[2]

### A.    Regions and its Subsidiaries

Regions is a full-service provider of consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services. (Compl. ¶ 38.) Regions is the successor by merger to several financial institutions, including Union Planters Corporation and AmSouth Bancorporation ("AmSouth"). (Compl. ¶ 38.) Regions is also the parent company of

---

[2]    Consistent with the requirements of Rule 12(b)(6), these allegations are drawn from the text of the Complaint or from additional documents that are explicitly referenced in the Complaint or are indisputable matters of public record. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim"); *Bovee v. Coopers & Lybrand C.P.A.* 272 F.3d 356, 360-61 (6th Cir. 2001) ("[T]his Court may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56.") (internal quotation omitted); *In re Huntington Bancshares Inc. ERISA Litig.*, No. 2:08-cv-00165, 2009 U.S. Dist. LEXIS 9102, at *6 n.3 (S.D. Ohio Feb. 9, 2009) ("In considering a defendant's motion to dismiss, it is proper for the Court to take into account any relevant ERISA plan documents not attached to a complaint where a plaintiff's claims are based on rights under the plans which are controlled by the plans' provisions as described in the plan documents and where the documents are incorporated through reference to the plaintiff's rights under the plans, and they are central to the plaintiff's claims.") (internal quotations omitted). Here, such additional documents include formal plan documents and summary plan descriptions ("SPDs"), Regions' annual and quarterly reports on SEC Forms 10-K and 10-Q, and a number of governmental publications whose authenticity is not in question. Copies of these additional documents and unpublished court decisions cited herein are attached as exhibits to the accompanying declaration of Thomas S. Gigot (the "Gigot Decl.").

a number of wholly-owned subsidiaries, including Defendants Regions Bank, a state-chartered

commercial bank; Morgan Keegan, a regional brokerage and investment management firm that

offered a variety of financial services and products, including a family of Regions Morgan

Keegan ("RMK") mutual funds; and MAM, which provided investment advisory services to,

among others, the RMK Select Funds.  (Compl. ¶¶ 43-45.)

**B.      The Regions 401(k) Plan and Predecessor Plans**

Today, Regions sponsors for its employees one 401(k)-style plan relevant to this

litigation (the "Merged Plan").  (Compl. ¶ 3.)  The Merged Plan is the result of an April 1, 2008

merger of two predecessor plans—the Regions Financial 401(k) Plan (the "Legacy Plan") and

the AmSouth Bancorporation Thrift Plan (the "AmSouth Plan")—following the November 4,

2006 corporate merger of Regions and AmSouth.  (Compl. ¶ 3.)

The written instruments of the Legacy Plan, the AmSouth Plan and the Merged Plan

(each a "Plan"), by which the Plans were maintained pursuant to ERISA § 402(a)(1), 29 U.S.C.

§ 1102(a)(1), had the following features in common:

- Each Plan is a "defined contribution plan" and an "individual account plan" within
  the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  (Regions Financial
  Corporation 401(k) Plan, Amended and Restated as of January 1, 2001, attached as
  Exhibit 1 to the Gigot Decl., §§ 1.15.1, 1.42; AmSouth Bancorporation Thrift Plan,
  Amended and Restated as of January 1, 1997, Revised February 2002, attached as
  Exhibit 2 to the Gigot Decl., § 1.51; Regions Financial Corporation 401(k) Plan,
  Amended and Restated Effective as of January 2002, Dated November 2008, attached
  as Exhibit 3 to the Gigot Decl., § 1.51.)

- Each Plan identifies Regions as the Plan's sponsor, and the Legacy Plan and the
  AmSouth Plan further identified Regions as a "named fiduciary" within the meaning
  of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).  (Legacy Plan § 2.5 (Gigot Decl., Ex.
  1); AmSouth Plan §§ 1.42, 1.62 (Gigot Decl., Ex. 2); Merged Plan § 1.62 (Gigot
  Decl., Ex. 3).)  Under the Merged Plan, an employee-run committee (the "Regions
  Benefits Management Committee" or "RBMC") serves as the named fiduciary.
  (Merged Plan §1.42 (Gigot Decl., Ex. 3).)

- Each Plan provides for its assets to be held in a trust for which Regions Bank serves

(or served) as the trustee, subject to the investment direction of Plan participants or another named fiduciary. (Legacy Plan § 2.3(b) (Gigot Decl., Ex. 1); AmSouth Plan §§ 8.01-8.04 (Gigot Decl., Ex. 2); Merged Plan §§ 8.01-8.04 (Gigot Decl., Ex. 3).)

- Each Plan identifies either Regions, the RBMC, or another employee-run committee (the "Regions Benefits Administration Committee") as the Plan's "administrator," as defined in ERISA § 3(16), 29 U.S.C. § 1002(16). (Legacy Plan § 1.2, Amend. 7 ¶ 1 (Gigot Decl., Ex. 1); AmSouth Plan §§ 1.10, 1.52, Amend. 10 ¶ 1 (Gigot Decl., Ex. 2); Merged Plan §§ 1.10, 1.52 (Gigot Decl., Ex. 3).)

- Each Plan both (i) allows a participating employee to make voluntary "401(k)" contributions to his or her plan account and (ii) requires Regions to make matching employer contributions based on a specified percentage of the employee's voluntary contribution. (Legacy Plan §§ 4.1, 4.2 (Gigot Decl., Ex. 1); AmSouth Plan §§ 4.01, 4.02 (Gigot Decl., Ex. 2); Merged Plan §§ 4.01, 4.02 (Gigot Decl., Ex.3).)

- Each Plan provides for a separate account that is to be maintained as a stock bonus plan and employee stock ownership plan (the "ESOP Account") within the meaning of ERISA and the Internal Revenue Code of 1986, as amended. (Legacy Plan § 1.42 (Gigot Decl., Ex. 1); AmSouth Plan § 1.51 (Gigot Decl., Ex. 2); Merged Plan § 1.51 (Gigot Decl., Ex.3).)

- Each Plan requires its ESOP Account to be invested solely in a pooled fund (the "ESOP Fund") that is designed to invest primarily in Regions common stock. (Legacy Plan §§ 4.10, 8.5, 8.12, Amend. 11 ¶ 10 (Gigot Decl., Ex. 1); AmSouth Plan § 1.51 (Gigot Decl., Ex. 2); Merged Plan § 1.51 (Gigot Decl., Ex.3).)

- Each Plan provides for its non-ESOP accounts to be invested among a menu of mutual fund options offered under the Plan. (Legacy Plan §§ 1.27, 4.10(b) (Gigot Decl., Ex. 1); AmSouth Plan § 8.03 (Gigot Decl., Ex. 2); Merged Plan § 8.03 (Gigot Decl., Ex.3).) The Legacy Plan's and the Merged Plan's (but not the AmSouth Plan's) menu of mutual fund options included, at one time or another, up to twelve of the RMK Select Funds, plus other non-affiliated mutual funds. (*See* Compl. ¶ 5 n.2.)

- Each Plan allows a participating employee to decide how much to contribute to his or her accounts, and how to invest and reinvest his or her accounts among the Plan's menu of investment options. Moreover, at all times after 2005, each Plan or its SPD has provided that it is intended to be a "404(c) plan" under ERISA because it "provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, as determined under regulations of the Secretary [of Labor])[.]" (*See* ERISA § 404(c)(1)(A), 29 U.S.C. § 1104(c)(1)(A); Legacy Plan Amend. 8 ¶ 12 (Gigot Decl., Ex. 1); Legacy Plan 2005 SPD, attached as Exhibit 4 to the Gigot Decl., at 10-11; AmSouth Plan § 8.03(c)(13) (Gigot Decl., Ex. 2); Merged Plan § 8.03(c)(2), (3) (Gigot Decl., Ex. 3).)

**C.       Plaintiffs and Their Claims For Relief**

Plaintiffs are six individuals who allege that they are or were participants in the Merged

Plan, the Legacy Plan, and/or the AmSouth Plan.  (Compl. ¶¶ 32-37.)  Each Plaintiff also alleges

that he or she chose to invest in the Plan's ESOP Fund, in one or more of the RMK Select Funds

or in some combination thereof.  (Compl. ¶¶ 32-37.)  Plaintiffs further allege that the Plans

suffered losses as a result of investments made through the ESOP Fund and the RMK Select

Funds.  (Compl. ¶ 488.)  In the fifteen Counts of their Complaint, Plaintiffs contend that various

of the four corporate and 37 individual Defendants named in the Complaint are personally liable

under ERISA § 409, 29 U.S.C. § 1109, to restore the alleged investment losses or to disgorge any

profits earned in violation of ERISA requirements.  (Compl. ¶ 26.)

## III.       ARGUMENT

To state a claim for monetary relief under ERISA § 409 1109, the Plaintiff must plead

facts sufficient to establish (i) the Defendants' fiduciary status under ERISA, (ii) a breach of an

ERISA duty by Defendants, (iii) "losses to the plan" (or conversely, profits to Defendants), and

(iv) that such losses "result[ed] from" that breach (or that such profits were obtained through an

illegal use of the plan's assets).[3]

To survive a Rule 12(b)(6) motion to dismiss, the Complaint must plead "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Id*. at 555 (internal quotations omitted).  "The claims must be 'plausible' and not

---

[3]        ERISA § 409 provides, in relevant part, that "[a]ny person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally
liable to make good such losses to the plan resulting from each such breach, and to restore to such plan any profits of
such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ."  29 U.S.C. § 1109(a).

'merely conceivable.'" *Huntington Bancshares*, 2009 U.S. Dist. LEXIS 9102, at *10 (quoting

*Twombly*, 550 U.S. at 568), attached hereto as Exhibit 5 to the Gigot Decl. Thus, "factual

allegations must be enough to raise a right to relief above the speculative level . . . ." *Ass'n of

Cleveland Firefighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). "In addition, a

plaintiff can plead himself out of court by alleging facts that show there is no viable claim."

*Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008); *see also NicSand, Inc. v. 3M Co.*, 507

F.3d 442, 458 (6th Cir. 2007) ("When 'the complaint itself gives reasons' to doubt plaintiff's

theory, . . . it is not our task to resuscitate the claim but to put it to rest. Nothing prevents a

plaintiff from pleading itself out of court[.]") (quoting *Twombly*, 550 U.S. at 568).

**A.      The "Company Stock Subclass" Claims (Counts I-V) are Legally Insufficient**

In Counts I-V, Plaintiffs purport to assert claims on behalf of all participants in the Plans

whose accounts were invested in Regions common stock (the alleged "Company Stock

Subclass") at any time between January 1, 2007 and the present (the alleged "Company Stock

Subclass Period"). As shown immediately below, the core claims alleged in Counts I and IV (the

"Prudence Claim" and "Disclosure Claim," respectively) are legally deficient. The remaining

claims (Counts II, III and V) are merely derivative of the Prudence and Disclosure Claims and

are addressed collectively in Section III.E, *infra*.

**1.      The Company Stock Prudence Claim (Count I) Fails as a Matter of Law.**

Count I alleges that Defendants (except Morgan Keegan and MAM) breached their duties

of loyalty and prudent care under ERISA §§ 404(a)(1)(A) and (B)[4] by allowing Plan participants

---

4       Section 404(a)(1) of ERISA states in relevant part that "a fiduciary shall discharge his duties with respect to
a plan solely in the interest of the participants and beneficiaries and –
        (A)      for the exclusive purpose of:
                 (i)      providing benefits to participants and their beneficiaries; and
                 (ii)     defraying reasonable expenses of administering the plan;

to invest in the Plans' ESOP Funds. (Compl. ¶ 325.) Plaintiffs contend that these Defendants should have removed the ESOP Funds from the Plans' investment lineups and forced all participants to sell their Plan-based holdings of Regions stock. Plaintiffs' allegations, even if true, fail to establish a breach of duty.

> ### a) The Complaint Fails to Plead That Continuation of the Plans' ESOP Funds Breached Any ERISA Duty.
>
> #### (1) The ESOP Funds Are Exempt From Various ERISA Requirements, and Defendants Are Entitled to a Presumption That Continuation of Those ESOP Funds Complies With ERISA.

The Plans were individual account plans under ERISA[5] (Compl. ¶ 64), and the component of each Plan through which participants invested in Regions stock was expressly denominated as both a stock bonus plan and an ESOP. (Legacy Plan §§ 1.15.1, 1.42, 4.10, 8.12(a) (Gigot Decl., Ex. 1); AmSouth Plan § 1.51 (Gigot Decl., Ex. 2); Merged Plan § 1.51 (Gigot Decl., Ex. 3).) As such, each Plan both expressly "provided for" investment in Regions stock and qualified as both an ESOP and an eligible individual account plan ("EIAP") under ERISA. *See* ERISA § 407(d)(3)(B); 29 U.S.C. § 1107(d)(3)(B).

ESOPs and other EIAPs differ from traditional pension plans because they reflect Congress' intent to encourage employee ownership of their company's stock. "Congress envisioned that an ESOP would function both as 'an employee retirement benefit plan and a

---

(B)     with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

29 U.S.C. § 1104(a)(1).

[5]     Section 407(d)(3)(A) of ERISA defines the term "eligible individual account plan" to mean "an individual account plan which is (i) a profit sharing, stock bonus or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on the date of [ERISA's enactment] and which on such date invested primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(3)(A) 407(d)(3)(A), . Section 407(d)(3)(B) of ERISA further provides, in relevant part, that a plan "shall be treated as an [EIAP] with respect to the acquisition or holding of qualifying employer securities . . . only if the plan explicitly provides for the holding of qualifying employer securities . . . ." 29 U.S.C. § 1107(d)(3)(B).

9

"technique of corporate finance" that would encourage employee ownership.'" *Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) (quoting *Martin v. Feilen,* 965 F.2d 660, 664 (8th Cir. 1992)).  Thus, "'the concept of employee ownership constituted a goal in and of itself.'"  *Edgar v. Avaya, Inc.*, 503 F.3d 340, 346 (3d Cir. 2007) (quoting *Moench v. Robertson*, 62 F.3d 553, 568 (3d Cir. 1995)); *see also Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (recognizing "strong policy and preference in favor of investments in employer stock") (citation omitted); *Kirschbaum v. Reliant Energy, Inc*., 526 F.3d 243, 254 (5th Cir. 1008) ("Relevant here are the long-term horizon of retirement investing, as well as the favored status Congress has granted to employee stock investments in their own companies.") (internal quotations omitted).

Intending to encourage employees to invest in employer stock, Congress specifically exempted ESOPs and other EIAPs from key portions of ERISA's generally-applicable fiduciary duties.  First, Congress provided in ERISA § 404(a)(2) that ERISA's duties of diversification and prudence—to the extent that prudence requires diversification—are not violated by an EIAP's acquisition or holding of qualifying employer securities, *i.e*., employer stock.  29 U.S.C. § 1104(a)(2).  Second, although ERISA § 407(a), 29 U.S.C. § 1107(a), generally limits the percentage of a pension plan's investments in employer securities, Congress specifically exempted EIAPs from this prohibition.  ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1).  Third, ERISA's general prohibitions against dealing with a party in interest or self-dealing, ERISA § 406(a) and (b), "shall not apply to the acquisition or sale by a plan of qualifying employer securities . . . if the plan is an [EIAP]."  29 U.S.C. § 1108(e)(3)(A).

In light of this statutory framework and Congress' express policy, the Sixth Circuit applies an important legal presumption that an EIAP fiduciary who invests plan assets in

employer securities acts prudently and consistently with ERISA. *See Kuper*, 66 F.3d at 1459

(quoting *Moench*, 62 F.3d at 571). "[T]o rebut the presumption that a fiduciary acted prudently

in investing in employer securities, a 'plaintiff must show that the ERISA fiduciary could not

have believed reasonably that continued adherence to the [EIAP's] direction was in keeping with

the settlor's expectations of how a prudent trustee would operate.'" *Edgar*, 503 F.3d at 348

(quoting *Moench*, 62 F.3d at 571). Put another way, the plaintiff must show "that 'owing to

circumstances not known to the settlor and not anticipated by him,' investing in employer

securities 'would defeat or substantially impair the accomplishment of the purposes of the

trust.'" *Id*. (quoting Restatement (Second) Trusts, § 227, cmt. [q])).

### (2) Plaintiffs Fail to Allege the Extreme Circumstances Required to Rebut the Presumption of Prudence.

In *Kuper*, the Sixth Circuit held that the defendants' alleged failure to investigate whether

to diversify or liquidate the ESOP during a period of substantial decline in stock price and

lengthy sale of a division was legally insufficient to rebut the *Moench* presumption. 66 F.3d at

1459-60. The Third Circuit in *Moench* suggested that a plaintiff *might* be able to rebut the

presumption of prudence by showing (i) a "precipitous decline in the price" of the employer's

stock, *coupled with* (ii) defendants' knowledge of "an impending collapse and [their] own

conflicted status." 62 F.3d at 572. That combination of factors *might* involve "changed

circumstances to such an extent" that a plan fiduciary would effectuate the settlor's intent "only

by deviating from the trust's direction" on employer stock. *Id.; see also Kirschbaum*, 526 F.3d

at 255 ("There is no indication that REI's viability as a going concern was ever threatened, nor

that REI's stock was in danger of becoming essentially worthless."); *Shirk v. Fifth Third

Bancorp*, No. 05-cv-049, 2009 U.S. Dist. LEXIS 24490, at *41 (S.D. Ohio Jan. 29, 2009)

(holding that plaintiffs' allegations of "non-optimal business practices" and "internal control

weaknesses" were insufficient to overcome the presumption of prudence), attached hereto as Exhibit 6 to the Gigot Decl.[6]

Here, Plaintiffs make conclusory allegations that the nation's economic crisis was entirely foreseeable (*see* Compl. ¶¶ 129-151), and that Regions' stock price dropped from $37.40 to $2.64 during the alleged Company Stock Subclass Period. (Compl. ¶ 22.) Yet the Complaint is devoid of any allegation of market fraud or any other plausible basis for suggesting that the market price for Regions did not reflect all of the factors that Plaintiffs contend made today's economic crisis and the drop in Regions stock foreseeable. Indeed, publicly-available documents cited in the Complaint refute any suggestion that this "stock drop" somehow is unique to Regions or signals the company's impending collapse. To the contrary, the specific facts contained in the cited documents demonstrate that Regions remains a viable company that is weathering the current worldwide financial crisis intact.

First, the Complaint selectively quotes from Regions' annual and quarterly reports on Forms 10-K and 10-Q, yet neglects to mention those portions of the 10-Ks, such as the graph below, showing that Regions' stock price essentially moved in tandem with its competitors in the banking sector.

---

[6]     In fact, courts have repeatedly held that a mere drop in stock price, absent a plausible risk of complete loss by insolvency or other extraordinary fact, does not rebut the prudence presumption. *See, e.g.,Wright*, 360 F.3d at 1098-99 (ill-fated merger, reverse stock split and 75 percent drop in stock price were insufficient to rebut *Moench* presumption); *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 830, 833 (N.D. Cal. 2005) (declining to adopt *Moench*, but concluding that widespread accounting violations, restated revenues for three years and 75 percent drop in stock price were insufficient to state claim); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 794-95 (W.D.N.C. 2003) (allegations of accounting irregularities plus 15 percent drop in stock price insufficient to rebut presumption of prudence).



(Regions Fin. Corp., Annual Report (Form 10-K), at 26 (Feb. 25, 2009) ("2008 10-K"), attached as Exhibit 7 to the Gigot Decl.) As another district court in this Circuit recently observed, this kind of industry-wide price movement undermines an ERISA prudence claim because "ERISA was simply not intended to be a shield from the sometimes volatile stock market." *Huntington Bancshares*, 2009 U.S. Dist. LEXIS 9102, at *27; *see also id.* at 23 n.8 (dismissing ERISA stock drop claims on Rule 12(b)(6) motion and observing that "although Huntington has experienced a significant drop in its stock price, Huntington's stock price essentially moved in tandem with the other regional banks in Huntington's geographic footprint over the Class Period").[7]

---

[7] Plaintiffs' allegations regarding various analysts' recommendations concerning Regions stock (Compl. ¶ 201) are of no avail. An analyst's recommendation to sell a company's stock reflects the analyst's belief that the stock will underperform the market or is currently overpriced, not necessarily that the analyst believes the stock to be worthless. Moreover, analysts' recommendations change over time. In fact, Plaintiffs fail to mention that Citigroup, which downgraded Regions to Sell on February 6, 2008, subsequently upgraded it to Hold on April 17, 2008. And currently, the analysts' overwhelming consensus is that Regions stock should be held. (*See* http://www.marketwatch.com/tools/quotes/ratings.asp?symb=RF&sid=1775719&siteid=mktw (last visited Apr. 10, 2009), attached as Exhibit 8 to the Gigot Decl.) Some analysts, such as the one Plaintiffs cite in Complaint ¶ 205 as predicting that Regions' earnings will not turn positive in 2009, continue to recommend buying Regions stock: "[Veteran banking analyst Richard] Bove, however, maintained his 'buy' rating on the stock and said the bank retains the best franchise in the Gulf States, while states like Alabama, Tennessee and northern Florida continue to offer superior growth prospects." (Reuters, *Regions Financial may cut dividend by 90 pct*, Jan. 26, 2009, attached as

Second, Plaintiffs allege that Regions now has a "Fitch" bank rating of "B" and infer that this rating signals a "threat of Regions' collapse." (Compl. ¶¶ 202-03.) But Fitch describes its B rating as reflecting "[a] strong bank. There are no major concerns regarding the bank. Characteristics may include strong profitability and balance sheet integrity, franchise, management, operating environment or prospects." (http://www.fitchratings.com/corporate/ fitchResources.cfm?detail=1&rd_file=ind (last visited Apr. 9, 2009), attached as Exhibit 10 to the Gigot Decl.) That Regions held a higher Fitch rating before the current economic crisis does not detract from the meaning of Fitch's B rating—that Regions remains a "strong bank."

Third, Plaintiffs allege that Moody's "downgraded [Regions] from a B- to a C+ and its long-term deposits from A1 to A2." (Compl. ¶ 206.) Citing one of the definitions of a "C" rating contained in a Moody's publication, Plaintiffs then suggest an inference that these ratings signal "'little prospect for recovery of principal or interest.'" (Compl. ¶ 206 (quoting Moody's Rating Symbols & Definitions (Aug. 2003) at 6) ("Moody's Definitions"), attached as Exhibit 11 to the Gigot Decl.).) But the definition of a "C" rating that Plaintiffs cite is *not* the definition of the C grade that corresponds to the Moody's Bank Financial Strength rating referred to in paragraph 206 of the Complaint. Rather, the definition that Plaintiffs quote is the definition of a C grade *for long-term deposits*—a category in which Plaintiffs admit Regions earned a rating of A2.[8] According to the Moody's definition of the Bank Financial Strength Rating referred to in paragraph 206, "Banks rated C possess adequate intrinsic financial strength." (Moody's Definitions, at 15 (Gigot Decl., Ex. 11).) Far from alleging facts sufficient to overcome the

_____

Exhibit 9 to the Gigot Decl.) Regardless, Plaintiffs have not alleged that analyst recommendations indicate that a company is on the verge of collapse, and such recommendations are clearly insufficient to overcome the *Moench* presumption.

[8] Regions' long-term deposit rating was very good: "Obligations rated A are considered upper-medium grade and are subject to low credit risk." (Moody's Definitions, at 6 (Gigot Decl., Ex. 11).)

*Moench* presumption, Plaintiffs have pleaded themselves out of court by alleging facts showing that Regions remains "a strong bank" with "adequate intrinsic financial strength."[9]

Fourth, Plaintiffs allege that Regions failed to increase its loan loss reserves in a timely manner (Compl. ¶¶ 163-173), and should have written down its goodwill sooner (Compl. ¶¶ 193-196). In essence, Plaintiffs complain that Defendants failed to predict the current credit crisis. But this is unavailing because ERISA requires that a fiduciary's action be judged "under the circumstances then prevailing." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); *see also Pugh*, 521 F.3d at 702; *Huntington Bancshares*, 2009 U.S. Dist. LEXIS 9102, at \*26-27 (rejecting allegations that defendants should have anticipated collapse of subprime market and holding that "Defendants cannot be held liable to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA").

Finally, Plaintiffs find fault not with the management or administration of the Plans but with Regions' own internal business decisions. (*See* Compl. ¶¶ 128-98.) But ERISA does not purport to regulate how a plan's sponsoring employer does business, even if those business decisions collaterally impact the plan. *See Hunter v. Caliber Sys.*, 220 F.3d 702, 718 (6th Cir. 2000); *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998); *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995) ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants.") (internal quotations omitted).

---

[9]     Nor does Regions' participation in the capital purchase program authorized by the Emergency Economic Stabilization Act (*see* Compl. ¶ 203) support a claim of impending collapse. That program "is designed to attract broad participation by healthy institutions, to stabilize the financial system and increase lending for the benefit of the U.S. economy and the American people." (*See* Press Release HP-1247, U.S. Dept. of the Treasury, Treasury Issues Additional Information on Capital Purchase Program (Oct. 31, 2008), attached as Exhibit 12 to the Gigot Decl.) Consistent with that purpose, another district court within this Circuit declined to treat the bank-sponsor's acceptance of federal money as a sufficient basis to maintain an ERISA stock drop claim. *Huntington Bancshares*, 2009 U.S. Dist. LEXIS 9102, at \*20.

Accordingly, Count I should be dismissed.[10]

### 2. The Company Stock Disclosure Claim (Count IV) Fails as a Matter of Law.

Count IV claims that the members of the RBMC and the AmSouth Benefits Committee (together, the "Committee Defendants") breached their ERISA disclosure duties in connection with the Plans' ESOP Funds. In doing so, the Complaint blurs an important threshold distinction between (i) ERISA's affirmative disclosure duties and (ii) a narrower common-law duty under ERISA not to misrepresent material facts.

ERISA imposes specific and affirmative disclosure obligations relating to pension plans including providing an SPD, summary annual report, summary of material modifications, participant benefit statements and, depending on the nature of the plan, a series of funding and funding-related notices. *See* ERISA §§ 101-11, 29 U.S.C. §§ 1021-1031, 29 C.F.R. § 2520.101-2520.107-1. These affirmative ERISA disclosure obligations are imposed on the plan's "administrator." *See id*.

Plaintiffs do not allege that anyone, much less the designated "administrator" of the Plans, breached any of the statute's detailed and affirmative disclosure duties with respect to the Plans. Nor do Plaintiffs allege that they ever asked any Plan fiduciary questions about the Plan or the ESOP Fund. Under Sixth Circuit law, this forecloses any claim premised on an alleged

---

[10]       To the extent Plaintiffs attempt to make a separate allegation of a breach of the duty of loyalty (Compl. ¶ 335), that claim must be dismissed as derivative of the untenable duty of prudence claims. As the district court explained in *Edgar v. Avaya*, "The inherent risk of dual loyalties for corporate directors and employees who also serve as administrators for their company's stock ownership plans is to be taken into account as a factor in applying judicial scrutiny to an administrator's decision with regard to their management of ERISA funds. This is not, however, a separate and distinct ERISA duty. This is merely a restatement of the Plaintiff's other allegations—namely that the Defendants breached their fiduciary duty under ERISA to the Plan's participants by failing to manage the Plans in the best interests of the Plans' participants." No. 05-3598, 2006 U.S. Dist. LEXIS 23151, at *33-34 (D.N.J. Apr. 24, 2006), attached as Exhibit 12 to the Gigot Decl., *aff'd*, 530 F.3d 340, 349 n.15; *see also In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 479 (S.D.N.Y. 2005) (declining to infer breach of duty of loyalty from link between plan fiduciaries' compensation and value of company stock). Plaintiffs have thus not stated a separate claim regarding Defendants' duty of loyalty. The same principle applies to the other sets of "Prudence Claims" alleged in Counts VI and XI of the Complaint.

failure affirmatively to make an ERISA-required disclosure.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed."); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 455 (6th Cir. 2002) (fiduciary may have an affirmative duty to inform when plan participant asks ERISA fiduciary questions about plan).

Without an ERISA claim based on an alleged failure to disclose, Plaintiffs' only resort is to the common-law duty, implied from ERISA § 404(a)(1)(A)'s general fiduciary duty of loyalty, not to misrepresent material facts.  To maintain a viable misrepresentation claim based on this common-law duty, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their detriment. *See Pirelli*, 305 F.3d at 449.

        a)        **Plaintiffs Fail to Sufficiently Allege That Defendants Were Acting in a Fiduciary Capacity When Making the Challenged Representations.**

"ERISA liability arises only from actions taken or duties breached in performance of ERISA obligations."  *Kirschbaum*, 526 F.3d at 256 (quoting *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003)).  "The relevant question is not whether an employer's action adversely affected a beneficiary's interest, but whether the employer was acting as a fiduciary when it took that action."  *Id.* at 257 (citing *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996)).

The representations that Plaintiffs challenge here are alleged to have been made in Regions' filings with the Securities and Exchange Commission ("SEC") or in general press releases.  As numerous courts have held, SEC filings and statements to the market as a whole are

made in a corporate capacity—not an ERISA fiduciary capacity. *Shirk*, 2009 U.S. Dist. LEXIS

24490, at *50 (collecting cases). Perhaps recognizing this insurmountable hurdle, Plaintiffs

attempt to allege that these non-ERISA representations somehow *became* ERISA

communications at some later time. Plaintiffs allege "on information and belief" that certain of

the individual Defendants disseminated "Plan documents and related materials which, among

other things, incorporated by reference misleading filings which Regions made with the SEC,

thus converting such materials into fiduciary communications." (Compl. ¶ 106; *see also* Compl.

¶¶ 122, 213.) Plaintiffs cite only to page 12 of the Merged Plan's SPD in support of this

allegation (Complaint ¶ 106), but that page states quite the opposite:

> **Documents incorporated by reference into the Prospectus and Registration
> Statement for the Plan are not part of the Summary Plan Description. The
> Plan Administrator is not responsible for documents prepared for the
> purpose of complying with Securities laws, has not reviewed such documents,
> and takes no responsibility for the accuracy or completeness of such
> documents.**

(Merged Plan Apr. 2008 SPD, at 12, attached as Exhibit 14 to the Gigot Decl. (emphasis in

original).)

In any event, several courts have held that incorporating SEC filings into ERISA

documents does *not* convert such corporate statements into fiduciary communications. *See*

*Shirk*, 2009 U.S. Dist. LEXIS 24490, at *49-50 (citing *Mellot v. Choicepoint, Inc.*, 561 F. Supp.

2d 1305, 1318 (N.D. Ga. 2007) ("The preparation of SEC filings, even if misleading and

incorporated by reference in required ERISA disclosures, is not a fiduciary act under ERISA."));

*Kirschbaum*, 526 F.3d at 257; *In re Bausch & Lomb, Inc. ERISA Litig.*, No. 06-cv-6297, 2008

U.S. Dist. LEXIS 106269, at *23-26 (W.D.N.Y. Dec. 12, 2008) (citing *Varity Corp*, 516 U.S.

489), attached as Exhibit 15 to the Gigot Decl. Thus, Plaintiffs' allegations are legally

insufficient to establish that any of the challenged representations were made by a Defendant in a

fiduciary capacity under ERISA.

<blockquote>

**b)      The Complaint Nowhere Alleges Any Affirmative Misrepresentation of Fact Regarding Regions or Regions Stock.**

</blockquote>

Plaintiffs' Disclosure Claim should be dismissed for the additional reason that the

Complaint fails to allege facts sufficient to establish a material misrepresentation of fact.

<blockquote>

**(1)      Regions Disclosed Its Exposure to the Risks, Uncertainties and Other Factors Cited in the Complaint.**

</blockquote>

Plaintiffs imply that Regions said nothing during the alleged Company Stock Subclass

Period about the risks, uncertainties and other factors that came to impact its business,

profitability and stock price.  But Regions' SEC filings make clear that Regions spoke

extensively on the very subjects Plaintiffs contend were insufficiently disclosed.

Regions explicitly disclosed its potential exposure to credit and market risk, both before

and during the alleged Company Stock Subclass Period.  Regions regularly warned investors

that:

> ***If we experience greater credit losses than anticipated, our earnings may be adversely affected.***
>
> As a lender, we are exposed to the risk that our customers will be unable to repay their loans according to their terms and that any collateral securing the payment of their loans may not be sufficient to assure repayment.  Credit losses are inherent in the business of making loans and could have a material adverse effect on our operating results.  Our credit risk with respect to our real estate and construction loan portfolio will relate principally to the creditworthiness of corporations and the value of the real estate serving as security for the repayment of loans.

(Regions Fin. Corp., Annual Report (Form 10-K), at 15 (March 1, 2007) ("2006 10-K")

(emphasis in original), attached as Exhibit 16 to the Gigot Decl.; *see also* Regions Fin. Corp.,

Annual Report (Form 10-K), at 14 (Feb. 27, 2008) ("2007 10-K"), attached as Exhibit 17 to the

Gigot Decl. (same); 2008 10-K, at 19 (Gigot Decl., Ex. 7) (same).)

Regions explicitly disclosed that its allowances for potential credit losses are based on

assumptions and judgments that necessarily change over time, so that:

> if our assumptions or judgments are wrong, our allowance for credit losses may not be sufficient to cover our actual credit losses. We may have to increase our allowance in the future in response to the request of one of our primary banking regulators, to adjust for changing conditions and assumptions, or as a result of any deterioration in the quality of our loan portfolio. The actual amounts of future provisions for credit losses cannot be determined at this time and may vary from the amounts of past provisions.

(2006 10-K, at 15 (Gigot Decl., Ex. 16) (same); *see also* 2007 10-K, at 14 (Gigot Decl., Ex. 17)

(same); 2008 10-K, at 19 (Gigot Decl., Ex. 7) (same).)

Regions also explicitly disclosed that its profitability and liquidity may be affected by

changes in economic conditions in the areas in which its loans or operations are concentrated:

> Regions' success depends to a certain extent on the general economic conditions of the geographic markets served by Regions Bank in the states of Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas and Virginia. The local economic conditions in these areas have a significant impact on Regions Bank's commercial, real estate and construction loans, the ability of borrowers to repay these loans and the value of the collateral securing these loans.

(2006 10-K, at 15 (Gigot Decl., Ex. 16); *see also* 2007 10-K, at 15 (Gigot Decl., Ex. 17) (same);

2008 10-K, at 20 (Gigot Decl., Ex. 7) (same).)

In addition to warning investors about these and other general market risks, Regions

specifically disclosed its exposure to the subprime, housing and construction markets, and

frequently discussed the effect of the increasing market turmoil. (*See, e.g.*, 2007 10-K, at 101-02

(Gigot Decl., Ex. 17); 2008 10-K, at 31, 53 (Gigot Decl., Ex. 7); Regions Fin. Corp., Quarterly

Report (Form 10-Q), at 31, 51, 59-60 (Oct. 30, 2008) ("Q3 2008 10-Q"), attached as Exhibit 18

to the Gigot Decl.) As Plaintiffs acknowledge throughout their Complaint, the subprime crisis

pervaded the entire economy and, in particular, the financial sector. (Compl. ¶¶ 129-151.)

Regions disclosed the sources of its economic pressures: "While Regions did not have material

exposure to many of the issues that plagued the industry (*e.g.*, sub-prime loans, structured investment vehicles, collateralized debt obligations), the Company's exposure to the residential housing sector, primarily within its commercial real estate and construction loan portfolios, pressured its loan portfolio, resulting in increased credit costs and other real estate expenses." (2008 10-K, at 31; *see also* 2007 10-K, at 25-26 (Gigot Decl., Ex. 17).)  In doing so, Regions made no secret of the fact or amount of its sub-prime exposure, stating, "Regions has approximately $100 million in book value of 'sub-prime' loans retained from the disposition of EquiFirst.  The credit loss exposure related to these loans is addressed in management's periodic determination of the allowance for credit losses."  (2007 10-K, at 102 (Gigot Decl., Ex. 17); *see also* 2008 10-K, at 53 (stating that Regions' exposure to sub-prime loans is $77.3 million) (Gigot Decl., Ex. 7).)  Moreover, Regions specifically identified its exposure to mortgage-backed securities (2006 10-K, Ex. 13, at 53 ($12,777,358,000) (Gigot Decl., Ex. 16); 2007 10-K, at 46 ($11,092,758,000) (Gigot Decl., Ex. 17); 2008 10-K, at 54 ($14,349,342,000) (Gigot Decl., Ex. 7)), to "off-balance sheet" risks and liabilities (2006 10-K, Ex. 13, at 122 (Gigot Decl., Ex. 16); 2007 10-K, at 129 (Gigot Decl., Ex. 17); 2008 10-K, at 149 (Gigot Decl., Ex. 7)), and to write-downs in the value of its goodwill (2008 10-K, at 20 (Gigot Decl., Ex. 7)).

> **(2)**    **Plaintiffs' Conclusory Assertions of Allegedly "Incomplete and Inaccurate Information" Are Insufficient.**

Plaintiffs allege that Defendants failed to provide "complete and accurate information" regarding eight separate topics.  (Compl. ¶ 361; *see also* Compl. ¶¶ 129-198.)  But these conclusory allegations fail to establish the kind of material misstatement of fact that would be needed to establish a viable ERISA misrepresentation claim under *Pirelli*.

*Alleged failure to disclose "high risk loan origination practices"*:  Plaintiffs allege that Defendants failed to provide complete and accurate information regarding Regions' "high risk

loan origination practices." (Compl. ¶ 361(a).) Regions' Forms 10-K, however, specifically identify the source, nature, composition and total values of the various categories of loans held by Regions during the alleged Company Stock Subclass Period. (2006 10-K, Ex. 13, at 49, 51-53 (Gigot Decl., Ex. 16); 2007 10-K, at 43-45, 62-69 (Gigot Decl., Ex. 17); 2008 10-K, at 51-53, 77-85 (Gigot Decl., Ex. 7).) Regions also fully disclosed that it was involved in subprime or "non-conforming" lending. Under the heading "Mortgage Servicing and Origination Fees," Regions explained, "[t]he primary source of income in this category is Regions' mortgage banking division, including Regions Mortgage (a division of Regions Bank) and EquiFirst. . . . EquiFirst typically originates non-conforming mortgage loans . . . ." (2006 10-K, Ex. 13, at 49 (Gigot Decl., Ex. 16).)

Nowhere do Plaintiffs contend that these disclosures were in any way factually inaccurate. Apparently, Plaintiffs' hindsight view is that Regions should have pejoratively characterized its loan portfolio as "high risk." But having informed investors quantitatively about its loan portfolios, Regions was not required to characterize that portfolio qualitatively as "high risk" or "low risk." *See Kowal v. MCI Comms. Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public such statements are immaterial as a matter of law."); *Krim v. Coastal Physician Group, Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998) ("When issuers accurately and completely disclose their operating expenses and net losses and accurately and completely list all factors for these expenses and losses, pejorative descriptions of these factors are not required.").

*Alleged failure to disclose "undiversified and risky real estate loan portfolio"*: Plaintiffs next allege that Defendants failed to disclose Regions' "undiversified and risky real estate loan

portfolio." (Compl. ¶ 361(b).) Plaintiffs do not explain what real estate loan portfolio they are referring to, but if they mean Florida, Regions' 2006 10-K includes a chart plainly indicating that 24 percent of its loans originated in Florida. (2006 10-K, at 3 (Gigot Decl., Ex. 16).) Regions further disclosed that it intended to build 50 more branch offices in 2007, mainly in Florida. (2006 10-K, Ex. 13, at 55 (Gigot Decl., Ex. 16).) And most significantly, Regions disclosed in its 10-K covering the year prior to the Company Stock Subclass Period that "[t]he housing market has weakened somewhat in selected markets, most notably in Florida, which had experienced above-average price increases and construction activity in recent years." (2006 10-K, Ex. 13, at 66 (Gigot Decl., Ex. 16).) Again, the Complaint fails to allege that any of these specific disclosures misstated facts.

*Alleged failure to disclose its "insufficient provision for loan loss"*: Plaintiffs allege that Regions failed to disclose that it had not sufficiently provided for loan losses. (Compl. ¶ 361(c).) This, however, merely restates Plaintiffs' contention that Regions and others should have predicted the worldwide credit crisis. Plaintiffs nowhere allege that Regions failed to disclose the amount of its loan loss reserves. Indeed, Regions clearly stated the amount of its loan loss allowance in its 10-Ks. (*See, e.g.*, 2008 10-K, at 30 (showing provision for loan losses for 2004 through 2008) (Gigot Decl., Ex. 7).)

*Alleged failure to disclose its "inadequate risk management controls"*: Plaintiffs allege that Defendants failed to disclose that Regions operated under "inadequate risk management controls." (Compl. ¶ 361(d).) But Regions disclosed its credit risk management process in its Annual Reports (*see* 2008 10-K, at 74-76 (Gigot Decl., Ex. 7); 2007 10-K, at 62-64 (Gigot Decl., Ex. 17); 2006 10-K, Ex. 13, at 65-66 (Gigot Decl., Ex. 16)), and the Complaint nowhere alleges that any of these disclosures were false. Instead, the Complaint cites a "Credit Risk Guidance"

(Compl. ¶ 174), and then suggests that Regions failed timely to follow such guidance. (Compl. ¶ 179.) Because these allegations come nowhere close to alleging a false statement, they cannot establish a viable ERISA misrepresentation claim under *Pirelli*.

*Alleged failure to disclose its "risky and excessive investment in MBS"*: Plaintiffs next assert that the Committee Defendants should have been aware of and disclosed the extent of Regions' investment in mortgage-backed securities. (Compl. ¶ 361(e).) The Complaint finds fault with these investments but fails to state what Regions allegedly failed to disclose about them. (*See* Compl. ¶¶ 181-86.) Indeed, the Complaint concedes that Regions *did* disclose the extent of its investments in mortgage-backed securities: "Regions reported in its 2006 Annual Report [just after the beginning of the Company Stock Subclass Period] *that roughly two-thirds of its securities available for sale were mortgage-backed securities*." (Compl. ¶ 184 (citing 2006 10-K, Ex. 13, at 53 (Gigot Decl., Ex. 16); 2007 10-K, at 47 (Gigot Decl., Ex. 17)) (emphasis in original); *see also* Compl. ¶ 182.) "When 'the complaint itself gives reasons' to doubt plaintiff's theory," the complaint must be dismissed. *NicSand, Inc.*, 507 F.3d at 458 (quoting *Twombly*, 550 U.S. at 568).

*Alleged failure to disclose its "improper off-balance sheet exposure"*: Plaintiffs allege that "Regions disclosed in its 2007 10-K that 'Regions issues off-balance sheet financial instruments in connection with lending activities.'" (Compl. ¶ 188 (providing specific details regarding the extent of Regions' off-balance sheet exposure and citing Regions Fin. Corp., Quarterly Report (Form 10-Q), at 19 (Aug. 3, 2007), attached as Exhibit 19 to the Gigot Decl.); *see also* Compl. ¶ 190 ("In its 2007 10-K, Regions states that its off-balance sheet exposure is one of its greatest risks[.]") (citing 2007 10-K (Gigot Decl., Ex. 17).) Plaintiffs fail to identify any material misrepresentation within the cited disclosures. Indeed, they cite them for the truth

of the facts stated therein.  This pleads Plaintiffs out of court under *Pirelli*.

*Alleged failure to disclose its "inadequate and improper valuation of its goodwill"*:  The Complaint recites a number of the disclosures that Regions made on its "goodwill" valuation. (Compl. ¶¶ 193-196 (citing Regions Fin. Corp., Report of Unscheduled Material Events or Corporate Changes for the Fourth Quarter of 2008 (Form 8-K), at Ex. 99.1 (Jan. 20, 2009), attached as Exhibit 20 to the Gigot Decl.; 2006 10-K, Ex. 13, at 86 (Gigot Decl., Ex.16); Regions Fin. Corp., Second Quarter Report (Form 10-Q) (Aug. 7, 2008), attached as Exhibit 21 to the Gigot Decl.; Q3 2008 10-Q (Gigot Decl., Ex. 18)).)  Yet nowhere do Plaintiffs allege that there was anything inaccurate or incomplete about these disclosures.  Rather, Plaintiffs allege that "[b]y at least the Fourth Quarter of 2007, Regions should have written down its goodwill substantially[.]"  (Compl. ¶ 196.)  This amounts to a hindsight allegation that Regions should have predicted the credit crisis sooner, but it says nothing about any misrepresentation of *fact*.

*Alleged failure to disclose its "risky [auction rate securities] activities"*:  Finally, Plaintiffs assert that Defendants failed to disclose that a Regions affiliate was "involved in the sale of auction rate securities ('ARS') as an alternative to money market funds."  (Compl. ¶¶ 197, 361(h).)  The Complaint concedes, however, that these facts were publicly disclosed in a May 31, 2006 press release filed with the SEC seven months before the start the alleged Company Stock Subclass Period.  (Compl. ¶ 197 (citing Press Release, SEC, 15 Broker-Dealer Firms Settle SEC Charges Involving Violative Practices in the Auction Rate Securities Market (May 31, 2006), attached as Exhibit 22 to the Gigot Decl.).)  Furthermore, the Complaint contains no allegations that Defendants made any false statements regarding ARS.

**B.     The Prohibited Transaction, Prudence and Disclosure Claims of the Alleged "Excessive Fee Subclass" (Counts XV, XI and XIV) are Legally Insufficient.**

Counts XI-XV of the Complaint purport to assert claims on behalf of all participants in

the Merged Plan or the Legacy Plan whose Plan accounts were invested in one or more of the

RMK Select Funds (the alleged "Excessive Fee Subclass") at any time between May 1, 2003 and

the present (the alleged "Excessive Fee Subclass Period").  These claims contend that the Plans'

use of the RMK Select Funds as investment vehicles violated ERISA because those mutual funds

were managed or advised by a corporate affiliate (Morgan Keegan or MAM) of the Plans'

sponsoring employer (Regions) and trustee (Regions Bank), and purportedly involved unlawful

fee arrangements.  The core claims alleged in Counts XV, XI and XIII (the Prohibited

Transaction, Prudence and Disclosure Claims) will be addressed here.  The remaining claims

(Counts XII and XIV) are merely derivative of the core claims and are addressed collectively in

Section III.E, *infra*.

### 1. The Prohibited Transaction Claim (Count XV) Fails as a Matter of Law.

Count XV of the Complaint alleges that use of the RMK Select Funds as investment

options under the Merged and Legacy Plans violated the "prohibited transaction" rules in section

406 of ERISA, 29 U.S.C. § 1106.  (Compl. ¶¶ 478-87.)

### a) ERISA's Prohibited Transaction Restrictions and Exemptions

The prohibited transaction rules in ERISA § 406 fall into two subsections.  First, section

406(a) prohibits a plan fiduciary from causing a plan to engage in any of five different kinds of

transactions with a "party in interest" to the plan.  29 U.S.C. § 1106(a).  A "party in interest" is

defined to include a person providing services to the plan, an employer whose employees are

covered by the plan, and certain affiliates of that employer.  *See* ERISA §§ 3(14)(A)-(F), 29

U.S.C. §§ 1002(14)(A)-(F).  Second, section 406(b) prohibits acts of self-dealing by a plan

fiduciary and acts that involve other conflicted interests in a transaction involving the plan or its

assets.  29 U.S.C. § 1106(b).  These rules are intended "'to prohibit transactions that would

clearly injure the plan,'" s*ee Chao v. Hall Holding Co.*, 285 F.3d 415, 425 (6th Cir. 2002)

(quoting *Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 858 (6th Cir. 2000)),

and "to prevent employee benefit plans from engaging in transactions that would benefit parties

in interest at the expense of plan participants and their beneficiaries," *id.* (citing *Lockheed Corp.

v. Spink*, 517 U.S. 882, 888 (1996)).

ERISA § 408, however, establishes important exemptions, which are applicable here.

ERISA § 408(b) categorically provides that "[t]he prohibitions provided in § 406 shall not apply

to any of" nineteen types of transactions, including the services arrangements that are needed to

operate a plan. *See* 29 U.S.C. §§ 1108(b)(1)-(19). Supplementing that list of statutory

exemptions, ERISA § 408(a) grants the Secretary of Labor ("DOL") broad authority to create

additional administrative exemptions for transactions found by DOL to be non-abusive. 29

U.S.C. § 1108(a).

> **b)** **DOL's PTE 77-3 Exempts the Plans' Purchase and Sale of Shares of the RMK Select Funds from ERISA's Prohibited Transaction Rules.**

The Legacy and Merged Plans received employee and employer contributions, the

"assets" of the Plan in question, which were used (in part) to buy shares of the RMK Select

Funds at the direction of certain participants. Those mutual funds were affiliated with one or

more of the corporate defendants in this action, each of which Plaintiffs allege is either a

"fiduciary" or "party in interest" with respect to the Plan in question. (Compl. ¶¶ 38-45.) This

raises the threshold question of whether the purchases and sales of shares of the RMK Select

Funds were prohibited transactions, but the answer by law is that they were not.

When ERISA was enacted in 1974, Congress included within ERISA § 408(b) a set of

specific provisions that allow bank- and insurance company-sponsored plans to buy and sell their

own (or affiliated) investment products and services, so long as the plan pays no more than

market price for those products.  *See* ERISA §§ 408(b)(4), (5), (8), 29 U.S.C. §§ 1108(b)(4), (5),

(8).  Recognizing that mutual funds were quickly becoming the investment vehicle of choice for

many plans, the DOL in 1977 used its authority under ERISA § 408(a) to create an

administrative exemption for the purchase and sale of shares of any "open end" mutual fund,

such as the RMK Select Funds, that is managed or advised by the plan's sponsoring employer or

an affiliated company.  Prohibited Transaction Exemption ("PTE") 77-3, 42 Fed. Reg. 18,734

(1977), attached as Exhibit 23 to the Gigot Decl.[11]  The exemption provides relief for the

acquisition or sale of shares of a registered open end[12]  mutual fund by an "in house" plan, that

is, a plan covering employees of the mutual fund, the fund's investment adviser, the fund's

principal underwriter, or any affiliate of such persons.  For the exemption to apply, the plan may

not pay any investment management, investment advisory or similar fee to the fund adviser,

underwriter or affiliate, except in the form of investment advisory fees paid from the mutual fund

itself under a duly-authorized investment advisory agreement.  *See* PTE 77-3.

These conditions are easily and routinely met where, as here, the plan uses mutual funds

that either have no "front end" or "back end" sales commissions or "loads," or for which such

charges are waived in the case of investors that are retirement plans.  *See Mehling v. N.Y. Life*

---

[11]     PTE 77-3 provides that "the restrictions of sections 406 and 407(a) of [ERISA] . . . shall not apply to the acquisition or sale of shares of an open-end investment company . . . by an employee benefit plan covering only employees of such investment company, employees of the investment adviser or principal underwriter for such investment company, or employees of any affiliated person . . . of such investment adviser or principal underwriter, provided that [certain] conditions are met (whether or not such investment company, investment adviser, principal underwriter or any affiliated person thereof is a fiduciary with respect to the plan)."  A parallel and substantially identical administrative exemption, PTE 77-4, 41 Fed. Reg. 50516 (1976), attached as Exhibit 24 to the Gigot Decl., applies to purchases and sales of open-end mutual funds when the investment advisor of the fund is also a fiduciary with respect to the plan (or an affiliate thereof), and is not an employer of employees covered by the plan.

[12]     Plaintiffs incorrectly suggest in paragraph 232 of the Complaint that one of the RMK Bond Funds used by the Legacy and Merged Plans—the RMK Select High Income Bond Fund—was a "closed end" fund.  Plaintiffs' mistake on this point is inconsequential, because a PTE covers the fund in any event.  In 1979, DOL created a parallel exemption applicable to "closed end" funds.  PTE 79-13, 44 Fed. Reg. 25,533 (1979), attached as Exhibit 25 to the Gigot Decl.

*Ins. Co.*, 163 F. Supp. 2d 502, 510 (E.D. Pa. 2001) (granting Rule 12(b)(6) motion to dismiss prohibited transaction claims regarding use of financial services company's affiliated mutual funds). Plaintiffs allege no specific facts that plausibly call into question the Plans' compliance with the requirements of PTE 77-3. Instead, Plaintiffs try to cloud the issue by shifting to a separate set of transactions and so-called "revenue sharing" arrangements between Morgan Keegan and/or MAM and other service providers to the Plans. As demonstrated below, these separate arrangements neither defeat the exemptive relief provided by PTE 77-3 nor support any of the alternative theories of "prohibited transaction" liability asserted in Count XV.

> **c)** **Although Contributions and Mutual Fund Shares Held By a Plan Are Assets of That Plan, Assets Held Within the Mutual Fund are Not Plan Assets.**

An investor in a mutual fund owns a share of the fund's mutual holdings, and the fund's portfolio is typically managed by a professional advisor, to which the mutual fund pays a fee. (*See generally* Employee Benefits Security Administration, A Look at 401(k) Fees 4, 9 (available at http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf) (hereinafter, "*DOL on 401(k) Fees*"), attached as Exhibit 26 to the Gigot Decl.)[13] With a 401(k) plan, a portion of these mutual-fund-level fees may be used "to pay various service providers to a 401(k) plan pursuant to a bundled services arrangement." *DOL on 401(k) Fees* at 9. A "bundled services arrangement" is one in which "some or all of the various services and investment alternatives may be offered by one provider for a fee paid to that provider [. . . , who] will then pay out of that fee any other service providers that it may have contracted to provide the services." *Id*. at 5-6. These "revenue sharing" payments from the original provider may go to the 401(k) plan's record keeper and/or trustee to defray the plan's overall costs of those services. *See Braden v.*

---

[13]     *DOL on 401(k) Fees* is one of the government handbooks that Plaintiffs cite or quote throughout their Complaint. (*See* Complaint ¶¶ 286-87, 290.)

*Wal-Mart Stores, Inc.*, 590 F. Supp. 2d 1159, 1165 n.11 (W.D. Mo. 2008) (describing traditional "revenue sharing" arrangements), *appeal docketed*, No. 08-3798 (8th Cir. Dec. 4, 2008).

Here, Plaintiffs assert that Regions, Regions Bank, Morgan Keegan or MAM may have received revenue sharing out of the fees from the RMK Select Funds. (Compl. ¶¶ 481-83.) Plaintiffs characterize such revenue sharing from the mutual funds as "kickbacks," purportedly paid as a *quid pro quo* for including the RMK Select Funds on the Plans' menu of investment options. Plaintiffs further contend that these purported "kickbacks" support an ERISA prohibited-transaction claim under three related, but subtly different, theories.

First, Plaintiffs appear to contend that such revenue sharing—allegedly from the mutual fund to Regions, Regions Bank, Morgan Keegan or MAM—constitutes payments of a commission by the Plans under PTE 77-3 such that the PTE's exemptive relief does not apply. (*See* Compl. ¶ 484.) But ERISA § 401(b)(1) specifically provides that mutual fund assets are not plan assets:

> In the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940 [15 U.S.C. § 80a-1 *et seq*.], the assets of such plan shall be deemed to include such security but shall not, solely by reason of such investment, be deemed to include any such assets of such investment company.

29 U.S.C. § 1101(b)(1); *see also* 29 C.F.R. § 2509.75-2(a) ("an investment by a plan in securities of [a mutual fund] may be made without causing, solely by reason of such investment, any of the assets of the investment company to be considered assets of the plan"). Thus, any commissions paid were not paid *by the Plans*. The conditions within PTE 77-3 expressly provide exemptive relief where, as here, investment management and other fees are paid solely from the assets of the mutual fund.

Second, Plaintiffs attempt to characterize the movement of mutual fund money as a prohibited "transaction" that is separate from the underlying purchase or sale of the mutual fund shares. Plaintiffs contend that, regardless of whether PTE 77-3 exempts the underlying purchases and sales of the mutual fund shares, any such payments and revenue sharing between the mutual funds and the Regions Defendants still involved a "transfer" or "use" of "assets of the plan." (Compl. ¶¶ 482-83.) Plaintiffs claim that these purported transfers and uses violate ERISA § 406(a)(1)(D)'s per se prohibition on such sales or uses involving "assets of the plan," and ERISA § 406(b)'s prohibition on self-dealing and conflicted interests involving "assets of the plan." (Compl. ¶¶ 482-83.) But the movement of mutual fund money involves a transfer or use of the mutual fund's assets, not "assets of the plan." For this reason, federal courts have rejected the theory that "revenue sharing" payments violate ERISA's prohibited transaction rules. *See Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009) ("Once the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets—again, not the assets of the Plans."); *Boeckman v. A.G. Edwards, Inc.*, No. 05-658-GPM, 2007 U.S. Dist. LEXIS 90251, at *8 (S.D. Ill. Aug. 31, 2007) ("[G]iven that under ERISA § 401(b), 29 U.S.C. § 1101(b), the mutual funds were not trafficking in Plan assets, the Court concludes that Boeckman's prohibited transactions claims fail as a matter of law."), attached as Exhibit 27 to the Gigot Decl.

Third, Plaintiffs attempt to invoke the separate prohibition in ERISA § 406(a)(1)(C) that applies to transactions involving a direct or indirect exchange of "services" between a plan and a party in interest. In particular, Plaintiffs theorize that the some unspecified services were provided by the corporate Defendants in exchange for revenue sharing payments, and that these unspecified services somehow constituted a direct or indirect exchange of services with the

Plans. (Compl. ¶ 481.) Plaintiffs' "services" theory fails for two reasons. First, in the case of any brokerage, advertising and promotional services provided in exchange for mutual fund fees, Plaintiffs allege, at most, that such services were provided for the mutual fund, not for the Plans. Second, the Complaint is devoid of any specific allegation that identifies the "services" that purportedly were given to the Plans as a "quid" for the revenue-sharing "quo." Indeed, the Complaint characterizes the revenue sharing as a "kickback" that returned nothing whatsoever to the Plans (Compl. ¶¶ 301-05, 317, 481-83), and for which no services were provided to the Plans by the RMK Select Funds. (Compl. ¶ 278 (alleging that "[t]he excessive fees derived by Regions and its affiliates were not credited back to the Plans and are *not the result of services provided by the RMK Select Funds to the Plans*") (emphasis added).) Accordingly, Plaintiffs have pleaded themselves out of court on their ERISA § 406(a)(1)(C) "services" theory of liability.

In sum, it has been clear since 1977 that plans sponsored by financial services companies like Regions may use their sponsor's own (or affiliated) mutual funds without running afoul of ERISA's prohibited transaction restrictions. Plaintiffs' speculations and theories about what the mutual fund does with its money fail, as a matter of law, to change that outcome.

### 2. The Excessive Fee Prudence Claim (Count XI) Fails to State a Viable Claim for Relief under ERISA.

In Count XI, Plaintiffs allege that Defendants (other than Morgan Keegan and MAM) breached ERISA's fiduciary duties of prudence and loyalty by selecting and continuing to offer the RMK Select Funds as Plan investment options. (Compl. ¶¶ 431-44.) The allegations in support of this claim are nearly identical to those concerning the prohibited transaction claims, including (i) the RMK Select Funds' status as "affiliated" mutual funds, and (ii) the sharing of the mutual funds' revenue with Regions or its subsidiaries.

As demonstrated in Section III.B.1, *supra*, however, ERISA's regulatory scheme specifically allows a plan sponsor like Regions to use affiliated mutual funds, including mutual fund revenue sharing arrangements. As the Seventh Circuit recently explained in *Hecker* when describing a revenue-sharing arrangement, "The Hecker group's case depends on the proposition that there is something wrong, for ERISA purposes, in that arrangement. . . . [S]uch an arrangement . . . violates no statute or regulation." *Hecker*, 2009 U.S. App. LEXIS 2950, at *23-24; *see also Braden*, 590 F. Supp. 2d at 1167 (noting that DOL "'does not believe that revenue sharing involves inherent ERISA violations'") (citing Testimony of Robert J. Doyle, Director of Regulations and Interpretations, Employee Benefits Security Administration, Before the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices, at 5 (July 11, 2007)).

Plaintiffs here attempt to avoid this roadblock by alleging that the fees charged by the RMK Select Funds were "excessive." (Compl. ¶¶ 260-95.) More specifically, Plaintiffs allege that for each of the RMK Select Funds, there exists one or more other mutual funds in the marketplace that advertises lower fees or expenses. (Compl. ¶¶ 260-95.) But this is unavailing because "[t]he fact that it is possible that some other funds might have had even lower [expense] ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued with other problems)." *Hecker*, 556 F.3d at 586. There may have been a host of reasons why Defendants chose not to invest in funds with the lowest possible fees, such as the "potential for higher return, lower financial risk, more services offered, or greater management flexibility." *Braden*, 590 F. Supp. 2d at 1167.[14] The Complaint is conspicuously lacking in any factual allegation that funds with

---

[14]     Moreover, considering fees alone is not enough. The DOL takes the position that "[f]ees and expenses are one of several factors to consider when you select and monitor plan service providers and investments. The level

lower fees performed better than the RMK Select Funds, or that they provided services comparable to those offered by the RMK Select Funds.

Equally important, "prudence" under ERISA is a question of process. "[ERISA's] test of prudence . . . is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); *see also Dupree v. Prudential Ins. Co.*, No. 99-cv-8337, 2007 U.S. Dist. LEXIS 57857 (S.D. Fla. Aug. 7, 2007), attached as Exhibit 29 to the Gigot Decl.; *Glennie v. Abitibi-Price Corp.*, 912 F. Supp. 993, 1000 (W.D. Mich. 1996) ("A court must consider the prudence of a fiduciary's conduct at the time of the investment."). Plaintiffs have not alleged facts indicating that Defendants neglected to engage in a prudent process, such as "fail[ing] to conduct research, consult appropriate parties, conduct meetings, or consider other relevant information."[15] *Braden*, 590 F. Supp. 2d at 1167. Therefore, Plaintiffs' claim about "excessive fees" is legally insufficient to plead any breach of ERISA duty, and should be dismissed.

### 3. The Excessive Fee Disclosure Claim (Count XIII) Fails as a Matter of Law.

In Count XIII, Plaintiffs claim that members of the RBMC breached their ERISA disclosure duties by allegedly "failing to provide complete and accurate information" concerning the RMK Select Funds. (Compl. ¶¶ 455-56.) Plaintiffs make no allegations of *affirmative* misrepresentations, but rather rely solely upon alleged *failures* to disclose additional information concerning:

---

and quality of service and investment risk and return will also affect your decisions." (Employee Benefits Security Administration, Understanding Retirement Plan Fees and Expenses (May 2004) ("*Understanding Fees*")*,* at 10, attached as Exhibit 28 to the Gigot Decl.; *id.* at 3 ("Generally the more services provided, the higher the fees.").)

[15] Plaintiffs' lack of allegations in this regard is particularly striking considering that Defendants have provided Plaintiffs with the meeting minutes of the committees responsible for selecting the Plans' investments. *See* Docket No. 66 (Stipulation and Order re Preliminary Case Schedule), at ¶ 1.

     a.     The RMK Select Fund's excessive fees and expenses that were substantially higher than the fees and expense charged in readily available and comparable fund options.

     b.     The performance of the RMK Select Funds could not justify the excessive fees charged as far less expensive passively and actively managed funds offered comparable and often better performance.

     c.     The excessive fees and expenses charged by the RMK Select Funds, which substantially reduced participants' retirement savings because, among other things, all such fees and expenses were paid from Legacy and [Merged Plan] assets.

     d.     The RMK Select Funds were selected and maintained as Plan investment options because Regions itself profited from inclusion of the funds in the Plan.

(Compl. ¶ 461.)

These conclusory allegations merely state Plaintiffs' own qualitative views about what makes a fee "excessive." Yet they completely ignore the acknowledged fact that the mutual funds' prospectuses were available to the Plans' participants (Compl. ¶ 255) and disclosed the mutual fund's total investment management fees and absence of Rule 12b-1 fees. Moreover, Plaintiffs incorrectly state that the "fees and expenses charged by the RMK Select Funds . . . were paid from Legacy and [Merged] Plan assets." (Compl. ¶ 461(c).) As shown above, the mutual funds' fees and expenses were paid from mutual fund assets, not Plan assets.

Furthermore, as discussed in Section III.A.2, *supra*, the Sixth Circuit recognizes an affirmative fiduciary duty to disclose information to plan participants in only two situations: (1) when such disclosure is specifically mandated under one of the detailed disclosure requirements within ERISA, *see Sprague*, 133 F.3d at 405, or (2) when the plan participant has asked the ERISA fiduciary questions about the plan. *See Pirelli*, 305 F.3d at 452. The first situation is not present here, because ERISA contains no affirmative requirement to disclose the kinds of fee-related information identified by Plaintiffs. As the Seventh Circuit explained in *Hecker*: "How Fidelity Research decided to allocate the monies it collected (and about which the participants

were fully informed) was not, at the time of the events here, something that had to be disclosed. It follows, therefore, that the Hecker group failed to state a claim against Deere based on the revenue-sharing arrangement and the lack of disclosure about it." 556 F.3d at 585; *see also Martin v. Caterpillar, Inc.*, No. 07-cv-1009, 2008 U.S. Dist. LEXIS 99465, at *11 (C.D. Ill. Sept. 25, 2008) ("This Court agrees that Defendants do not breach their fiduciary duties by failing to make disclosures regarding revenue sharing that are not required by the statutory scheme promulgated by Congress and enforced by the DOL."), attached as Exhibit 30 to the Gigot Decl.; *Taylor v. United Techs. Corp.*, No. 3:06cv1494, 2007 U.S. Dist. LEXIS 57807, at *12 (D. Conn. Aug. 9, 2007) (same), attached as Exhibit 31 to the Gigot Decl.[16] Nor is the second situation present, because Plaintiffs here do not allege that they asked an ERISA fiduciary any questions about the Plans, much less about the four categories of fee and expense information Plaintiffs allege was not disclosed.

**C. The Prudence and Disclosure Claims of the Alleged "Bond Fund Subclass" (Counts VI and IX) Fail to State Viable Claims for Relief under ERISA.**

Counts VI-X purport to assert claims on behalf of participants in the Merged Plan or Legacy Plan whose accounts were invested in the RMK Select High Income Bond Fund and the RMK Select Intermediate Bond Fund (the alleged "Bond Fund Subclass") between January 1, 2007 and the present. (Compl. ¶ 5.) These claims seek to impose liability under ERISA on various Defendants for alleged losses resulting from Plan-based investments in the RMK Select High Income Fund and the RMK Select Intermediate Bond Fund (together, the "Bond Funds"). The core claims alleged in Counts VI and IX (the Bond Fund Prudence and Disclosure Claims)

---

[16] To be sure, DOL has issued proposed regulations that would require disclosure of some additional fee-related information for 401(k) plans. But these proposed regulations are not yet law, so they serve only to underscore that current law imposes no such disclosure duty. *See Taylor*, 2007 U.S. Dist. LEXIS 57807, at *12-13 ("[R]ecent proposals to amend the regulations to require revenue sharing disclosures make it apparent that ERISA fiduciaries are under no present duty to do so.") (citing 71 Fed. Reg. 41,392, 41,394); *Martin*, 2008 U.S. Dist. LEXIS 99465, at *11.

will be addressed here.  The remaining claims (Counts VII, VIII and X) are merely derivative of the core claims and are addressed collectively in Section III.E, *infra*.

### 1.     The Bond Fund Prudence Claim (Count VI) Fails As a Matter of Law.

In Count VI, Plaintiffs allege that Defendants (other than the "AmSouth Thrift Plan Defendants" listed in Compl. ¶¶ 50-52) breached their duties of loyalty and prudent care under ERISA § 404(a)(1)(A) and (C) by allowing the Bond Funds to remain on the Plans' menus of investment options after January 1, 2007.  Plaintiffs rely on the same factual allegations used to support the prohibited transaction and other "Excessive Fee" claims, namely that the continued use of the Bond Funds as Plan investment options became imprudent and disloyal on January 1, 2007 because "Morgan Keegan is a wholly-owned subsidiary of Regions Financial Corporation" (Compl. ¶ 383) and because the Bond Funds, like all of the RMK Select Funds, purportedly "were selected and maintained because of the fees earned by Morgan Keegan, an affiliated entity and wholly-owned subsidiary of Regions."  (Compl. ¶ 389.)

As discussed in Sections III.B.1 and III.B.3, *supra*, there is nothing inherently wrong, under ERISA, with the use of affiliated mutual funds or with the sharing of mutual fund revenue. *See Hecker*, 556 F.3d at 585; *Braden*, 590 F. Supp. 2d at 1167.  Plaintiffs, therefore, make a series of conclusory allegations to the effect that the Bond Funds had both "excessive investment in high-risk assets that was inappropriate for a fixed income bond fund" (Compl. ¶ 383) and "poor performance and deviation from the stated investment profile and objectives of the Bond Funds."  (Compl. ¶ 389.)  This is unavailing.

First, the Plans were structured to qualify as "ERISA § 404(c) Plan[s]."  (Legacy Plan 2005 SPD, at 10-11 (Gigot Decl., Ex. 5); AmSouth Plan § 1.51 (Gigot Decl., Ex. 2); Merged Plan § 1.51 (Gigot Decl., Ex. 3).)  ERISA § 404(c) qualification contemplates, under modern

portfolio theory,[17] that plan participants will be offered an array of plan investment options "which in the aggregate enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B)(3). Such a portfolio will include some assets with low risk/return characteristics and others with high risk/return characteristics, and no such asset inherently is "imprudent" when viewed in isolation. Therefore, it is legal error under ERISA to consider the risk/return characteristic of one investment vehicle in isolation rather than as part of the portfolio as a whole. *See Laborers Nat'l Pension Fund*, 173 F.3d at 318 (reversing district court for considering risk of interest-only mortgage-backed securities in isolation rather than applying modern portfolio theory).

Second, it is legal error under ERISA to judge an investment by hindsight, as Plaintiffs seek to do here. "The fiduciary duty of care requires prudence, not prescience." *DeBruyne* v. *Equitable Life Assur. Soc'y*, 720 F. Supp. 1342, 1349 (N.D. Ill. 1989). Thus, ERISA requires that a fiduciary's action be judged "under the circumstances then prevailing." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). "[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) (internal quotations omitted); *see also*

---

[17] Modern portfolio theory holds that an investor can optimize overall risk and return by holding a diversified pool of investments having a broad range of risk/return characteristics. *See* 29 CFR § 2550.404a-1(b)(1), (2) (providing, together, that a fiduciary has fulfilled his prudence obligations if he has considered the "role the investment or investment course of action plays in that portion of the plan's investment portfolio . . . taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action" in light of the composition of the portfolio with respect to diversification, liquidity, projected return of the portfolio, and the funding objectives of the plan); *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir. 1999) ("[T]he regulations [29 CFR § 2550.404a-1] provide that the fiduciary shall be required to act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness.").

*Donovan*, 716 F.2d at 1467; *Glennie*, 912 F. Supp. at 1000.  Here, Plaintiffs' Complaint is devoid of any specific allegations about the fiduciary process for selecting and monitoring the Bond Funds.

### 2. The Bond Fund Disclosure Claims (Count IX) Fail as a Matter of Law.

Count IX, which is brought only against the members of the RBMC (Compl. ¶ 411), complains only about the failure to disclose additional information concerning the inner workings of the Bond Funds, not information pertaining to the Plans' investment in those Funds. (Compl. ¶¶ 412, 415 (alleging failure to disclose the Bond Funds' "exposure to poor quality asset and mortgage backed securities, and CDOs and related derivatives," failure to diversify, and investment strategy and volatility); *see also id.* ¶ 259.)  Yet the Complaint alleges neither facts supporting the theory that RBMC members were aware of the inner workings of the Bond Funds,[18] nor an ERISA requirement that they be so aware, or disclose it to participants in the Plans.[19]  For all of these reasons, Plaintiffs' disclosure claim concerning the Bond Funds must be dismissed.

### D. The Complaint Fails to Allege Facts Sufficient to Establish That Certain Defendants Functioned as ERISA Fiduciaries.

All claims against C. Dowd Ritter, David Turner, Jill Shelton, Chris Glaub, Sherry Anthony, and Barbara Watson fail for the additional reason that the Complaint nowhere alleges

---

[18]     To the extent Plaintiffs argue that Regions' status as the parent company of Morgan Keegan allows them to impute knowledge of the Bond Funds' internal workings to Regions, such claim is of no avail because Count IX is brought against the individual members of the RBMC, not against Regions itself.  Indeed, Count VIII alleges that information about the Bond Funds' investments was *not* provided to the fiduciaries who could have used it to avoid offering the Bond Funds as investment options.  (Compl. ¶¶ 406-07.)  Of course, Count VIII in turn fails because Morgan Keegan and MAM are not alleged to be fiduciaries (Complaint ¶¶ 44-45) and because the Complaint does not allege any facts whatsoever indicating that Regions or the Compensation Committee Defendants had any knowledge of the inner workings of the Bond Funds.  Plaintiffs' claims are inadequate when taken separately, and each is dependent upon the other.  They cannot bootstrap one another into sufficiency.

[19]     Relief from inadequate disclosures regarding the Bond Funds may be pursued under the securities laws, not ERISA.  *See In re Tyco Int'l Ltd. Multidistrict Litig.*, No. 02-1357-PB, 2004 U.S. Dist. LEXIS 24272, at *22 (D.N.H. Dec. 2, 2004), attached as Exhibit 32 to the Gigot Decl.; *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 837 (N.D. Cal. 2005).

facts sufficient to establish that these Defendants functioned as ERISA fiduciaries with respect to the actions and inactions at issue in the underlying Prudence, Disclosure and Prohibited Transaction Claims in Counts I, IV, VI, IX, XI, XIII, and XV of the Complaint.

There are only two ways for a person to acquire fiduciary status under ERISA. First, a person can be designated as a "named fiduciary" for purposes of ERISA § 402(a), 29 U.S.C. § 1102(a). *Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 828 (6th Cir. 2007). Plaintiffs make no allegation that Mr. Ritter, Mr. Turner, Ms. Shelton, Mr. Glaub, Ms. Anthony or Ms. Watson, are (or were) among any of the Plans' named fiduciaries.

Second, a person may acquire fiduciary status under ERISA by performing one of the fiduciary functions described in ERISA § 3(21). 29 U.S.C. § 1002(21); *see also Pfahler*, 517 F.3d at 828; *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."); *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006) (explaining that "'[f]iduciary status . . . is not an all or nothing concept,' and that [courts] must therefore 'ask whether a person is a fiduciary with respect to the particular activity in question.'") (quoting *Moench*, 62 F.3d at 561); *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001) ("[A] person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions."). As the Supreme Court explained:

> [T]he statute does not describe fiduciaries simply as administrators of the plan, or managers or advisers. Instead it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan. . . . In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram*, 530 U.S. at 225-26 (citations omitted); *see also Seaway Food Town, Inc. v. Med. Mut.*,

347 F.3d 610, 617 (6th Cir. 2003) (same).

Here, the underlying Prudence, Disclosure and Prohibited Transaction claims concern the selection or management of Plan investment options, or the disclosure of information to Plan participants. Although Plaintiffs allege that the Committee Defendants had fiduciary authority, control or responsibility with respect to certain of those functions, Plaintiffs do not allege that Messrs. Ritter, Turner or Glaub, or Mmes. Shelton, Anthony or Watson participated as voting members of any of these Plan Committees. Nor do Plaintiffs allege that these individuals had any other kind of authority, control or responsibility for management or investment functions, or that they were Plan Administrators or were delegated any authority from the Plan Administrator for making disclosures to Plan participants. Rather, the sole factual bases for the alleged fiduciary status of these individuals, all of which are insufficient, are as follows:

- **C. Dowd Ritter:** The Complaint alleges only that, "[a]s Director, Chairman, President, and CEO of Regions, [C. Dowd Ritter] has been a fiduciary to the [Plans] with authority to appoint the Compensation Committee members." (Compl. ¶¶ 49.A, 52.A, 56.A.)

  o This is unavailing because fiduciary responsibility does not flow from one's position on a board of directors but from actual performance of fiduciary functions.[20] 29 CFR 2509.75-8 ("Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of [ERISA]."); *Shirk*, 2009 U.S. Dist. LEXIS 24490, at *43-44; *In re Calpine Corp. ERISA Litig.*, No. C-03-1685 SBA, 2005 U.S. Dist. LEXIS 9719, at *10 (N.D. Cal. Mar. 31, 2005) ("Indeed, directors are only fiduciaries to the extent that they perform the functions of a fiduciary."), attached as Exhibit 33 to the Gigot Decl.

---

[20]     The only act Plaintiffs cite regarding Mr. Ritter is that, as a member of the Board, he had a vote in determining the membership of the Compensation Committee, whose responsibilities include appointing another committee that selected investment options for the Plans. This action is too far removed from any type of fiduciary discretion or authority to succeed in drawing Mr. Ritter into liability. Moreover, even if Mr. Ritter's appointment of Compensation Committee members were a fiduciary act, the Complaint is utterly devoid of any allegation that such appointments were imprudent. *Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (dismissing claims against board members where allegations did not extend to the limited fiduciary obligations board members had—to appoint, retain, or remove members of plan's investment committee).

- **David Turner, Jill Shelton and Chris Glaub:** The Complaint alleges only that these Defendants were "non-voting members" of the RBMC. (Compl. ¶ 47.)

  - The RBMC may take action to exercise its authority and control over the Plans only through voting. (*See* Merged Plan § 1.10 (Gigot Decl., Ex. 3).) Because Mr. Turner, Ms. Shelton and Mr. Glaub had no vote on the RBMC, they did not have or exercise authority or control with respect to the Plans or their assets, as required by ERISA § 3(21). Thus, they are not fiduciaries.

- **Sherry Anthony, Chris Glaub, and Barbara Watson:** Plaintiffs allege that Ms. Anthony, Mr. Glaub and Ms. Watson became Plan fiduciaries solely by signing Forms 5500 or 11-K on behalf of Regions.[21] (Compl. ¶¶ 49, 52.)

  - Under ERISA, performing ministerial acts does not give rise to fiduciary liability. *See In re Tyco Int'l Ltd. Multidistrict Litig.*, 2004 U.S. Dist. LEXIS 24272, at *11 ("Ministerial action[s] of this sort [signing SEC filings] do not give rise to fiduciary responsibilities.").

  - Moreover, the Legacy Plan clearly states that Regions is the Plan Administrator. (Legacy Plan § 1.2 (Gigot Decl., Ex. 1).) Ms. Anthony and Mr. Glaub were, at various times when the Legacy Plan was in effect, assigned this administrative task for Regions. They were not thereby transformed into the Plan Administrator in contravention of the Plan document.

  - Form 11-K states that Regions Bank was the trustee of the AmSouth Plan and that Ms. Watson signed on that trustee's behalf. (Regions Fin. Corp., Annual Report of Employee Stock Purchase, Savings and Similar Plan, (Form 11-K), at signature page (June 29, 2007), attached as Exhibit 34 to the Gigot Decl.) Signing the 11-K did not make Ms. Watson the Plan trustee as a matter of fact or law.

In short, the Complaint's factual allegations are insufficient, as a matter of law, to establish that Messrs. Ritter, Turner or Glaub, or Mmes. Shelton, Anthony or Watson had any fiduciary authority or responsibility with respect to the acts or omissions at issue in Counts I, IV, VI, IX, XI, XIII, and XV of the Complaint. Those Defendants are entitled to dismissal of all

---

[21]   Plaintiffs make similar allegations with respect to administrative duties carried out by Harry Dinken, Tusa McNary, and John Daniel. (Compl. ¶ 49.) For the reasons discussed herein, these Defendants' acts of signing Forms 5500 or 11-K are not sufficient to make them Plan fiduciaries. These Defendants are, however, also alleged to be plan fiduciaries due to their membership on either the RBMC or the Regions Benefits Administration Committee.

such claims against them.

**E.    The Monitoring, Co-Fiduciary Disclosure and Co-Fiduciary Liability Claims (Counts II, III, V, VII, VIII, X, XII and XIV) Are Legally Deficient and Should Be Dismissed.**

For each of the three sets of core prudence and disclosure claims (*see* Sections III.A-C, *supra*), Plaintiffs also allege a corresponding set of "monitoring," "co-fiduciary disclosure" and "co-fiduciary liability" claims against additional Defendants alleged to have indirect responsibility for the underlying breaches of duty.  Plaintiffs allege that these Defendants have indirect responsibility (i) because they allegedly failed adequately to monitor the alleged fiduciaries (Counts II, VII and XII) (together, the "Monitoring Claims"), (ii) because they allegedly failed to provide needed materials or information to the alleged fiduciaries (Counts III and VII) (together, the "Co-Fiduciary Disclosure Claims") or (iii) because they allegedly knew of breaches of duty by others yet failed to take adequate steps to prevent or to remedy those breaches (Counts V, X, and XIV) (the "Co-Fiduciary Liability Claims").  Because Plaintiffs have failed to adequately plead the core Prudence and Disclosure Claims (*see* Sections III.A-C, *supra*) the Monitoring Claims, Co-Fiduciary Disclosure Claims, and Co-Fiduciary Liability Claims fail as a matter of law.  *See, e.g.*, *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 616 (N.D. Tex. 2008); *Ward v. Avaya, Inc.*, 487 F. Supp. 2d 467, 481 (D.N.J. 2007), *affirmed at* 503 F.3d 340, 349 n.15; *Huntington Bancshares*, 2009 U.S. Dist. LEXIS 9102, at *38 ("Defendants argue that because Plaintiffs have not adequately pleaded the existence of any underlying fiduciary breach, the tag-along claims [for failure to monitor, failure to disclose information to co-fiduciaries and co-fiduciary liability] fail as well.  This Court agrees."); *Shirk*, 2009 U.S. Dist. LEXIS 24490, at *59.  Accordingly, the Monitoring, Co-Fiduciary Disclosure and Co-Fiduciary Liability Claims (Counts II, III, V, VIII, IX, X, XII and XIII) should be dismissed.

**F.      ERISA § 404(c) Bars Recovery Because Participants in the Plans Exercised Investment Control Over Their Own Plan Accounts.**

Because the participants in the Plans exercised investment control over their own Plan accounts, ERISA § 404(c) bars recovery.  This is dispositive of all claims, and the Court may dismiss the Complaint on this basis alone.

ERISA § 404(c) exempts plan fiduciaries from liability for losses to individual accounts that result from participants' own investment decisions.  Specifically, ERISA § 404(c) provides that, where a plan "provides for individual accounts and permits a participant to exercise control over the assets in his account," no fiduciary "shall be liable . . . for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control."  29 U.S.C. § 1104(c).  In other words, where a participant chooses his own investments within a plan, a plan sponsor or fiduciary "cannot be a guarantor of outcomes for participants."  *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 312 (5th Cir. 2007)  Rather, "[i]f particular participants lost money or did not earn as much as they would have liked, that disappointing outcome was attributable to their individual choices."  *Hecker*, 556 F.3d at 590.

Department of Labor regulations explain that a plan qualifies as a Section 404(c) plan if plan participants (1) are informed that the plan is intended to be a 404(c) plan, *see* 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i); (2) have the opportunity to exercise control over their individual accounts, *see id*. § 2550.404c-1(b)(2)(ii); (3) are offered a broad range of investment alternatives, *see id.* § 2550.404c-1(b)(3); and (4) indeed exercise control over their individual accounts, *see id*. § 2550.404(c)).  The Merged Plan meets (and both the Legacy Plan and AmSouth Plan met) all of these requirements.  The Plan documents and their SPDs specifically inform participants that they are intended to be "Section 404(c) Plans."  (Legacy Plan 2005 SPD, at 10-11 (Gigot Decl., Ex. 4); AmSouth Plan § 1.51 (Gigot Decl., Ex.2); Merged Plan § 1.51 (Gigot Decl., Ex.

3).)  These materials likewise demonstrate that the Plans offered participants a broad range of investment options and expressly permitted participants to direct their own investment choices. *See* section II.B, *supra*.  Indeed, the Complaint demonstrates that Plaintiffs made such investment choices.

Participants could invest their own contributions among any of at least thirteen diversified mutual funds or in an ESOP Fund.  At all times relevant to the Company Stock Claims in the Complaint, participants also could immediately move to any other fund within the Plan those employer contributions initially allocated to the ESOP Fund.  As a result, any losses allegedly suffered by having money allocated to one investment fund rather than another are attributable to participants' own investment decisions, and the Plans' fiduciaries cannot be held liable for those decisions.  *See Langbecker*, 476 F.3d 299 (remanding order certifying class for reasons that included district court's failure to consider application of ERISA § 404(c) defense to ERISA "stock drop" claims); *Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 976 (W.D. Wis. 2007) (dismissing on Section 404(c) grounds claim that mutual fund investment options were imprudent because of allegedly excessive fees), *aff'd on other grounds*, 556 F.3d 575 (7th Cir. 2009).  For these reasons, the Plans' losses are attributable to decisions by the Plan participants, and Plaintiffs have failed to state a claim for breach of fiduciary duty.

## IV.    CONCLUSION

For the foregoing reasons, the Regions Defendants respectfully request that this Court dismiss the claims against them in their entirety.


Respectfully submitted by,


s/ Thomas S. Gigot

Thomas F. Fitzgerald (admitted *pro hac vice*)
Thomas S. Gigot (admitted *pro hac vice*)
Christopher J. Rillo (admitted *pro hac vice*)
Sarah A. Zumwalt (admitted *pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5811
Phone: 202-857-0620
Fax:     202-659-4503
Email: tff@groom.com
         tsg@groom.com
         crillo@groom.com
         szumwalt@groom.com

Peter S. Fruin
Jeffrey A. Lee (admitted *pro hac vice*)
William B. Wahlheim (admitted *pro hac vice*)
Grace R. Murphy (admitted *pro hac vice*)
**MAYNARD COOPER & GALE, PC**
1901 – 6th Avenue North, Suite 2400
Birmingham, AL 35203-2602
Phone: 205-254-1068
Fax:     205-254-1999
Email: pfruin@maynardcooper.com
         jlee@maynardcooper.com
         wwahlheim@maynardcooper.com
         gmurphy@maynardcooper.com

***Counsel for the Regions Defendants***

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on April 10, 2009, a true and correct copy of the foregoing document was forwarded by electronic means through the Court's ECF System to the following individuals:

Derek W. Loeser
Lynn L. Sarko
Margie E. Wetherald
Karin B. Swope
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Phone: 206-623-1900
Fax: 206-623-3384
Email: lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
mwetherald@kellerrohrback.com
kswope@kellerrohrback.com
*Plaintiffs' Interim Co-Lead Counsel*

Ellen M. Doyle
William T. Payne
John Stember
Stephen M. Pincus
Joel R. Hurt
Pamina Ewing
**STEMBER FEINSTEIN DOYLE & PAYNE, LLC**
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: 412-281-8400
Fax: 412-281-1007
Email: edoyle@stemberfeinstein.com
wpayne@stemberfeinstein.com
jstember@stemberfeinstein.com
spincus@stemberfeinstein.com
jhurt@stemberfeinstein.com
pewing@stemberfeinstein.com
*Plaintiffs' Interim Co-Lead Counsel*

W. Brantley Phillips
Matthew M. Curley
Michael L. Dagley
**BASS BERRY & SIMS PLC**
315 Deaderick Street, Suite 2700
Nashville, TN 37238-0002
Phone: 615-742-6200
Fax:    615-742-2803
Email:  bphillips@bassberry.com
          mcurley@bassberry.com
          mdagley@bassberry.com
*Counsel for Morgan Asset Management, Inc.*
*& Morgan Keegan & Company, Inc.*

Michael A. Brady
Shepherd B. Tate
**BASS BERRY & SIMS PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103
Phone: 901-543-5900
Fax:    901-543-5999
Email:  mbrady@bassberry.com
          state@bassberry.com

*Counsel for Morgan Asset Management, Inc.*
*& Morgan Keegan & Company, Inc.*

Signed:        <u>s/ Thomas S. Gigot</u>